**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THOMAS L. PAYNE, SID ARCHINAL, )
GARY H. KARESH, JO ANN KARESH, )
BELCA D. SWANSON AND MERLE K. )
SWANSON, individually and on behalf )
of all others similarly situated, )
 )
   Plaintiffs, ) <u>CLASS ACTION</u>
 )
   vs. )
 ) CA No. 02-1927
ANTHONY J. DeLUCA, HARRY J. )
SOOSE, FRANCIS J. HARVEY, JAMES C. )
McGILL, RICHARD W. POGUE, )
DANIEL A. D'ANIELLO, PHILLIP B. )
DOLAN, E. MARTIN GIBSON, ROBERT F. )
PUGLIESE, JAMES DAVID WATKINS, )
and THE CARLYLE GROUP, )
 )
   Defendants. )

<u>**MEMORANDUM OPINION**</u>

 Pending before the Court is Defendants' Motion to Dismiss the Second Amended Class Action Complaint ("SAC"), Docket No. 73.  For the reasons discussed below, the Motion is granted in its entirety and Plaintiffs' complaint is dismissed with prejudice.

**I.** **BACKGROUND**

 A. <u>Factual History</u>[1]

 IT Group, Inc. ("ITG" or "the Company"), was a Delaware corporation headquartered in Monroeville, Pennsylvania, whose primary business was providing environmental remediation services to commercial customers and federal government agencies.  In November 1996, Defendant The Carlyle Group ("Carlyle"), a private merchant bank located in Washington, D.C., invested some $45 million in ITG, acquiring more than 46,0000 shares of convertible preferred

---

[1] Unless otherwise noted, the facts in this section are taken from Plaintiffs' Second Amended Class Action Complaint, Docket No. 70.

stock and 1.2 million shares of common stock, giving it approximately 25% of the voting power of the Company.  As holder of the preferred stock, Carlyle was paid an annual stock dividend of $6.36 million, regardless of the performance of IT Group and regardless of the value of ITG stock to open-market investors.

By virtue of its position as principal holder of the convertible preferred stock, Carlyle had the right to elect one fewer than the majority of directors and to vote with the common shareholders on the election of other directors.  Carlyle was thereby able to install one of its managing directors, Defendant Daniel D'Aniello, as Company chairman, and named four other members of the ITG Board of Directors – Defendants Philip Dolan, Martin Gibson, Robert F. Pugliese, and James David Watkins.   Although Defendant Francis J. Harvey had no formal affiliation with Carlyle, he served on two other boards at Carlyle-controlled companies and served on the ITG Board "at Carlyle's behest."  (SAC, ¶ 85.)  Other directors were Defendants James C. McGill and Richard W. Pogue. Anthony J. DeLuca served as President and Chief Executive Officer ("CEO"); Defendant Harry J. Soose was Senior Vice President and Chief Financial Officer.[2]

Soon after Carlyle took control of the Company, ITG embarked on an aggressive plan of growth and diversification through acquisition.  Between 1997 and 2000, the Company acquired eleven domestic and international companies, many of which had been competitors in the environmental remediation field.  To finance these acquisitions, ITG took the following steps:

- In February through June 1998, in connection with its acquisition of OHM Corporation, ITG obtained a $240 million credit facility which was later refinanced to consist of an eight-year $228 million amortizing term loan and a six-year, $185 million revolving credit facility.

- In December 1998, when acquiring Fluor Daniel GTI, Inc., the Company borrowed $20 million in cash from Fluor Daniel and financed the remaining $51.4 million of purchase and transaction costs using cash on hand and its revolving credit facility.

---

[2] Collectively, Messrs. DeLuca, Soose, Harvey, McGill, Pogue, D'Aniello, Dolan, Gibson, Pugliese and Watkins will be referred to as the "Individual Defendants."

- To finance its acquisitions of Roche Limited Consulting Services and EFM Group in the spring of 1999 and to refinance existing indebtedness in the revolving credit facility, ITG issued $225 million of ten-year senior subordinated notes for net proceeds of $216 million.

The acquisitions and diversification boosted ITG revenues from $400 million in 1996 to approximately $1.4 billion in 2000.  However, by the spring of 2000, the Board of Directors realized that the Company's strategy of "growth by acquisition" had failed for a number of reasons:

- the increase in revenue, although significant, was not sufficient to offset the debt which financed the acquisitions;

- ITG had difficulty managing the diversity of the acquired companies and the businesses they performed, in part because of turnover among key personnel in those companies;

- several of the acquired entities did not perform as well as expected;

- the Company did not realize the anticipated cost-savings and other efficiencies expected from consolidation of the acquired businesses, in part because of poor management; and

- the general economic slowdown of the late 1990s.

(SAC, ¶ 87.[3])

The Board of Directors re-focused its attention on debt reduction, recognizing that ITG was having increased difficulty meeting the financial covenants associated with its bank loans.  On March 8, 2000, ITG obtained an additional $100 million, seven-year term loan ("Term C Loan") from its lending banks in an attempt to resolve its liquidity problems.  Although described as a means to support "seasonal business pattern working capital requirements," Plaintiffs allege that, in reality, the Term C Loan was merely a temporary solution to the Company's massive liquidity problems

---

[3]  The SAC provides several additional reasons for the failure of ITG.  Those allegations are derived from other complaints pending against the Company and against the Individual Defendants, e.g., that Carlyle "embarked on an acquisition and debt binge, buying companies for amounts far in excess of their fair value;" and that an unidentified "they" made transfers "for the benefit of insiders, artificially extending the life of the insolvent company to obtain a return on the Carlyle Defendants' equity investment." (SAC, ¶¶  88-90.)  Since such allegations are not factually supported elsewhere in the SAC, they have been ignored in the Court's analysis.

which Defendants concealed from investors.

Late in 2000, ITG agreed with its lenders that in 2001, it would divest itself of "certain non-core assets and implement other measures in order to reduce debt and raise capital." (SAC, ¶ 95.) Plaintiffs contend that as another example of the Company's "general pattern of obfuscation," this divestiture plan extended not only to passive assets such as real estate, but to businesses which had just been acquired in the preceding three or four years.

Despite the ever-increasing liquidity crisis, ITG maintained a public relations campaign designed to reassure the investing public about the Company's stability and bright future. At the same time, a number of allegedly deceptive accounting and managerial practices (discussed in more detail below) were implemented at the direction of Defendants DeLuca and Soose. By September 2001, the Company's line of credit was almost depleted and it was having difficulty meeting its loan covenants. As a result, it was forced to renegotiate the terms of its loans.

On November 13, 2001, Defendant DeLuca announced his resignation as President and CEO; he was replaced by Mr. Harvey. According to Plaintiffs, Mr. Harvey had actually become Mr. DeLuca's de facto superior at the May 2001 Board of Directors meeting when he was named vice chairman of ITG. Plaintiffs claim that Carlyle required Mr. DeLuca's ouster "due to the [Company's] severe financial situation." (SAC, ¶¶ 86, 98.)

By December 7, 2001, even the questionable accounting practices instituted by Messrs. DeLuca and Soose were not sufficient to keep ITG afloat and it was forced to admit to its lenders that without an emergency loan of $35 million, it would be bankrupt by January 4, 2002. The lenders refused to advance more funds; Carlyle refused to invest additional monies. Although ITG immediately retained workout and restructuring specialists, the Company acknowledged at a second meeting with the banks on December 18, 2001, that its liquidity and leverage problems prevented it from obtaining new contracts with its largest customer, the federal government. On December 27, 2001, the Company publicly announced to investors that a bankruptcy filing could

be expected.  On January 16, 2002, just three weeks later, ITG filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.[4]

      B.    Procedural History

          On May 31, 2002, Plaintiff Thomas L. Payne filed a class action suit in the United States District Court for the District of Nevada , alleging that Defendants DeLuca and Soose had issued public statements which failed to disclose the magnitude of the Company's financial difficulties and perpetrated a fraudulent scheme to artificially inflate the price of ITG's shares. (Complaint, ¶ 4.)  Mr. Payne brought suit "behalf of all other persons or entities who purchased or acquired [ITG] common stock during the Class Period and were damaged thereby."  (Id., ¶ 17.) The Class Period was defined as February 24, 2000, through January 15, 2002.

          On October 4, 2002, Mr. Payne, Sid Archinal, Gary H. Karesh, Jo Ann Karesh, Belca D. Swanson and Merle K. Swanson were approved by the District Court in Nevada as Lead Plaintiffs. Based on the relationship of this suit to Staro Asset Management LLC v. DeLuca et al., CA No. 02-886, already pending in this Court, the parties stipulated to a transfer of the action to this District.

          Plaintiffs then filed an Amended Complaint on February 28, 2003 (Docket No. 26), adding the Board members and The Carlyle Group as Defendants.  Defendants moved to dismiss the Amended Complaint on June 9, 2003 (Docket No. 38), which the parties continued to brief until June 10, 2004, adding evidence and argument as information emerged from the Company's bankruptcy proceedings in the U.S. District Court for the District of Delaware.

          On December 16, 2004, the Court issued a Memorandum Opinion, granting the motion to dismiss for failure of Plaintiffs to allege scienter with the particularity required by the Private Securities Litigation Reform Act ("Reform Act" or "PSLRA"), 15 U.S.C. § 78u et seq.  However, the dismissal was without prejudice and Plaintiffs were directed to file a Second Amended Class Action

---

[4] Because of this bankruptcy, IT Group, Inc., is not a defendant herein.

Complaint. (Docket No. 68.) Defendants moved to dismiss the Second Amended Complaint on May 27, 2005.

      C.    <u>Jurisdiction and Venue</u>

      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1337, Section 27 of the Securities Exchange Act of 1934 ("the 1934 Act.") Plaintiffs claim that Defendants violated Sections 10(b) and 20 (a) of the 1934 Act, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the Securities and Exchange Commission ("SEC.")

      Venue is appropriate in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) inasmuch as many of the acts giving rise to the violations alleged herein occurred in this District.

## II.    STANDARD OF REVIEW – MOTION TO DISMISS

      Unlike a typical civil matter, a securities fraud action is subject to a pyramid of requirements in order to withstand a motion to dismiss for failure to state a claim upon which relief can be granted. The base of the pyramid is established by Federal Rule of Civil Procedure 12(b)(6), which in general requires the court to

> accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party. . . . Dismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

<u>In re Rockefeller Ctr. Props., Inc. Secs. Litig.</u>, 311 F.3d 198, 215 (3d Cir. 2002) (internal citations omitted.)

      The inquiry under Rule 12(b)(6) "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." <u>In re Rockefeller Ctr.</u>, <u>id.</u> The court is not required, however, to credit "bald assertions or legal conclusions," nor may "legal conclusions draped in the guise of factual allegations . . . benefit from the presumption of truthfulness." <u>Id.</u> at 216.

      As a general matter under Rule 12(b)(6), a court may not consider matters extraneous to

the pleadings without treating the motion as one for summary judgment and giving all parties reasonable opportunity to present materials pertinent to such a motion under Rule 56.   An exception is made, however, for a "document integral to or explicitly relied upon in the complaint," and it has been long established that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted.)  In securities fraud actions, it is equally well-established that a court may consider public filings such as quarterly and annual reports filed with the SEC.[5]  Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

In such a case, the court must also apply Rule 9(b), requiring that "in all averments of fraud, . . . the circumstances constituting fraud . . . shall be stated with particularity."  Fed.R.Civ.P. 9(b).  As the Third Circuit Court of Appeals has repeatedly held, "this particularity requirement has been rigorously applied in securities fraud cases."  In re Rockefeller Ctr., 311 F.3d at 216, *citing* In re Burlington, 114 F.3d at 1417.  Although Rule 9(b) does not demand that a plaintiff present every material detail of the fraud such as date, location, and time, plaintiffs must use "'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"  In re Rockefeller Ctr., id., *quoting* In re Nice Sys. Ltd. Secs. Litig., 135 F. Supp.2d 551, 577 (D. N.J. 2001).  The heightened pleading standard of Rule 9(b) "gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements."  In re Burlington, 114 F.3d at 1418.

At the top of pyramid, the Reform Act adds a further  requirement, i.e., that "the complaint

---

[5]  As a public entity trading on the New York Stock Exchange, ITG was required to file quarterly and year-end reports with the Securities and Exchange Commission. Under Sections 13(a) and 15(d) of the 1934 Act, any company offering registered securities must file a comprehensive annual report with the SEC on Form 10-K within 90 days of the close of the company's fiscal year.  15 U.S.C. § 78m; 17 C.F.R. § 240.13a-1.  Similarly, a quarterly report must be filed on Form 10-Q within 45 days after each of the company's first three fiscal quarters.  17 C.F.R. §§ 240.13a-13.

shall, with respect to each act or omission alleged to violate this title, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  Courts have interpreted this language to mean that while under Rule 9(b) malice, intent, knowledge, and other mental states may be averred generally in suits claiming fraud, the Reform Act requires more than vague or unspecific allegations concerning each defendant's state of mind at the time in question.  In re Rockefeller Ctr., 311 F.3d at 224.  Heightened particularity also applies to statements which are alleged to have been misleading or false, requiring the plaintiff to state with regard to each such statement "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  "If a complaint fails to comply with the PSLRA's pleading requirements, dismissal is mandatory."  GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004), citing 15 U.S.C. § 78u-4(b)(3)(A).

## III.   APPLICABLE LAW – COUNT I

### A.   Count I – Violation of Section 10(b) of the Securities Exchange Act

In Count I of the Second Amended Complaint, Plaintiffs allege that each Individual Defendant violated Section 10(b) of the 1934 Act.  In particular, Plaintiffs allege:

> At all relevant times, the Defendants, individually and in concert, directly and indirectly, . . . engaged and participated in a continuous course of conduct whereby they knowingly and/or recklessly made and/or failed to correct public representations which were or had become materially false and misleading regarding [ITG's] financial results and operations.  This continuous course of conduct resulted in the Defendants causing [ITG] to publish public statements which they knew, or were reckless in not knowing, were materially false and misleading, in order to artificially inflate the market price of [ITG] stock and which operated as a fraud and deceit upon the members of the Class.

> The Individual Defendants are liable as direct participants in and as a controlling persons [sic] of the wrongs complained herein.  By virtue of their positions of control and authority as officers and directors of [ITG] the Individual Defendants were able to and did, directly or indirectly, control the content of the aforesaid statements relating to the Company, and/or the failure [sic] to correct those statements in timely

fashion once they knew or were reckless in not knowing that those statements were no longer true or accurate.  The Individual Defendants caused or controlled the preparation and/or issuance of public statements and the failure to correct such public statements containing misstatements and omissions of material facts as alleged herein.

(SAC, ¶¶ 483-484.)

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Among the rules and regulations promulgated under Section 10(b), Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)      To employ any device, scheme, or artifice to defraud,. . .

(b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In a securities fraud action brought pursuant to Section 10(b) and Rule 10b-5, the basic elements to be alleged by a plaintiff are: (1) a material misrepresentation or omission by the defendant; (2) scienter, i.e., a wrongful state of mind on the part of the defendant; (3) in connection with the purchase or sale of a security; (4) reliance, often referred to in fraud-on-the-market cases as "transaction causation;" (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.  Dura Pharmaceuticals, Inc. v. Broudo, 554

U.S. 336, 125 S.Ct. 1627, 1631 (2005).

Before we address the question of whether the Second Amended Complaint satisfies each of these elements, we digress to consider two bodies of law which pertain to the allegations therein, the fraud-on-the-market doctrine, and legal theories which may provide some protection for statements which might otherwise be actionable as fraudulent misrepresentations or omissions.

B.      Fraud-on-the-Market

Under traditional securities fraud analysis, the plaintiff was required to prove that he purchased or sold securities in reliance on the defendant's misrepresentations, i.e., that he was aware of and directly misled by a specific representation. *See* Semerenko v. Cendant Corp., 223 F.3d 165, 178 (3d Cir. 2000). In recent years, however, courts have applied a "fraud-on-the-market" doctrine to the sale and purchase of securities traded on an efficient open market[6] where face-to-face transactions are rare. *See* Basic, Inc. v. Levinson, 485 U.S. 224, 241-243 (1988); Semerenko, id. Under this theory, a plaintiff is entitled to three presumptions: (1) the market price of the security incorporated the alleged misrepresentations (or omissions), (2) the plaintiff relied on the market price as an indicator of the security's value, and (3) the plaintiff acted reasonably in relying on the security's market price. Semerenko, 223 F.3d at 179; Basic, Inc., 485 U.S. at 248-249.[7] In short, plaintiffs relying on a fraud-on-the-market theory are alleging that the defendants' misleading statements "caused injury, . . . not through the plaintiffs' direct reliance upon them, but

---

[6] For a comprehensive analysis of an "efficient market," *see* Bowe v. PolyMedica Corp. (In re PolyMedica Corp. Sec. Litig.), 432 F.3d 1, 16-50 (1st Cir. 2005). Because ITG stock was traded on the New York Stock Exchange which is undisputedly an efficient market, we need not perform the type of analysis presented in PolyMedica.

[7] These presumptions of reliance may be rebutted by showing that (1) the market did not respond to the alleged misrepresentations, (2) the plaintiff did not rely on the market price when making his investment decision, or (3) the plaintiff's reliance was unreasonable. Semerenko, 223 F.3d at 179 and n7. Defendants do not offer any of these rebuttal arguments, arguing only that investors were given repeated, escalating warnings of the risks associated with ITG's liquidity problems and substantial indebtedness. (Defs.' Memo at 31.) Truth-on-the-market analysis is intensely fact specific and thus seldom appropriate at the pleading stage. Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 (2d Cir. 2000).

by dint of the statements' inflating effect on the market price of the security purchased."  Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1218 (1st Cir. 1996).  In the Third Circuit, an efficient market is defined as one in which "information important to reasonable investors . . . is immediately incorporated into stock prices."  In re Burlington, 114 F.3d at 1425 (citation omitted.)

Here, Plaintiffs allege that the market for ITG securities was efficient because:

- the stock was listed and actively traded on the New York Stock Exchange, a highly efficient market;

- ITG's average trading volume during the Class Period was in excess of 96,000 shares and it had market capitalization during the Class Period in excess of $165 million;

- the Company regularly communicated with public investors via established market communication mechanisms, e.g., press releases, communications with the financial press, and periodic conference calls with securities analysts; and

- securities analysts at major brokerage firms made their reports about ITG widely available to brokerage sales personnel and thence to customers.

(SAC, ¶ 478.)

Plaintiffs contend that the market for ITG securities promptly absorbed current information about the Company – including the alleged misrepresentations – and that the information was reflected in the prices at which the stock traded.  Therefore, the fraud-on-the-market theory applies to all purchases of ITG securities by members of the Class during the Class Period.  (SAC, ¶ 479.)

Defendants do not dispute Plaintiffs' argument that they are entitled to the presumption of reliance in either their Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Docket No. 74, "Defs.' Memo.") or their Reply Memorandum in Support of the Motion to Dismiss the Second Amended Class Action Complaint (Docket No. 88.) Therefore, in the analysis which follows, we do not address the element of reliance, the fourth element recognized in Dura.

     C.     The Reform Act's Statutory Safe Harbor and Related Protections

Defendants do dispute, however, Plaintiffs' contention that the statutory "safe

harbor" provided for forward-looking statements does not apply.   Because we discuss the applicability of this doctrine throughout our consideration of the alleged material misrepresentations, we set out the general principles of that doctrine as a threshold matter.  Also, we discuss briefly the "bespeaks caution" doctrine and the law related to "puffery."

   1. *The Statutory Safe Harbor:*  "Concerned about the effect of litigation's specter on corporate disclosure, Congress created in the PSLRA a safe harbor for forward-looking statements."  In re Merck & Co. Sec. Litig., 432 F.3d 261, 272 (3d Cir. 2005), *citing* S. Rep. No. 104-98, at 16, *reprinted in* 1995 U.S.C.C.A.N. 679, 695.  As defined in the Reform Act, a forward-looking statement (written or oral) is one which contains "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." *See* In re Advanta Corp. Sec. Litig., 180 F.3d 525, 536 (3d Cir. 1999), *quoting* 15 U.S.C. § 78u-5(i)(1)(A).  A forward-looking statement may also address "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer."  15 U.S.C.  § 78u-5(i)(1)(B).[8]  Such statements are said to fall within the "statutory safe harbor" of the Reform Act and are not grounds for liability under Section 10(b).  In re Advanta, id.  By definition, statements which are not forward looking are not entitled to protection of the statutory safe harbor provision.  Also explicitly excluded are any forward-looking statements "included in a financial statement prepared in accordance with generally accepted accounting principles."  15 U.S.C. § 78u-5(b)(2)(A).

   In order to fall within the safe harbor, a forward-looking statement must be identified as such

---

  [8]  In addition to the statements described in § 78u-5(i)(1) paragraphs (A) and (B) set out in the text, the Reform Act includes as forward-looking statements: "(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission."  15 U.S.C. § 78u-5(i)(1).

and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872-873 (3d Cir. 2000), *quoting* 15 U.S.C. § 78u-5(c)(1)(A)(i).  Cautionary language must be "extensive yet specific." In re Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1993) (comparing safe harbor cautionary language to that of the bespeaks caution doctrine discussed below.)

The safe harbor provision does not apply, however, if the statement was made by a natural person (as compared to a business entity) who had "actual knowledge" at the time that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B)(i).  A forward-looking statement made by a business entity is protected unless it was made by or with the approval of an executive officer of that entity who had actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B)(ii).  If a forward-looking statement later proves to be erroneous, there is no duty imposed by the Reform Act to update such a statement.  In re Advanta, 180 F.3d at 536; 15 U.S.C.A. § 78u-5(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement.")

In applying the Reform Act safe harbor provision, the court must first look at the statement itself, determine if it is forward-looking, and decide if it is accompanied by adequate  cautionary statements or is otherwise immaterial.  The second step is to consider whether the plaintiff has adequately alleged that the forward-looking statement, even if accompanied by cautionary language, was made with actual knowledge that the statement was false or misleading.  Greebel v. FTP Software, Inc., 194 F.3d 185, 201 (1st Cir. 1999).

2.      *The "Bespeaks Caution" Doctrine:*  Enactment of the PSLRA's safe harbor provision did not do away with the judicially created "bespeaks caution" doctrine.  EP Medsystems, 235 F.3d at 873. "'[B]espeaks caution' is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may

render it immaterial as a matter of law."  In re Trump Casino, 7 F.3d at 364.  The Third Circuit has

strictly delineated, however, the type of accompanying language which is sufficient to trigger

application of the bespeaks caution doctrine.   That language must

> relate directly to that on which investors claim to have relied. . . . [A] vague or
> blanket (boilerplate) disclaimer which merely warns the reader that the investment
> has risks will ordinarily be inadequate to prevent misinformation.  To suffice, the
> cautionary statements must be substantive and tailored to the specific future
> projections, estimates or opinions . . . which the plaintiffs challenge.

EP Medsystems, 235 F.3d at 873.

Like the safe harbor provision, the bespeaks caution doctrine does not protect forward-

looking statements made with actual knowledge of their falsity at the time they are made.   In re

Trump Casino, 7 F.3d at 368.

3.      "Puffery:"   A third source of protection for allegedly false or misleading

statements is the concept of "puffery."   Puffery comes into play when a court is considering the

materiality of statements alleged to have been misleading.  While materiality determinations are

typically reserved for the trier of fact, "complaints alleging securities fraud often contain claims of

omissions or misstatements that are obviously so unimportant that courts can rule them immaterial

as a matter of law at the pleading stage."  In re Burlington, 114 F.3d at 1426.

The Third Circuit has defined puffery as "vague and general statements of optimism . . .

understood by reasonable investors as such."  In re Advanta, 180 F.3d at 538; In re Burlington, 114

F.3d at 1428, n14.  Such "statements of subjective analysis or extrapolations, such as opinions,

motives and intentions" or other types of "soft information" are not actionable because investors

do not rely on such information in making decisions.  In re Advanta, id. at 539; see also Parnes v.

Gateway 2000, 122 F.3d 539, 547 (8th Cir. 1997), pointing out that  "some statements are so vague

and such obvious hyperbole that no reasonable investor would rely upon them."

The context in which optimistic statements are made is critical to the distinction between

misrepresentation and puffery.  In re Lucent Technologies, Inc. Sec. Litig., CA No. 00-621, 2002

U.S. Dist. LEXIS 11556 at *77 (D. N.J. June 26, 2002).   In general, the more the statement diverges from known facts about the entity or the more precise and concrete the statement, the less likely courts have been to dismiss the statement as inactionable puffery.  *See* Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353, 372 (5th Cir. 2004).

The source of the comment also plays a role in determining if general statements of optimism are actionable.  Statements of opinion by top corporate officials may be actionable if they are made without a reasonable basis.  Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1099 (1991).  The Court distinguished such statements from ordinary, unattributed expressions of optimism because such statements "can be materially significant to investors because investors know that these top officials have knowledge and expertise far exceeding that of the ordinary investor."  In re Burlington, 114 F.3d at 1428, *citing* Virginia Bankshares, 501 U.S. at 1090-1091.

"If a statement meets the definition of mere puffery and hence, is immaterial as a matter of law, it is irrelevant whether the statement is forward-looking or made with actual knowledge that it is false."  California Pub. Emples. Ret. Sys. v. Chubb Corp., ("CALPERS"), CA No. 00-4285, 2002 U.S. Dist. LEXIS 27189, *34, n13 (D. N.J. June 26, 2002).

## IV.   ANALYSIS OF COUNT I

We turn now to analysis of each of the critical Dura elements, scienter and the existence of material misrepresentations which proximately caused Plaintiffs' losses.

### A.   Scienter

Normally, analysis of a securities fraud action would begin with a discussion of the statements alleged to be material misrepresentations or omissions by the defendant.  However, we begin with the concept of scienter because we conclude that for the second time, Plaintiffs have failed to allege that all but two of the Individual Defendants acted with the wrongful state of mind necessary to state a claim against them under the Reform Act.

The Third Circuit Court of Appeals defines scienter as

15

> a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable conduct, involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

In re IKON Office Solutions, Inc., 277 F.3d 658, 667 (3d Cir. 2002)(citations and internal quotations omitted).

The PSLRA requires a plaintiff, "with respect to each act or omission," to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." GSC Partners, 368 F.3d at 237, quoting 15 U.S.C. § 78u-4(b)(2).  A plaintiff may satisfy the "strong inference" requirement in either of two ways: "(a) by alleging facts sufficient to show that defendants had the motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  In re Burlington, 114 F.3d at 1418 (internal quotation omitted).  As we have previously pointed out in this case, the facts giving rise to a strong inference of scienter must be alleged with particularity, meaning that plaintiffs must plead "the who, what, where, when, and how: the first paragraph of any newspaper story." (Docket No. 68 at 11, quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).)

The Third Circuit has concluded that to the extent the general pleading permitted with respect to mental state established in Rule 9(b) conflicts with the PSLRA's heightened scienter requirements, the PSLRA "supersedes Rule 9(b) as it relates to Rule 10b-5 actions."  In re Advanta, 180 F.3d at 531, n5.  The appropriate sanction for complaints which fail to meet the PSLRA scienter requirement is dismissal.  Id. at 531.

1.     Identifying the Individual Defendants:  Because scienter must be determined as to each Individual Defendant, we first briefly outline their roles with ITG.  Plaintiffs provide the following information about the ten Individual Defendants who are alleged to have violated Section 10(b).  Officers are listed first, followed by members of the Board of Directors.

- **Anthony DeLuca**:  Chief Executive Officer, President, and Director of ITG from 1996 when the Company was taken over by Carlyle until he was forced to resign in

November 2001.  Had been with ITG in senior management positions since March 1990.  (SAC, ¶ 40.)  The only Individual Defendant identified in the SAC as being a stockholder in ITG.  (<u>Id.</u>, ¶ 99.)

- **Francis J. Harvey**:   Replaced Mr. DeLuca as Acting CEO and President in November 2001 upon the latter's termination.  Director of ITG from 1999 through 2002; was a member of the Board of Directors' executive committee and the compensation committee.  Served on the boards of other companies in which Carlyle had major investments. (SAC, ¶ 42.)  Elected Vice Chairman of the Board in May 2001.  (<u>Id.</u>, ¶ 86.)

- **Harry J. Soose**:   Joined ITG in 1991; became Senior Vice President and Chief Financial Officer as of July 1999 and remained in those positions until ITG declared bankruptcy.  (SAC, ¶ 41.)

- **Daniel A. D'Aniello**:   Elected to represent Carlyle on the Board and served as Board Chairman from 1996 through 2002.  Had been a managing director of Carlyle since 1987 and served on boards of other companies owned by Carlyle.  Member of the executive and compensation committees.  (SAC, ¶¶ 45,  79.)

- **James C. McGill** and **Richard W. Pogue**:   Served as directors during the Class Period; members of the audit review committee.  (SAC, ¶¶ 43-44.)

- **Martin Gibson** and **Robert F. Pugliese**:   Elected by Carlyle to represent its interests on the Board; served as directors throughout the Class Period; members of the audit review committee.  (SAC, ¶¶ 47-48.)

- **Philip B. Dolan**: Represented Carlyle on the Board from 1996 through 2002 and served on the board of one other company affiliated with Carlyle.  Was a principal, then managing director, of Carlyle from 1998 through 2002 and a vice president of Carlyle since 1989.  Member of the compensation committee.  (SAC, ¶ 46.)

- **James D. Watkins**: Elected to represent Carlyle on the Board from 1996 through 2002 and served on the board of one other company affiliated with Carlyle.  Member of the compensation committee.  (SAC, ¶ 49.)

2.    *Motive and Opportunity Method of Satisfying the "Strong Inference"*

*Requirement*:  In a Complaint comprised of 491 paragraphs and 181 pages, Plaintiffs fail to state

whether they are relying on motive and opportunity to establish scienter, on circumstantial

evidence, or on a combination of the two.   In their Memorandum of Law in Opposition to

Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Docket No. 86, "Plfs.'

Memo"),  Plaintiffs argue that "the distinctive motivational factor in this case" was "prolonging the

Company's survival" for two years and that in the SAC, they "clearly allege that IT Group's viability depended on Defendants' scheme to artificially make it appear viable." (Id. at 52-53.)

Under the PSLRA, motive and opportunity must be supported by "facts stated 'with particularity' and those facts must give rise to a 'strong inference' of scienter." In re Advanta, 180 F.3d at 535, quoting 15 U.S.C.A. § 78u-4(b)(2).   At least one court has held that the opportunity to commit fraud by controlling dissemination of information to investors may be presumed when the defendants served as the company's senior officers and/or directors.  In re Stonepath Group, Inc. Sec. Litig., 397 F. Supp.2d 575, 591 (E.D. Pa. 2005).   However, there are no factual allegations[9] in the Second Amended Complaint that any Individual Defendant took any particular steps to control the flow of information and neither Defendants nor Plaintiffs address this prong in their briefs.  We need not dwell on this question, however, because we conclude that the purported motive – prolonging the Company's survival – is insufficient to establish scienter.

In attempting to show scienter from a defendant's motive and opportunity to commit fraud, "motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud."  GSC Partners, 368 F.3d at 237 (internal quotation omitted.)  General motives such as wishing to complete a particular corporate transaction (GSC Partners, id.), the desire to avoid breaching loan covenants or disclosing lack of liquidity (In re Stonepath Group, 397 F. Supp.2d at 592-593), attempting to increase a company's stock value as part of an acquisition strategy (In re Nice Sys., 135 F. Supp.2d at 583-84), or even such personal benefits as increasing

---

[9]  Plaintiffs do allege that the Individual Defendants, "because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Class Period."  They claim each Individual Defendant was provided with copies of the allegedly materially misleading documents "prior to or shortly after their issuance and/or was aware of their contents before their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected."  (SAC, ¶ 54.)  However, these conclusory statements are not supported by any particularized allegations regarding which SEC filings or press releases were reviewed by which Individual Defendants, when those reviews were made, or how any Defendant modified the content of such public statements.

one's compensation[10] or maintaining continued employment (<u>In re Digital Island Secs. Litig.</u>, 357 F.3d 322, 331 (3d Cir. 2004)) are insufficient establish scienter.

Reading the Second Amended Complaint in its entirety, the most one can conclude is that Plaintiffs allege because each Individual Defendant held a position as officer or director, he was therefore motivated to keep the Company afloat. Of course, the goal of every director and officer of a business entity is to assure its longevity and market position, not only for personal motives such as compensation or the prestige of being associated with a successful organization, but also for the more general purposes of attracting investors and achieving the goals of the corporation, including profitability. "Prolonging the company's survival," however, surely falls within those generalized motives which, as Plaintiffs recognize, "can be ascribed to virtually all corporate officers and directors" and thus may not be used to establish scienter. (Plfs.' Memo at 54, *quoting* <u>In re Nice Sys.</u>, 135 F. Supp.2d at 583.)

The only Individual Defendant to whom Plaintiffs point as having reaped a "concrete and personal benefit . . . resulting from the fraud" is Mr. DeLuca. Plaintiffs allege that Mr. DeLuca,

> aware that the end-game for IT Group's financial cover-up was soon approaching, began dumping his holdings of IT Group stock. According to his filings with the SEC, DeLuca sold 20,000 shares in October 2001 and 226,398 shares between November 6 and November 14, 2001. These were the first sales by DeLuca since at least January 1, 1999, and were transacted while DeLuca knew that the Company was in serious financial trouble because he knew the true facts which were concealed from the public. . . .

(SAC, ¶ 468.)

According to Defendants, Messrs. Soose, Harvey, and Pogue also owned stock in ITG during the Class Period. However, none of them sold stock during the Class Period and all lost their investments when ITG declared bankruptcy on January 16, 2002. (Defs.' Memo at 11, n8.)

---

[10] Although Defendants Harvey, D'Aniello, Dolan, and Watkins were members of the Board's compensation committee, there are no allegations that any Individual Defendant perpetrated the alleged fraud in order to maintain and/or increase his compensation as an officer or director.

In support of their argument that Mr. DeLuca actually sold at a loss, Defendants provide "Form 4's" dated April 10, 2000, January 10, 2001, and February 12, 2001, together with "Form 144's" filed on November 13, 2001, October 5, 2001, December 18, 2001, and January 17, 2002.[11] (Declaration of David A. Becker in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint, Docket No. 75, "Becker Decl.," Tabs A and B.[12]) Defendants assert that Mr. DeLuca purchased ITG stock worth more than $700,000 during the Class Period at prices of more than $5.00 per share, but was forced to sell in response to margin calls at prices between $2.30 and $1.38 per share.  (Defs.' Memo at 11-12.)

The Court is unable to determine from the documents provided how Defendants calculated these losses, but does note that Mr. DeLuca purchased 114,365 shares in the period March 27, 2000, through December 15, 2000, at prices ranging from $5.00 to $7.43 per share.[13]  He sold 246,398 shares in October and November 2001 at prices between $1.90 and $5.20 per share,

---

[11] Pursuant to Section 16(b) of the 1934 Act, a shareholder or corporation may bring suit against any director, officer or beneficial owner of more than 10% of any class of outstanding shares (a "statutory insider") who profits from short-swing transactions in that corporation's securities.  15 U.S.C. § 78p(b).  Section 16(a) requires statutory insiders to disclose any change in ownership "within ten days after the close of each calendar month" in which such change occurs.  Id., § 78p(a).  That disclosure is made via a "Form 4" filed with the Commission which sets forth the insider's name, the date of the transaction, the number of shares sold or bought and the price per share.  Tristar Corp. v. Freitas, 84 F.3d 550, 552-553 (2d Cir. 1996).

Under the SEC's Rule 144(d), 17 C.F.R. § 230.144, "control persons" may not sell restricted stock for the two years following acquisition.  Under Rule 144(k), 17 C.F.R. § 230.144(k), after that point in time, the owner of the stock completes a "Form 144," Notice of Proposed Sale of Securities, in advance of the sale, and submits the form along with the stock to a transfer agent who contacts the stock issuer, which either clears or objects to the transfer.  If the issuer objects, the holder must obtain a legal opinion to overcome that objection.  Once that process has been completed, new, unrestricted stock certificates are issued to the holder who may then proceed to sell his stock.  Telemark Dev. Group, Inc. v. Mengelt, 181 F. Supp.2d 897, 902 (N.D. Ill. 2002).  Like Form 4s, Form 144s are available to the public and the same information is available in the 10-Q reports filed by the issuer of the stock.  As noted above, the Court may take judicial notice of reports filed with the SEC in considering a motion to dismiss.

[12] Exhibits A through H of the Becker Declaration are found in Docket No. 76, Exhibits I through R are in Docket No. 77.

[13] An additional 35,000 shares purchased at an undisclosed price have not been included in the calculation.  We note that the purchases were made during the Class Period and after the point in time when Plaintiffs allege Mr. DeLuca and others instigated the fraudulent scheme to hide the Company's true financial condition from investors.

leading to a probable loss.[14]  We find no evidence in the exhibits provided to support the argument that these sales were forced as the result of margin calls, but consider that information irrelevant.

Drawing inferences in favor of Plaintiffs as required, we agree that Mr. DeLuca may have been aware in November 2001 that the Company's demise was imminent.  However, it is also logical to infer that if Mr. DeLuca were motivated to sell his stock because he knew "the true facts which were concealed from the public" regarding the Company's serious financial trouble, he would have done so during the summer of 2001 when stock prices reached a high of $7.75 per share and not waited until news of the Company's problems began to emerge in October 2001.  The sales might also have occurred because Mr. DeLuca was aware of the imminent demise of his relationship with ITG.  We conclude that these sales, at best, provide only a weak inference of scienter on the part of Mr. DeLuca.  *See* Ganey v. PEC Solutions, Inc., 418 F.3d 379, 499 (4th Cir. 2005) (together with other factors, the fact that individual defendants lost collective stock value during the class period gave rise to a strong inference that no scienter existed.)

Finally, Plaintiffs point to the fact that Carlyle would lose its investment of over $45 million if ITG collapsed, as well as the $6.3 million annual dividend on its preferred stock and an investment banking fee on the Company's acquisitions.[15]  While these might have been financial motivations for Carlyle to keep the Company afloat, no Section 10(b) claim is made against Carlyle in Count I.  Nor are there any allegations that Defendants named to the Board by Carlyle to represent its interests (D'Aniello, Gibson, Pugliese, Dolan and Watkins) took any specific actions to protect Carlyle's investment.  Moreover, Carlyle invested an additional $6 million in ITG during

---

[14]  We must conclude this was a "probable" loss because Mr. DeLuca sold 132,033 shares more than he purchased during the time period for which we have received Form 4s.  If those additional shares were purchased at prices less than the price at which they were sold in October and November 2001, Defendant would have made a profit on those sales.

[15]  This point is not alleged in the Second Amended Complaint but raised only in the brief in opposition to the motion to dismiss.  *See* Plfs.' Memo at 54-55.

the Class Period (*see* Becker Decl., Tab E), did not receive the quarterly dividend on its preferred

stock after the last quarter of 2000 (*see* Becker Decl., Tab J-11), and, presumably, lost its entire

investment when ITG declared bankruptcy.  *See* In re Alpharma Sec. Litig., 372 F.3d 137, 152 (3d

Cir. 2004) (affirming lower court's reasoning that where largest stockholder, i.e., the one who stood

to gain the most from the alleged fraud, sold no stock during the class period and thus failed to

have benefitted from the alleged scheme, plaintiffs had not satisfied the motive and opportunity

prong of Burlington.)

>    The Court concludes that to the extent Plaintiffs have attempted to show any Defendant had

motive and opportunity to fraudulently misrepresent the financial condition of the Company to the

investing public in order to keep it afloat, they have failed to establish that claim with the

particularity required by the Reform Act.

>    3.    *The Reckless Behavior Method of Alleging Scienter:* Because we have been

unable to discern any allegations of motive (except with regard to Defendant DeLuca), and because

Plaintiffs repeatedly apply the adjective "reckless" to Defendants' actions, we now focus on the

second prong of the Burlington test for establishing a strong inference of scienter.  Under the

PSLRA, plaintiffs attempting to plead scienter by alleging facts sufficient to establish recklessness

must allege a statement

>> involving not merely simple, or even inexcusable negligence, but an extreme
>> departure from the standards of ordinary care, and which presents a danger of
>> misleading buyers or sellers that is either known to the defendant or is so obvious
>> that the actor must have been aware of it.

In re Advanta, 180 F.3d at 535 (internal quotation omitted), and also noting that "scienter may be
alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing,
such as intentional fraud or other deliberate illegal behavior."

>    Reckless behavior should not be defined liberally, otherwise there is a risk of losing the

distinction between scienter and negligence.  In re Digital Island Sec. Litig., 223 F. Supp.2d 546,

555 (D. Del. 2002).

Plaintiffs contend that in addition to overwhelming documentary evidence to show that the Individual Defendants knew about the fraudulent misrepresentations and omissions made in press releases and SEC filings throughout the Class Period, they now have information from five confidential witnesses who provide first hand knowledge of how the fraud was perpetrated.  Before considering that evidence in detail, however, we note that with the exception of Defendants Soose, DeLuca, Dolan, D'Aniello, and Harvey, none of the Individual Defendants is mentioned by name anywhere in the Second Amended Complaint after being identified in paragraphs 40 through 49. They are referred to generically in their capacity as members of the Board of Directors in several instances, e.g., they all are alleged to have attended a March 2001 Board meeting in Washington, D.C., at which Confidential Witness 1[16] ("CW1") made a presentation about the Company's financial situation.  (SAC, ¶¶ 148-149.)  Similarly, Confidential Witness 3[17] ("CW3") stated that he had made presentations to "the Board" at its regular meetings on as many as four occasions in 1999 and 2000 in which he "laid out" problems related to working capital issues.  (Id., ¶ 64.)  Based on these "contacts with the Board," CW3 concluded that the Board members "knew in 2000 and 2001 that the Company had significant liquidity problems."  (Id., ¶ 265.)

In a similar vein, Plaintiffs refer generally to what "Defendants" knew or did.  For example, in their statements regarding scienter, they allege:

> Each of the Individual Defendants, by virtue of his high-level position with the
> Company, directly participated in the management of the Company, and . . .[18] was

---

[16] CW1 is described as "a top executive with responsibility for making payments for the Company." (SAC, ¶ 129.) He reported directly to Mr. Soose and worked at ITG headquarters in Pittsburgh.  (SAC, ¶ 11.b.)

[17] CW3 headed the commercial environmental remediation business throughout the Class Period.  He originally reported to an individual named Ray Pompe, then, beginning in the summer of 2000, directly to Mr. DeLuca. (SAC, ¶ 255.)

[18] We have omitted references in these allegations to "Carlyle as employer and/or affiliate of certain of the Individual Defendants" because Carlyle is not alleged to have violated Section 10(b) as are the Individual Defendants.  Nor is there any factual support for an inference that any Individual Defendant took or did not take a particular action because of his affiliation with Carlyle.

directly involved in the day-to-day operations of the Company at the highest levels and/or was involved in major policy making and decision-making regarding business strategy and financial reports, and therefore was privy to confidential proprietary information concerning the Company. . . .

The Individual Defendants . . . were involved in drafting, preparation and/or dissemination of the various public, shareholder and investor reports or other communications alleged herein, were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements. . . .

The Individual Defendants . . . because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company. . . . Each Individual Defendant . . . was provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance and/or was aware of their contents before their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants . . . thus caused the misrepresentations in such public statements to be made.

Because of the positions and access to material non-public information available to them but not [the] public as alleged above, each of the Individual Defendants . . . knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations concerning the Company complained of herein were then materially false and misleading. . . .

Defendants, who were under a duty to disclose the true facts, but instead misrepresented or concealed them during the relevant period herein. [sic] As officers and directors and controlling persons of a publicly held company . . . the Individual Defendants . . . each had a duty to promptly disseminate accurate and truthful information with respect to IT Group's financial condition and performance [etc.] . . . . and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. . . .

(SAC, ¶¶ 52-57.)

The Second Amended Complaint is scattered with allegations directed vaguely at "Defendants." For example, Plaintiffs allege that "Defendants artificially reduced IT's indebtedness at the end of each fiscal quarter in order to present misleading numbers reported in the Company's quarterly and annual SEC filings." (SAC, ¶ 11a.) Accepting that statement as true for purposes of analysis, who took what particular step to artificially reduce ITG's indebtedness or how that step

24

was accomplished is never alleged with particularity for any Defendant other than Messrs. Soose and DeLuca.  Similarly, the allegation that "on March 7, 2000, Defendants disseminated a press release which announced four new contracts for environmental consulting and engineering services" which was "false and misleading because it failed to disclose the Company's growing liquidity problems related to its growth-by-acquisition strategy" (SAC, ¶ 295) is not supported by factual allegations as to which Defendants wrote or approved the press release.  Plaintiffs repeatedly allege in general terms that "Defendants" knew or should have known that certain practices were violations of GAAP[19] or that certain representations were false.  However, those allegations are not supported in turn by corroborating factual support explaining how and why any particular Defendant (other than Mr. Soose) knew the statements to be violative of GAAP.

There are other vague references to Company "management," e.g., "management . . . further concealed the nature and extent of the Company's liquidity problems . . . in a conference call with a Salomon Smith Barney analyst in the July 2000 time frame" (SAC, ¶ 337), or, as reported in a Salomon Smith Barney analyst's report dated October 27, 2000,  "management continue[d] to maintain that year end debt levels of $625 million will be met. . . . "  (Id., ¶ 357.) There are, however, no factual allegations identifying the particular member(s) of "management" who participated in such conference calls.

Allegations that the Company's financial difficulties were "a common theme" at Board meetings or that by 2000 the Board members were aware of that problem does not establish that the attendees of those meetings were therefore committing fraud.  Although several Defendants (McGill, Pogue, Gibson and  Pugliese) are identified as members of the Board's audit review committee, the Court has been unable to pinpoint a single allegation that as members of that committee, any one of them took or failed to take specific action that perpetrated the fraud, even

---

[19]  GAAP is the acronym for "generally accepted accounting principles."

though they would be the sub-group of the Board most likely to be aware of deliberate inconsistencies between public information and private knowledge or of violations of GAAP.

Most of the allegations against the Individual Defendants fall squarely within the category of "group pleading."  As Judge Harold Ackerman recently noted, "group pleading," a method by which securities fraud plaintiffs could name corporate officers as individual defendants without pleading the particulars of their participation in the preparation and dissemination of corporate statements, was a judicial response to the difficulty that such plaintiffs often faced in attributing authorship for public corporate statements.  In re Bio-Technology Gen. Corp. Sec. Litig., 380 F. Supp.2d 574, 583 (D.N.J. 2005).  Although "the Third Circuit has not expressly determined whether group pleading has survived enactment of the PSLRA . . . the prevailing authority within this District counsels that group pleading has been abolished."  Id.  at 584, *citing* cases from the Districts of New Jersey and Eastern Pennsylvania; *see also* In re PMA Capital Corp. Sec. Litig., CA No. 03-6121, 2005 U.S. Dist. LEXIS 15696, *41 (E.D. Pa. July 27, 2005); In re Digital Island, 223 F. Supp.2d at 553; *compare, however*, In re Rent-Way Secs. Litig., 209 F. Supp.2d 493, 518 (W.D. Pa. 2002) (concluding that there was "no reason to find that group pled allegations per se cannot meet the heightened pleading standards of Rule 9(b) or the PSLRA.")  Judge Ackerman further noted that the best indication to date of how the Third Circuit Court of Appeals will decide this question is the Court's holding in In re Advanta, i.e., that "generalized imputations of knowledge do not suffice" to establish scienter, regardless of the defendant's position with the corporation. In re Bio-Technology, 380 F. Supp.2d at 584.  We agree with the District Court in New Jersey, and the majority of courts in this Circuit who have considered the matter, that under the PSLRA, allegations based solely on group pleading cannot establish a strong inference of scienter.  Thus, generalized claims that each Individual Defendant – e.g., "by virtue of his high-level position with the Company, directly participated in the management of the Company" or "was privy to confidential proprietary information concerning the Company" – are not sufficient to give rise to a strong

26

inference that he acted with the required state of mind.   In re Alpharma, 372 F.3d at 142.

Similarly, the allegation that each Individual Defendant was "involved in drafting, preparation and/or dissemination of the various public, shareholder and investor reports or other communications" or was "able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company" is insufficient to establish scienter.  Where – as in the Second Amended Complaint – the plaintiff "fails to allege why a defendant's position necessarily entails a particular duty or why a specific corporate policy requires the defendant to have responsibility for particular press releases or SEC filings, allegations concerning group-published information should be rejected for failing to plead scienter with particularity."  In re Bio-technology, 380 F. Supp.2d at 584.

We find that these blanket allegations fail to satisfy the particularity requirement of the Reform Act when alleging scienter of each Individual Defendant.  As the Court of Appeals has noted, "it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent, or that defendants 'must have known' their statements were false."  GSC Partners, 368 F.3d at 239.  Because Plaintiffs state no particular factual allegations against Individual Defendants McGill, Pogue, Gibson, Pugliese, and Watkins, we conclude that Plaintiffs have failed to establish scienter with regard to them and they must, consequently, be dismissed from the action herein.

4.   *Reckless Behavior and Defendants Dolan, D'Aniello and Harvey:* Plaintiffs provide a few more detailed allegations regarding Defendants Dolan, D'Aniello, and Harvey.  Confidential Witness 3 stated that when he presented information to the Board at its meetings about the subject of "bad" accounts receivable, Mr. Dolan would remark "go collect the receivables." (SAC, ¶ 259.) CW3 also stated that at the March 2001 Board meeting, he personally "laid out the problems with the Company" to Defendants Harvey and either Dolan or D'Aniello.[20]

---

[20]   Other than this general reference to ITG's "problems," it is unclear which specific problems were discussed at this meeting or how Mr. Dolan or Mr. D'Aniello reacted to CW3's comments.

(Id., ¶ 265.)   Mr. Dolan is alleged to have attended the December 7, 2001, meeting at which the lending banks were told of the Company's dire financial situation.  (SAC, ¶ 218.)

In June 2001, CW3 and Mr. D'Aniello had a private talk lasting more than two hours "in which CW3 frankly stated the extent of the Company's liquidity and other problems" and "told D'Aniello that someone had to stand up and take the write-offs."  (SAC, ¶ 266.)  CW3 also states that Mr. D'Aniello had similar meetings with the heads of the government services and international business lines at the same June 2001 Board meeting (id.), but there are no allegations about what those individuals told Mr. D'Aniello or what his reaction might have been to their information.

Plaintiffs allege that Mr. Harvey testified in the ITG bankruptcy proceedings that no later than December 2000 or early January 2001, the Board of Directors became aware of the Company's difficulty in meeting loan covenants and the "severe financial crisis that the company found themselves [sic] in."  (SAC, ¶¶ 150-151.)   They also allege that Mr. Harvey was secretly installed as Acting CEO and President in May 2001, six months before Mr. DeLuca's termination was publicly announced, "because Carlyle was unhappy with the Company's financial results."  (SAC, ¶ 86.)  Mr. Harvey also is alleged to have spoken to Defendants Dolan and D'Aniello "every day concerning ITG's business and finances from the time Harvey was first installed by Carlyle," (id.), but there are no factual allegations to support this claim or any discussion of inferences that might be drawn from it.  During the summer of 2001, CW3 took Mr. Harvey on a nation-wide tour to see for himself the widespread project mismanagement, particularly non-payment of vendors and abandoned projects, the Company's failure to write-off uncollectible accounts receivable, and its inability to pay subcontractors.  (Id., ¶ 267.)  Soon after he became CEO, Mr. Harvey became aware of the Company's violation of the federal government's "pay-when-paid" policy[21] and "put a stop to" it.  (Id., ¶ 205.)   According to Mr. Soose, Mr. Harvey "led the presentation" to the lending

---

[21]  This policy is discussed in more detail in Section IV.B.4 below.

banks on December 7, 2001.  (Id., ¶ 218.)

In sum, Defendants Dolan, D'Aniello, and Harvey are alleged to have known in late 2000 or earlier 2001 about the Company's (1) problems collecting accounts receivable; (2) failure to write-off certain accounts receivable in a timely manner; (3) liquidity problems; (4) difficulty meeting loan covenants; and (5) general mismanagement.  Based on these specific claims, together with more general allegations against Company "management," or "Defendants," Plaintiffs appear to allege that the failure by Defendants Dolan, D'Aniello, and Harvey to make these problems known to the investing public was reckless and a violation of Section 10(b).  The problem is that Plaintiffs fail to allege the role any of these Defendants had in "drafting, preparation and/or dissemination of" the alleged materially false and misleading SEC filings or other public statements made during the Class Period[22] or how they knew of the alleged accounting frauds, other than by reference to each Defendant's "high-level position with the Company."  As noted above, scienter cannot be shown by alleging generalized imputations of knowledge based on a defendant's position with the company.  Thus, the Court concludes that although Plaintiffs state allegations against Defendants Dolan, D'Aniello, and Harvey with more particularity than those against the other directors, they have still failed to meet the requirements of the PSLRA for establishing scienter on the part of those Defendants.

5.     *Reckless Behavior and Defendants Soose and DeLuca:*  We reach a contrary conclusion, however, with regard to Plaintiffs' allegations against Messrs. DeLuca and Soose.

Plaintiffs contend that Mr. Soose, the Chief Financial Officer, manipulated ITG's accounting system in a number of ways designed to suppress the Company's apparent debt and  artificially inflate revenues.  Defendant Soose directed CW1 to "slow down payments of the Company's bills"

---

[22]  There is a slight exception to this conclusion – in the press releases issued after November 13, 2001, Mr. Harvey, not Mr. DeLuca, was the spokesman for ITG.

(SAC, ¶ 129) and directed him to ignore pay-when-paid regulations, telling him that the regulations "didn't matter" (id., ¶ 207.)  He allegedly inflated the claimed contract backlog for the Company's Beneco division by including maximum potential revenue, not the historical estimate (id., ¶ 276) and indirectly ordered Confidential Witness 5[23] ("CW5") to improperly "book revenues in excess of orders already received" (id., ¶ 280.)   These accounting manipulations were reflected in the Company's filings with the SEC which Mr. Soose prepared and signed.  Plaintiffs also contend that Defendant Soose was reckless in not disclosing the artificial suppression of the Company's indebtedness (id., ¶ 27) and in failing to assure that ITG complied with the pay-when-paid regulations (id., ¶ 14b.)  To support their allegations that Mr. Soose acted with scienter, Plaintiffs contend that in addition to the allegations of the Confidential Witnesses about his manipulation of the Company's accounting system, he received daily memos about the Company's liquidity position from 1998 to the end of 2001, along with copies of "Monthly Compliance Letters" provided to lending banks, documents which showed the Company's "true" financial situation as compared to the "false" information provided to the public.   (Id., ¶¶ 17-18, 162; see also Exhibit B thereto.)

With regard to Mr. DeLuca, Plaintiffs allege that as Chief Executive Officer, he was aware of the accounting manipulations Defendant Soose either initiated or condoned.  He pressured Confidential Witness 4[24] ("CW4") to "improperly book unbilled receivables as revenues, and inflate reported profits by falsely increasing the estimated profit margins on the projects."  (Id., ¶ 270.) He insisted that CW3 delete negative points from his presentation to the Board of Directors in March 2001. (Id., ¶ 265.)  Like Mr. Soose, he received copies of the daily liquidity reports which

---

[23]  CW 5 is described as the assistant controller of Beneco for three years; he replaced CW 4 as controller when he resigned in February 2001.  One month later, CW 5 also left ITG "after refusing to follow improper instructions from Pittsburgh to book receivables (and therefore revenues) which were not properly accrued under GAAP."  (SAC, ¶ 279.)

[24]  CW 4 was the chief financial officer of Beneco.  He reported to the president of Beneco, Robert Newberry, who in turn reported to Jim Backus, the senior vice president of the Company's outsourced services and international divisions.  (SAC, ¶ 270; Becker Decl., Tab F-2 at 13.)

contained information which was withheld from investors.  Plaintiffs allege that Mr. DeLuca authorized a series of misleading press releases between February 24, 2000, and October 20, 2001, in which he made misrepresentations or omissions about (1) ITG's plan to pay down debt; (2) its contract backlog; (3) the effectiveness of ITG's diversification-by-acquisition strategy; (4) the reasons for the Company's poor performance although he knew its mediocre results were the result of a constant struggle with bankruptcy; and (5) the Company's chronic liquidity problems.

The question remains, however, whether ITG made material misrepresentations or omissions to investors.  It follows that if its public statements were not false or misleading or were otherwise protected, neither Mr. Soose nor Mr. DeLuca could be said to have acted with an intent to deceive, manipulate or defraud or with any other extreme departure from the standards of ordinary care.

### B.    Material Misrepresentations and Omissions

Rule 10b-5 provides that it is a violation of securities law "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading. . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b);  In re Burlington, 114 F.3d at 1417, n5.  Rule of Civil Procedure 9(b) requires a plaintiff alleging violation of Section 10(b) to show "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it  was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage."  In re Rockefeller Ctr., 311 F.3d at 216 (internal quotation omitted.)  The PSLRA further requires that the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

In efficient markets – which are presumed to be composed of reasonable investors – material information is defined as information which  "would be important to a reasonable investor

in making his or her investment decision" and which "alters the price of the firm's stock." Burlington, 114 F.3d at 1425.  The price of a company's stock, therefore, is determined by all available material information regarding the company and its business.  Id.  As a result, the materiality of disclosed information may be determined by considering the effect, if any, disclosure has on the price of the stock.  It logically follows that if disclosure has no effect on the price of the stock, the information "was immaterial as a matter of law."  Id.; see also Oran, 226 F.3d at 282 ("materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.")

Conversely, undisclosed information is considered material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  T.S.C. Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); In re Westinghouse Sec. Litig., 90 F.3d 696, 714 (3d Cir. 1996).  Non-disclosure of material information does not lead to liability under the Reform Act unless the defendant had an affirmative duty to disclose that information.  Basic, Inc., 485 U.S. at 239, n17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.")   "Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information."  Burlington, 114 F.3d at 1432.   In fact, a defendant is not required "to disclose a fact merely because a reasonable investor would like to know that fact."  Id., quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).  Thus, to establish liability for fraud for failure to disclose, a plaintiff must show both that the information was material and that the defendant had a duty to disclose.  Shaw, 82 F.3d at 1202 (the "mere possession of material nonpublic information does not create a duty to disclose.")

In most instances, the materiality of a particular statement is a matter to be determined by the fact-finder.  See Basic, Inc., 485 U.S. at 239-41.  However, certain statements are so clearly immaterial that a court may reach that finding in considering a motion to dismiss.  In re Rockefeller

Ctr., 184 F.3d at 294.  For purposes of the analysis which follows, we begin with the assumption that each of the statements identified by Plaintiffs – or the subject matter of the alleged omission – is material.

Plaintiffs allege that Defendants fraudulently misrepresented the Company's financial condition to investors in five ways:[25]

First, at the end of the Class Period, ITG  performed an unannounced restatement of its financial statements, writing off some $92.6 million of accounts receivable.  These write-offs pertained to purchase price adjustments recorded during acquisitions and to change orders which were never accepted by the customer and therefore, according to Plaintiffs, never should have been included in receivables.  Defendants also failed to write-off receivables which were not collectible after project completion.  Also, ITG artificially inflated revenues by "dumping" the value of operating assets into goodwill accounts when assets were acquired, thereby eliminating the depreciation expenses of these assets from project expenses and inflating profits and revenues from the projects in which these assets were used.  (SAC, ¶¶ 23-24.)

Second, the Company's total accounts receivable were consistently overstated and misrepresented to enhance their apparent collectibility.  That is, the SEC filings consistently overstated billed receivables and understated the less desirable unbilled receivables.  Within

---

[25]  Plaintiffs also claim that many of these actions were also violations of GAAP as discussed in more detail below and that Defendants violated 17 C.F.R. § 229.303, SEC Regulation S-K, which requires disclosure of all information necessary to a complete understanding of the data provided in an SEC filing and identification of known trends, "demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." (See SAC ¶¶ 314, 334, 354, 372, 399, 421, 444, and 465, in which Plaintiffs allege that ITG failed to disclose its deteriorating liquidity condition, impairment of receivables, and violation of pay-when-paid rules.)  However, the Third Circuit Court of Appeals has explicitly held that violations of Item 303 do not create an independent cause of action for private plaintiffs.  Oran, 226 F.3d at 287.  More importantly, "demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5.  Such a duty to disclose must be separately shown. . . . [A] violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5."  Plaintiffs have not addressed this issue in their memorandum in response to the motion to dismiss.

unbilled receivables, claimed receivables for unapproved change orders were understated and within billed receivables, amounts in excess of revenues were not subtracted. The true amounts of billed and unbilled receivables were stated in the Monthly Compliance Letters sent to the lending banks and to Defendant Soose. The misrepresentations in the SEC filings were not only violations of GAAP, but also led investors to believe the Company's revenue stream was more reliable than it actually was. (SAC, ¶¶ 30-31.)

Third, through the Company's SEC filings, press releases and financial analysts' reports, Defendants knowingly fostered the impression that ITG had access to a "substantial cushion" of credit on its revolving credit line and was progressing satisfactorily toward its stated goal of debt reduction. In reality, according to Plaintiffs, ITG was suffering from a prolonged liquidity crisis, had virtually no available credit, and was on the brink of bankruptcy throughout much of the Class Period. Based on their analysis of the daily liquidity position reports provided to Defendants Soose and Deluca,[26] Plaintiffs claim that the Company repeatedly violated its loan covenants; manipulated its apparent credit availability by paying-down the credit line at the end of each fiscal quarter only to borrow heavily immediately after SEC filings and bank reports were prepared; instituted a policy of not paying vendors at the end of the quarter, also to inflate apparent cash availability; and claimed that the Term C Loan was used to cover seasonal revenue fluctuations when in fact, the additional funding "was merely finding its way into a bottomless black hole." (SAC, ¶¶ 25-29.)

Fourth, ITG failed to disclose that it did not and could not abide by the federal pay-when-paid regulations requiring that subcontractors and other vendors on its projects be paid before

---

[26] The daily liquidity position reports were prepared by the Company treasurer and showed use of the revolving credit facility. The reports identified the amount of (A) borrowings outstanding, (B) letters of credit outstanding, (C) total revolver usage (the sum of A and B), and (D) resulting availability (the difference between C and the total facility availability of $185 million). The amount disclosed as the revolver balance in the SEC filings correlates to borrowings outstanding, not to the total revolver usage, a discrepancy which Plaintiffs allege further hid from investors the fact that total availability was less than reported. (SAC, ¶ 124.)

invoicing government agencies for work performed. Due to the Company's chronic liquidity crisis, it could not pay its subcontractors in a timely fashion; consequently the liquidity problem was exacerbated because ITG could not then bill the government for the unbilled receivables it had already included in revenues. (SAC, ¶ 32.)

Finally, ITG constantly misrepresented not only the value of its contract backlog, but also its dependability, profitability, and time-frame in which the Company would receive backlog revenue. Moreover, Defendants misled investors into believing that the backlog represented future revenues to ITG alone when, in fact, the backlog was composed largely of indefinite delivery orders ("IDO") on which ITG was only one of several potential contractors for work that might never be funded by the governmental agency. (SAC, ¶¶ 33-34.)

We turn to an in-depth analysis of each of Plaintiffs' claims.

1.     *Failure to Disclose the $92.6 Million Write-off of Uncollectible Receivables*[27] *and Misallocation of Operating Assets to Goodwill:*  According to Plaintiffs, on December 7, 2001, when making a presentation to its lending banks in an effort to get additional credit, Defendants disclosed for the first time that ITG intended to write-off before the end of the year approximately $92.6 million in accounts receivables, including $17.3 million related to 1998 and prior years, $5.0 million related to 1999, and $31.4 million and $38.9 million related to years 2000 and 2001, respectively. (SAC, ¶¶ 215-228; *see also* Becker Decl., Tab Q at ITG 00238.) Plaintiffs allege that

---

[27]  Plaintiffs have provided a supplemental pleading which attempts to set out in great detail further allegations in support of this claim. *See* Declaration of Lionel Z. Glancy in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint, Docket No. 84. A review of the documents attached thereto leads to the conclusion that, as Plaintiffs had previously alleged, the Individual Defendants were aware in 2000 and 2001 (1) that ITG had acquired a substantial accounts receivable problem along with its acquisition of OHM in 1998, (2) that two Beneco projects had changed-scope and performance problems, (3) that in 2000, the Company performed a comprehensive analysis of "acquired estimated unbilled accounts receivable and acquired claims," which resulted in a special charge in December 2000 (as discussed in text above) and (4) that the "full-scale review" of accounts receivable problems was still underway as late as December 2001. What none of these documents shows, however, is that any Defendant knew the accounts receivable which were not written off in 2000 were not collectible.

throughout the Class Period, Defendants knowingly overstated the Company's accounts receivable, then were forced to restate those amounts in December 2001. Unlike the lending banks, the public was never informed of the "secret" December 2001 restatement. Plaintiffs contend that these write-downs were "undisputably material" because they reduced 2000 and 2001 EBITDA[28] by 22% and 27% respectively and, had they been taken in the proper time-frames, would have wiped out net income for both years. (SAC, ¶ 228.)

Plaintiffs further allege that these write-downs were taken because "the Company's management knew of the dubious nature of the Company's claimed receivables, even though at or about the time the write-downs were taken, and shortly before the presentation of the write-downs to IT's banks on December 7, IT [Group] issued its third quarter 2001 financial results which failed to mention even the possibility that write-downs would be taken." (SAC, ¶ 221.) They contend that "purchase price adjustments recorded during acquisitions were known when the various acquisitions were made and should have been written down not later than May 2000. By including the billings for claims and change orders in accounts receivable, ITG violated GAAP which provide that such amounts may not be included in accounts receivable until it is known that they are deemed properly collectible." (SAC, ¶ 224.)

Confidential Witness 3 said that ITG improperly claimed accounts receivables from "monster sized projects kept on the books which should have been written off because all work on them was ended without collecting the money already taken into revenue. Although the projects were long-complete, time was recorded on those projects only for supposed (but not real) pursuit of claims, merely for the purpose of avoiding write-offs." (SAC, ¶¶ 257-258.) The Board of Directors was aware of the problem of "bad receivables." (SAC, ¶ 259.) Some of the receivables written off in 2001 were two to four years old, including $30 million for the commercial business line

---

[28] That is, "earnings before interest, taxes, depreciation and amortization." EBITDA is one measurement of an entity's cash flow and its ability to make interest or debt payments.

headed by CW3 and $60 million for the government business line.  (Id.)

Plaintiffs allege that Defendants knew that these receivables should have been written-off no later than early 2001 because in December 2000, ITG identified a so-called "special charge" of $40.7 million, of which $37.5 million which was described as "changes in estimates on accounts receivable," intended to "reduce[ ] the carrying value of project claims which have been in protracted litigation and adjust[ ] the close-out value of certain acquired accounts receivable." (SAC, ¶ 224; see also Becker Decl., Tab F-3 at 14.)  Plaintiffs claim that although ITG engaged in an "extensive review" of both billed and unbilled receivables in determining that it should write-off $37.5 million of unbilled receivables, it failed to write-off receivables already billed to customers, even though these had been recorded when the related acquisition took place.  The failure to take these write-offs in the proper years, as required by GAAP, hid from investors the highly material fact that ITG had actually experienced "enormous" losses in 2000 and 2001.  (SAC, ¶ 228.)  Finally, to the extent that revenue included estimated recoveries for claims and change orders, the amount of that estimated revenue should have been reported in the financial statements inasmuch as this information was a material fact necessary for evaluation of the Company's true financial condition. (SAC, ¶¶ 231-232.)

With regard to the allegation that ITG made a "secret" restatement of accounts receivable in December 2001, the Court concludes this allegation is based on speculation and hypothesis, not facts.  See In re Burlington, 114 F.3d at 1429 (plaintiffs must plead "factual allegations, not hypotheticals.")  Plaintiffs claim that the Company took a secret restatement, and build from that "fact" an allegation of scienter based on the size and effect of the restatement late in the Class Period.  Then, working backward, they further allege scienter on the part of Defendants  because they "should have" written off earlier the accounts receivable they "knew" were uncollectible.

"Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."

In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp.2d 474, 486 (S.D. N.Y. 2004); *see also* In re MicroStrategy Sec. Litig., 115 F. Supp.2d 620, 634-35 (E.D. Va. 2000) , agreeing with this general principle and noting that "when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."

"A restatement is proper if based on 'mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.'" In re Interpool, Inc. Sec. Litig., CA No. 04-321, 2005 U.S. Dist. LEXIS 18112, * 15 (D. N.J. Aug. 17, 2005), *quoting* Accounting Principles Board ("APB") Opinion No. 20. "A restatement is specifically not proper for 'new information or subsequent developments' or for 'better insight or improved judgment.'" Id. APB 20 further provides that a change in estimate should not be accounted for by a restatement of prior quarters.

In a case quite similar to the facts herein, the plaintiffs in In re Acterna Corp. Sec. Litig., 378 F. Supp.2d 561, 581 (D. Md. 2005), treated a press release announcing the defendant's financial results as if it were a restatement of its financial numbers from previous quarters. The plaintiffs then argued that doing so was an admission by the company that its earlier statements related to the company's amortization of goodwill were misleading, and that the size of the write-off demonstrated scienter on the part of the individual defendants. Id. As the In re Acterna court pointed out, however, the cases on which the plaintiffs relied, e.g., In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp.2d 334, 342 (D. Md. 2004), and In re MicroStrategy, 115 F. Supp.2d at 636, involved actual restatements. The court concluded that the press release was not a restatement or correction of financial numbers from previous quarters and that the plaintiffs could not " merely rest on the conclusory allegation that Acterna's goodwill representations prior to [the] press release . . . were false or misleading." To the contrary, the plaintiffs were required to provide sufficient facts that gave rise to an inference that when the defendant represented previously that

there was no impairment to goodwill, that, in fact, there was an impairment.  In re Acterna, id.

Similarly, Plaintiffs here rest their allegations that Defendants Soose and DeLuca knew the Company's earlier financial statements were false and misleading on an inference from a restatement which did not occur.  The excerpt from the presentation made to the banks is simply a statement that ITG intended to take a substantial write-off in 2001, not an expression of intent to restate its earlier financial statements.  By analogy to the requirement stated by the Acterna court, Plaintiffs must provide sufficient facts that would give rise to an inference that when Defendants represented earlier in the Class Period that the accounts receivable were collectible, Defendants in fact knew that they were not.

We further note that there are no financial documents, public or confidential, generated by the Company after the SEC 10-Q statement filed on November 6, 2001,[29] in which any Defendant or the Company pursues the idea of making an actual restatement.  The idea that the write-off in 2001 should have led to a restatement apparently originates in the so-called "Chanin Report," a document which was prepared during the course of the Company's bankruptcy proceedings, and not in any document prepared by Defendants.  (See Becker Decl., Tab L, Draft Restructuring Plan, dated April 11, 2002, Exhibit L at 6.)  In that document, the write-off was applied to fiscal years 1998 through 2001 and adjusted EBITDA is calculated.  Although the Chanin Report specifically notes that the Company "took the charge entirely in 2001, choosing not to restate prior period earnings," Plaintiffs apparently interpret the allocation of the write-off to multiple years and the calculation of adjusted EBITDA as a de facto restatement.

Second, it appears that a restatement most likely would have been improper had it been

---

[29]  As Plaintiffs allege, the 10-Q for the third quarter of 2001 does not refer to a possible year-end restatement.  However, it does state that "included in accounts receivable at September 28, 2001, is approximately $39 million associated with contract claims and unapproved change orders, which are believed by management to be probable of realization.  Most of these claims and change orders are being negotiated or are in arbitration.  This amount includes contract claims in litigation. . . . The actual amounts realized could be materially different than [sic] the amounts recorded."  (Becker Decl., Tab G-6 at 5.)

taken.  There is no implication in the presentation to the lenders or in any other document provided to the Court that ITG had identified "mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared."

Third, there are no allegations that any auditor, lender or the SEC recommended that these write-offs be taken.  The fact that the Company – not an outside entity – initiated the inquiry "urges against an across the board inference of scienter."  *See* In re Bellsouth Corp. Sec. Litig., 355 F. Supp.2d 1350, 1376 (N.D. Ga. 2005).  As Plaintiffs acknowledge, when Defendant Harvey became Acting CEO, he instituted a "more conservative approach" to accounting.  (Plfs.' Memo at 12; *see also* Declaration of Robert M. Zabb in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint, Docket No. 83, "Zabb Decl.," Exhibit D, Minutes of a Board of Directors meeting held on December 6, 2001, at 2.)  The Board Minutes which Plaintiffs provide also explicitly noted that the proposed accounts receivable write-off should "not be viewed as a restatement of earnings."  (Id. at 2-3.)  The fact that Mr. Harvey changed the standard by which accounts receivable were deemed uncollectible is not evidence that Defendants DeLuca or Soose acted recklessly by not arriving at the same conclusion earlier.  *See* In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 891 (8th Cir. 2002) (holding that defendants' failure to take a write-off at the earlier time proposed by the plaintiff was insufficient to plead a violation of Rule 10b-5).  To the extent Plaintiffs claim these write-offs "should have been" taken at an earlier time, at least one court has found that "a delinquent write-down of the impaired asset[], without anything more, does not state a claim of securities fraud, stating at best a bad business decision."  In re ICN Pharmaceuticals, 299 F. Supp.2d 1055, 1065 (C.D. Cal. 2004) (dismissing complaint where plaintiffs failed to substantiate defendants' GAAP violations or to provide detailed evidence of contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter.)  The distinction between the actions (or inaction) of Defendants DeLuca and Soose and

those of Mr. Harvey would also lend support to the conclusion that a restatement would have been improper because the decision to write-off certain accounts receivable was based on "new information or subsequent developments" or as a result of Defendant Harvey's "better insight or improved judgment" as it became apparent ITG was headed for bankruptcy.

Finally, Plaintiffs rely on the statements of their Confidential Witnesses to show that Defendants Soose and/or DeLuca were reckless in failing to take the write-offs earlier. Confidential Witness 5, for instance, was instructed by Dave Derry (who reported to Mr. Soose) not to book losses which should have been booked according to GAAP. (SAC, ¶¶ 281-282 and Exhibit D at 32.) Although CW5 was the controller of Beneco and would therefore be in a position to know financial reporting consistent with GAAP, there is no allegation that he informed any Defendant that the accounting methodology used by ITG with regard to accounts receivable violated GAAP. When he resigned in March 2001, his letter of resignation was sent to the president of Beneco, Tom Dillon, in Sandy, Utah (not Pittsburgh headquarters) and refers to accounting disagreements he had Mr. Dillon and Mr. Derry. (SAC, ¶ 282 and Exhibit D at 33.) There is no implication that Mr. Soose or Mr. DeLuca was aware of the disagreement. As noted previously, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim[;] only where such allegations are coupled with evidence of corresponding fraudulent intent might they suffice." In re Exxon Mobil Corp. Sec. Litig., 387 F. Supp.2d 407, 426 (D. N.J. 2005) (internal quotation omitted.)

As the Third Circuit Court of Appeals has pointed out, "GAAP is not a set of rigid rules ensuring identical treatment of identical transactions, but rather characterizes the range of reasonable alternatives that management can use." In re Burlington, 114 F.3d at 1421, n10, further commenting that "GAAP includes broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations." (Internal quotation omitted.) While violations of GAAP standards may provide evidence of scienter, the complaint

must describe the violations with sufficient particularity, e.g., the approximate amount by which revenues and earnings were overstated, the transactions involved, the identities of customers or employees involved in the transactions. Greebel, 194 F.3d at 203.

We conclude that Plaintiffs have failed to satisfy the particularity standard applied to claims that the defendants distorted certain data disclosed to the public by using unreasonable accounting practices. See In re Burlington, 114 F.3d at 1417-18; also In re Exxon Mobil, 387 F. Supp.2d at 426, citing cases, and compare Klebanow v. NUI Corp. (In re NUI Sec. Litig.), 314 F. Supp.2d 388, 401-402 (D. N.J. 2004) in which plaintiffs identified the precise accounts which they alleged demonstrated improper classification of bad debts, the amounts thereof, the SEC regulation and GAAP directive violated by defendants. To satisfy the PSLRA requirement for particularity in cases related to accounts receivable reporting, the complaint must "include details about when and to what level the accounts receivable should have been written down, . . . and how many accounts ultimately were uncollectible." In re Loewen Group Inc. Secs. Litig., CA No. 98-640, 2004 U.S. Dist. LEXIS 16601, *34 (E.D. Pa. Aug. 18, 2004). Allegations that accounts receivable should have been written-off "earlier" or that Defendants "knew" in 2000 that certain accounts were uncollectible because they had undertaken a comprehensive review of outstanding accounts receivable fail for lack of facts to support such conclusions.

In allegations based on the defendant's violation of GAAP, the plaintiff must show "that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts." In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994); Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 563 (6th Cir. 2005); In re IKON Office Solutions, 277 F.3d at 669. The plaintiff cannot satisfy the reckless behavior prong of showing scienter where the disputed "items involve complex issues of accounting as to which reasonable accountants could reach different conclusions." Id. at 1241. The fact that ITG apparently employed the same method for reporting accounts receivable from at least 1998

through 2000 and received an unqualified audit from Ernest & Young in each of those years lends support to the conclusion that the method for reporting accounts receivable during that period was acceptable. (*See* Becker Decl., Tabs F-1 through F-3, 10-K forms for 1998-2000, each stating in effect that the annual Ernest & Young audit included an assessment of "the accounting principles used and significant estimates made by management as well as evaluating the overall financial statement presentation. . . . In our opinion, the consolidated financial statements . . . present fairly, in all material respects, the financial position of The IT Group . . . in conformity with accounting principles generally accepted in the United States.")

Plaintiffs' second claim with regard to write-offs is that Defendants improperly allocated assets of acquired companies to goodwill.  According to Confidential Witness 2[30] ("CW2"), ITG – through Defendant Soose – was "very aggressive" in recording acquisitions, particularly in determining the amount to be allocated to goodwill.[31]  "ITG had a practice of writing off as many assets as possible when the acquired entity was added to ITG's books.  The public would not know about these write-offs because the write-off only reduced the total amount of assets from the acquired entity on ITG's books with a corresponding increase in the goodwill account."  (SAC, ¶ 241.)  CW2 stated that this "methodology allows very low depreciation on projects involving heavy equipment, thus inflating profits on these projects."  (Id., ¶ 242.)  According to CW2, when Emcon was acquired in 1999, ITG inappropriately wrote-down $20 million of assets, "increasing Emcon's business line's contribution to IT Group's profits 'considerably' and allowing DeLuca to show high

---

[30]  CW2 was the vice president of Emcon, the solid waste division and a vice president of IT Group. He joined ITG when it acquired Emcon in June 1999.  During the Class Period, he served under Dennis Galligan, president of Emcon, who worked at Company headquarters. (SAC, ¶ 240.)  According to the Complaint, Galligan reported to Mr. Soose.  (Id., ¶ 246.)  CW2 stated that he had several "heart to heart" conversations with Galligan "about how the Company was cooking the books."  (Id., ¶ 247.)

[31]  Goodwill is commonly defined as "the excess of cost of an acquired firm or operating unit over the current or fair market value of net assets of the acquired unit."  BLACK'S LAW DICTIONARY, 694 (6th ed. 1990.)

profits and boost the claimed backlog."[32]   (SAC, ¶ 243.)   Plaintiffs also allege – based on statements by CW2 – that "someone" at the Company's shared services department said that "ten landfill-related plants owned by IT Group were worth approximately $40 million, but were improperly written off as part of the purchase accounting process."  (Id., ¶ 244.)  Similarly, CW3 stated that the uncollectible accounts receivable of a company acquired by ITG were "flushed down the toilet" by moving them to the goodwill account, then replaced "by still more bad receivables which were subsequently claimed as revenue," in an effort to "keep goodwill afloat."  (Id., ¶ 256.)

While these actions may have been "aggressive," Plaintiffs fail to establish how the practice constituted accounting fraud.   There is no allegation that this practice of allocating largely unidentified assets to goodwill violated GAAP.  Moreover, the claim that "someone" said to CW2 that $40 million in assets were written off in the purchase accounting process is the quintessential example of an allegation which fails to meet the PSLRA criteria of pleading who, what, when, where and how.  Who directed that these assets be written off?  When?  Which  GAAP provision if any did the practice violate?  How did the anonymous "someone" know of this practice and what was his or her basis for concluding that writing-off $40 million was improper?

Similarly, although CW2 may have been in a position to know about the allegedly improper allocation of $20 million in Emcon assets when that company was acquired by ITG, there is no allegation to establish how he knew that comparable misallocations were a "general practice" at ITG, nor are there any details of which other assets were fraudulently posted to goodwill.  The claim by CW3 is equally lacking in specificity.  His vague contention that an unspecified amount of uncollectible accounts receivable at an unidentified company were moved to goodwill at an unspecified time is entirely without factual support.

The only Defendant identified with specificity in this portion of the Second Amended

---

[32] Plaintiffs fail to explain how improperly writing off assets to goodwill "boosted" the backlog and the Court will not consider this portion of CW2's statement.

Complaint is Mr. Soose, who is alleged to have been "very aggressive" in writing off assets at the time of acquisition. (SAC, ¶ 241.) The Court concludes that Plaintiffs have failed to establish that such "aggressive" actions constituted fraud, reckless or unreasonable behavior, or even, for that matter, serious mismanagement. To the extent Plaintiffs' claims for violation of Section 10(b) are based on these allegations, they must fail.

2. *Misrepresentation of the Proportion of Billed and Unbilled Accounts Receivable and the Collectibility of Accounts Receivable in General:* Plaintiffs allege that in its public statements, ITG misrepresented the relative proportions and quantities of billed versus unbilled receivables. (SAC, ¶ 153.) According to an independent auditor's report prepared after ITG declared bankruptcy, as of January 4, 2002, the Company had unbilled receivables in excess of $223 million which had a zero chance of recovery. (Id.) In contrast, the 10-Q for the third quarter of 2001 reported unbilled receivables of only $127 million, an "enormous" apparent increase which "gives rise to a strong inference that the reports of billed receivables had been materially inflated since at least the publication of the 2000 Form 10-K." (SAC, ¶ 154.)

Plaintiffs further allege that ITG used an "unconventional" definition of billing. In addition to overstating billed receivables and understating unbilled receivables, Defendants improperly included as billed receivables "billings in excess of revenues," a term defined in the SEC filings as "amounts billed in accord with contract terms, which are in excess of the amounts includable in revenue." (SAC, ¶ 158.) Plaintiffs contend that this practice violates GAAP, which prohibits including such amounts in accounts receivable since that category should reflect only earned revenue.

The third way in which accounts receivable information was manipulated involved change orders. Because the client was under no obligation to pay such charges until the change order was approved, the practice of recording amounts charged to unapproved change orders was a violation of GAAP. (SAC, ¶ 160.) Plaintiffs acknowledge that this inclusion was disclosed in the Company's

45

SEC filings, but claim that the amount was "grossly understated" by $90 to $100 million for almost every quarter of 2000.  According to Plaintiffs, every SEC filing between the fourth quarter of 1999 and the third quarter of 2001 violated GAAP by including "billings in excess" and unapproved change orders as receivables, thereby misleading investors into believing that the total amount of accounts receivable was greater than it was.  The quality of the receivables was further misrepresented because ITG publicly reported more billed receivables than unbilled receivables, whereas the opposite was actually true.  (SAC, ¶¶ 169-182.)  The fact that this practice continued into 2001 is shown by the fact that ITG was forced to make the undisclosed restatement of its accounts receivable in the fourth quarter.  (SAC, ¶ 161.)

Plaintiffs base the allegations regarding accounts receivable misrepresentations on the Monthly Compliance Letters ITG provided to its lenders which contain the "true numbers" of billed and unbilled receivables. (SAC, ¶ 162 and Exhibit C thereto.)   They also provide a memorandum dated May 11, 2001, from Mr. Soose "to many recipients including Defendants,"[33] which contains information about accounts receivable as of December 31, 1999, and March 31, 2000.  (SAC, ¶¶ 187-196 and Exhibit D at 17-26.)  By comparing the amounts identified therein as "unbilled" and "total" with the amounts reported in the 10-K for 1999 and the 10-Q for the first quarter of 2000, they conclude that the Company falsely reported both the total accounts receivable and the allocation between billed and unbilled categories.  This was especially true, they contend, for the receivables due from the federal government which were ostensibly the most collectible of the Company's receivables, yet at the same time the most affected by the billed versus unbilled distinction because of the pay-when-paid regulations.  (SAC, ¶¶ 195-196.)

The final document on which Plaintiffs rely to show the falsity of the Company's public representations of its billed receivables is an August 2, 2001 memorandum to, among others,

---

[33] Of the 23 recipients of this memo, only one, Mr. DeLuca, is a Defendant herein.

Defendant Soose, estimating billed receivables of $147.2 million as of August 1, 2001, and $150.7 million as of September 3, 2001. (SAC, ¶¶ 197-199, *see also* Exhibit D at 27-28.) When these totals are compared to the amount of $336 million as of September 28, 2001, reported in the Company's 10-Q for the third quarter, this "dramatic shift" is unexplainable. (SAC, ¶ 199.)

Plaintiffs contend that the 1999 10-K misrepresented the proportion of billed receivables as compared to unbilled receivables and violated GAAP by including within accounts receivable some $37 million of claims and unapproved change orders that management believed were "probable of realization." ITG should have disclosed to the investing public -- as it did to its banks in the Monthly Compliance Letters – (1) that its total receivables were not more than $314 million, (2) that the proportion of billed to unbilled receivables was heavily skewed toward the less collectible unbilled receivables, (3) that almost 25% of the claimed receivables consisted of unapproved change orders, (4) that the total receivables were "highly impaired" because of the Company's violation of pay-when-paid requirements; and (5) that the receivables were overstated because the amounts improperly included purchase price adjustments recorded during acquisitions as well as non-reimbursed cost overruns. (SAC, ¶¶ 304; 308-309.) Moreover, total revenues were overstated because of the inflated receivables, improper acquisition accounting, dumping assets into goodwill and thereby reducing project-related depreciation, failure to write-off bad claims, and improper application of hourly rates to lump sum revenue projects. (SAC, ¶ 310.)[34]

Defendants argue that all one can infer from a comparison of the "Trends in Accounts Receivable" charts included in the Monthly Compliance Letters to the lenders with the accounts receivable data in the SEC filings is that the two documents reflect different reporting measures. That is, it is impossible to infer either the falsity of the SEC filings or scienter on the part of any

---

[34] Similar misrepresentations were allegedly repeated in the 10-Q forms for the first three quarters of 2000 (SAC, ¶¶ 324-325 and 329-331; 344-345 and 349-351; 363-364 and 368-370, respectively); Form 10-K for 2000 (SAC, ¶¶ 388, 393-396); and 10-Q forms for the first three quarters of 2001 (SAC, ¶¶ 412 and 417-419; 435 and 440-442; 448 and 461-463, respectively.)

Defendant simply because the internal and external reports differ.  (Defs.' Memo at 17-18.)  In addition, although CW4 and CW5 allege that unbilled receivables were improperly booked at Beneco, their allegations are without the necessary details to provide support for the alleged GAAP violations, much less scienter by any Defendant.  (Id. at 26.)  Defendants further argue that Plaintiffs cannot rely on the write-offs of receivables in December 2000 and 2001 to show that the accounts receivable were not "legitimate" in the first place because a subsequent write-down of receivables does not show that the receivables were known to be uncollectible when they were recorded.   In sum, Plaintiffs' claim that receivables were fraudulently inflated because "management" knew of the "dubious nature" of certain receivables is no more than fraud by hindsight. (Id. at 48-49.)

Defendants also argue that ITG disclosed to the market that to conform with GAAP, accounting for its long-term contracts required it to estimate accounts receivables and to subsequently review and revise those estimates as contract circumstances changed.  Each SEC filing noted that "actual results inevitably will differ from those estimates and such differences may be material to the consolidated financial statements."  (See, e.g., Becker Decl., Tab F-3 at 23.)  In addition, the SEC filings disclosed that accounts receivable included amounts attributable to claims and unapproved change orders which were "believed by management to be probable of realization."  (Defs.' Memo at 50-51.)

Plaintiffs argue that the December 2001 restatement demonstrates a knowing violation of GAAP; Defendants counter that this claim reflects Plaintiffs' misunderstanding of the percentage of completion accounting method which GAAP requires for long-term contracts such as those to which ITG was a party.  The questions of which GAAP principles apply and whether a corporation has violated those principles are questions of fact best left to the analysis of experts later in the course of litigation.  In re Burlington, 114 F.3d at 1421.  The Court concludes, however, that such analysis is unnecessary because the statements regarding collectibility are "classic"

forward-looking statements.  GSC Partners, 368 F.3d at 242 (statements about collectibility are predictions of the likelihood of collection on change orders and claims.)

Moreover, the Court concludes that investors were apprised of the method ITG used in reporting its accounts receivable.  For instance, in the 10-Q SEC filing for FY 2000, the Company disclosed:

- most services were performed under time-and-material, cost reimbursement, fixed-price or unit-bid contracts of two years or less;

- revenues from time and material, and cost-reimbursement contracts were recognized as costs were incurred;

- estimated fees were recognized under the percentage of completion method determined based on the ratio of costs incurred to estimated total costs;

- because some contracts provided for revenue adjustments to reflect scope changes and claims, revenues included some estimates; when claims or scope changes were negotiated with clients, any changes from the estimated amounts were reflected in earnings;

- accounts receivable net of allowance for doubtful accounts included billed receivables, costs and estimated profits in excess of billings, contract claims and unapproved change orders, investments in federal privatization projects, and retention;

- "costs and estimated profits in excess of billings" represented amounts earned but not immediately billable according to the contract terms, e.g., passage of time, achievement of certain milestones or completion of the project;

- "billings in excess of revenues" was defined as amounts billed as per the contract in excess of the amounts includable in revenue; and

- accounts receivable incorporated claims (including claims in litigation) and unapproved change orders "believed by management to be probable of realization;" most were being negotiated or were in arbitration.

(Becker Decl., Tab F-3 at 23.)

In the same SEC filing, ITG announced that it had instituted an "accelerated claims resolution strategy" which had "reduced substantially" the estimated amount of claims recovery previously projected.  (Becker Decl.,Tab F-3 at 23.)  This strategy resulted in the special charge of $37.5 million in estimated accounts receivable, related primarily to project claims which had been

in protracted litigation and the close-out value of accounts receivable in entities which had been acquired during the Company's growth phase.  (Id. at 28.)   ITG further warned investors that "[w]hile management believes no additional material loss will be incurred related to these claims and change orders, as adjusted, the actual amounts realized could be materially different than the amount recorded."  (Becker Decl., Tab F-3 at 23.)

Such cautionary language would have alerted investors to how ITG reported its revenue and accounts receivable, whether that method was "unconventional" as Plaintiffs claim or merely reflective of the percentage of completion accounting method as Defendants argue.[35]  Where cautionary language is sufficient, it "renders the alleged omissions or misrepresentations immaterial as a matter of law."  In re Trump Casino, 7 F.3d at 371.  Plaintiffs fail to explain why the market would not have found these caveats sufficient to alert investors to the system of accounting used by ITG in reporting accounts receivable.

We turn to the claim that because the amounts identified for billed versus unbilled accounts receivable in the Monthly Compliance Letters and other internal documents and the amounts reported in the SEC filings are different, Defendants must have knowingly provided false information to the public.  First, we reject Plaintiffs' argument that because the credit agreement requires the monthly reports to the banks to comply with GAAP, it is unlikely that the banks would accept a non-GAAP metric; thus, if the Monthly Compliance Letters conform to GAAP, then the SEC filings are either false or non-GAAP compliant.  (Plfs.' Memo at 17.)  A close reading of the section of the credit agreement provided shows that the lenders received not only the monthly reports prepared by ITG, but also every quarterly and annual SEC filing.  (See Zabb Decl., Exhibit F, Section 7.1 (b) and (c).)  If it is true, as Plaintiffs allege, that the amounts and relative collectibility of accounts receivable was of major importance to the investing public, that information

---

[35]  See also Becker Decl., Tab N, American Institute of Certified Public Accountants Statement of Position 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts.

would also be important to ITG's lenders.  Yet there is no allegation that at any time during the Class Period, the banks objected to the apparent inconsistencies between the accounts receivable information they received in the Monthly Compliance Letters and the information published in the SEC filings.

Secondly, the Court has attempted to reconcile for itself the amounts reported in the Monthly Compliance Letters and the SEC filings for the period January 1999 through December 2001 and finds the task impossible.  The Monthly Compliance Letters, for instance, report billed accounts receivable, unbilled accounts receivable, and "other net" in 1999.  In 2000 and 2001, the category "other net" is dropped in favor of reporting retainage and billings in excess.  The SEC filings break out "claims and unapproved change orders" in 1999 and 2000, but not in 2001.  The Company identifies an allowance for doubtful accounts in 2000 but not in 1999 or in any of the quarterly reports in 2001.  Furthermore, in a document prepared in May 2000 where accounts receivable are broken out by operating unit, the analysis uses categories such as accounts receivable, unbilled accounts receivable, retainage receivable, allowance for doubtful accounts, unvouchered accounts payable, and claims.  (SAC, Exhibit D at 17-26.)[36]  What is referred to internally as "equity investment" in those documents totals $23.4 million, an amount which compares to the amount identified as "federal privatization projects" in the 10-K for 2000.  In other words, as Defendants claim, one cannot infer that the public statements were false because there is no consistency between how private and public amounts were calculated or, for that matter, how categories were defined at different points in time for different purposes.

---

[36] We also reject Plaintiffs' argument that this document is evidence of knowledge on the part of Defendant Soose that public disclosures were false and misleading.  (Plfs.' Memo at 50.)  The memo explicitly states that in determining day sales outstanding ("DSO") targets for the last nine months of 2000, "legacy projects, accounts receivable and unvouchered accounts payable are excluded and billings in excess or client prepayments are included" because the managers were being held responsible only for projects they directly controlled.  (SAC, Exhibit D at 17.)  Therefore, those numbers will never equal the public reports which presumably include the amounts explicitly excluded in Mr. Soose's memo.  This third presentation of accounts receivable supports the conclusion that ITG presented its accounts receivable data in a variety of formats, depending on the purpose of the information.

While we recognize that some courts have identified divergence between internal reports and external statements on the same subject as evidence of scienter (*see*, *e.g.*, Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001) (*en banc*), *cert. denied*, 536 U.S. 935 (2002), and Greebel, 194 F.3d at 196),[37] that factor is merely one indicator of scienter.  The PSLRA requirement of a "strong inference" of scienter means that "plaintiffs are entitled only to the most plausible of competing inferences," a "significant strengthening" of the burden on the plaintiff to survive a motion to dismiss as compared to pre-PSLRA standard under Rule 12(b)(6).  Helwig, 251 F.3d at 553; *see also* In re Rockefeller Ctr., 311 F.3d at 224 ("Unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the Reform Act, they may not benefit from inferences flowing from vague or unspecific allegations -- inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.")  Here, the critical issue is whether at the time the statements regarding collectibility of certain accounts receivable were made, Mr. Soose and/or Mr. DeLuca knew that those monies were not collectible.  We conclude that simply knowing there was a large accounts receivable problem, much of which was acquired during the Company's growth phase and which presumably the Company attempted to collect, does not lead to the strong inference that Defendants Soose and DeLuca knew many of those accounts were not collectible and should have been written off at an earlier point.  "If all that is involved is a dispute about the timing of a writeoff, based on the estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence." DiLeo, 901 F.2d at 627.

Finally, the Court rejects Plaintiffs' argument that it is illogical to infer that ITG would have

---

[37] In Helwig, the Court of Appeals for the Sixth Circuit adopted a list of nine factors indicative of scienter.  As a result, district courts in that Circuit have considered each of those factors in their scienter analyses.  *See*, e.g., In re Goodyear Tire & Rubber Co. Secs. Litig., CA No. 03-2166 *et al.*, 2006 U.S. Dist. LEXIS 11914, *76 (N.D. Ohio Mar. 22, 2006).  The Third Circuit Court of Appeals, to date, has not directed district courts in this Circuit to apply such an analysis.

used the phrases "billed receivables" and "unbilled receivables" differently in its internal and external reports.   It is just as logical to infer that the phrase "billed receivables" internally represented amounts for which a customer had actually been invoiced, i.e., revenue that was actually "in the pipeline," while externally, the phrase included – as stated in the SEC filings – costs and estimated profits in excess of billings, i.e., amounts that had been earned and recognized under the percentage of completion accounting method, but not immediately billable.  Although it may ordinarily be reasonable to infer, as Plaintiffs argue, that the phrases would have been used consistently in reports to the lenders and in public statements, given the requirements of percentage of the contract accounting and other peculiarities of accounting under multi-year contracts, we cannot draw a strong inference of scienter from the inconsistencies in the meaning of those phrases as used in external and internal reports.

    3. *Failure to Disclose the Company's Prolonged Liquidity Crisis, Violation of Loan Covenants, and Accounting Manipulations:* Plaintiffs allege that the ITG liquidity crisis began no later than the spring of 2000 when Defendants recognized that the growth-by-acquisition strategy was not working.  In March 2000, ITG took on a new $100 million Term C Loan, claiming publicly that the "new debt was merely a transaction undertaken in the ordinary course of business to address seasonal liquidity issues."   Plaintiffs allege that, in truth, the Term C Loan was necessary to tide the Company over until recently acquired assets – including active businesses -- could be divested.  (SAC, ¶¶ 93-95.)  Also, according to Plaintiffs, Defendants became aware in 2001 that ITG was having trouble meeting its quarterly loan covenants.  By September 2001, Defendants were forced to acknowledge that ITG would definitely not meet its quarterly loan covenants and that the line of credit was almost totally wiped out.  (SAC, ¶ 96-98.)

   To avoid disclosing these problems, the Company undertook a number of fraudulent activities to reduce apparent indebtedness, allow ITG to meet its loan covenants, and hide the fact that for most of the Class Period, its credit lines were used to the maximum.  First, in most of its

filings with the SEC, the Company did not disclose its revolving credit line balance and stopped reporting the amount of letters of credit outstanding after the first quarter SEC filing in 2001. Because the letters of credit were deducted from the Company's balance on the revolving loan, investors were unaware that the reported balance was overstated.  (SAC, ¶¶ 105-109.)

Second, in order to have adequate cash flow to satisfy loan covenants based on EBITDA, ITG transferred revenues from its three most productive divisions – Beneco, ET Environmental and Stennis – at the end of each quarter, a practice Plaintiffs characterize as "milking" the divisions for cash.  (SAC, ¶¶ 120-123.)  According to CW2, Emcon "had to pay down the credit line" every quarter.  (SAC, ¶ 251.)  Beginning in 1999, CW4 wired all available cash at the end of each month to the corporate bank account in Pittsburgh, at the direction of Company Controller Jim Pierson who said he was acting on orders from Defendant Soose.  Immediately after the end of the quarter, money would be wired back to Beneco.  "CW4 states it was 'common knowledge' that 'they were doing this with everybody,' i.e., with the other IT subsidiaries."  (Id., ¶ 271.)  CW5 also knew about wiring cash at the end of each month while he was Beneco's assistant controller and controller. (SAC, ¶ 283.)

Third, ITG inflated its account balances by temporarily withholding payments to vendors at the end of each quarter.  (SAC, ¶ 111.)  CW1, who was responsible for such payments, was instructed by Defendants Soose and DeLuca to slow down payments of the Company's bills as early as 1999.  Although checks were cut in December 1999, they were not sent out until after the new year.  (SAC, ¶ 129.)  CW2 stated that when Emcon was acquired in June 1999, its practice changed from immediately paying vendors to delaying payment for 90 to 120 days.  "On many occasions," he was told that checks had been sent to vendors but, in reality, they had been written "and put in a drawer."  (Id., ¶¶ 248, 252.)  Beginning in 2000, according to CW3, the accounts payable department would write checks, place them in a secret drawer, and say the checks were sent out.  In late 2000, at a meeting with Mr. DeLuca, CW3 told him about the secret drawer.

When Mr. DeLuca denied its existence, CW3 took him to see the drawer for himself.  (SAC, ¶ 261.)

Finally, ITG had assured investors that the Company would reduce its outstanding debt to $625 million by the end of fiscal year 2000.  Projections in July 2000 showed that even under the best case scenario, the Company would fall short of its announced debt reduction targets if invoices were paid as they became due.  Therefore, as of July 11, 2000, Defendants began not paying vendors at certain divisions.  (SAC, ¶ 117.)  Even though this ploy did not succeed in achieving the projected debt reduction, it allowed ITG to overstate its credit availability and consequently had "a material impact in inducing inflation of the Company's stock price."  (Id., ¶¶ 112-119.)

Plaintiffs contend that every press release and SEC filing[38] issued during the Class Period misrepresented the Company's credit availability, failed to disclose its liquidity crisis, or both. Briefly summarized, they contend that in the press releases,[39] Mr. DeLuca:

- Falsely assured investors that ITG had reduced its net debt by $46 million in 1999 and that it expected to pay down debt further in 2000, knowing at the time the Company could not meet its debt reduction target. (SAC, ¶¶ 291-293; February 24,

---

[38]  Although Plaintiffs also refer to numerous reports issued by analysts at Salomon Smith Barney (see, e.g., SAC, ¶¶ 297, 318, 337, 357-358, 374-376, 404-405, 426, and 449-452), the Court will not consider those statements for the following reasons.  First, there are no allegations tying any Individual Defendant to any statement made in the analysts' reports.  That is, although the reports were allegedly based on conference calls between the analysts and "management," no statements are attributed to an Individual Defendant nor is any Defendant identified by name or position.  Second, there is no allegation that either ITG or any Defendant adopted or endorsed the analysts' statements.  See Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) (to allege scienter based on statements made by a non-employee third party, the plaintiff must allege that the defendant either "(1) intentionally fostered a mistaken belief concerning a material fact that was incorporated into [statements] . . .; or (2) adopted or placed [its] imprimatur" on the third party's statements); see also In re Burlington, 114 F.3d at 1429 ("When a high-ranking corporate officer explicitly expresses agreement with an outside forecast, that is close, if not the same, to the officer's making the forecast" and that officer is not insulated from liability when he does so.)  Third, there is no allegation that ITG or any Defendant was so "entangled" with Salomon Smith Barney as to imply that it or he had assumed a duty to correct errors in those reports.  See In re Boston Tech. Sec. Litig., 8 F. Supp.2d 43, 55 (D. Mass. 1998) (plaintiff must allege that "(1) the issuer 'entangled' itself in the making of a statement by the analyst; (2) the issuer knew that the statement . . . was false or lacked a reasonable factual basis when made; and (3) the issuer failed to disclose the falsity or the unreasonableness to investors.")

[39]  See Becker Decl., Tab J, where the press releases are provided in chronological order.  Dates in parentheses are the dates the press releases were issued.

2000.)

• Failed to disclose ITG's growing liquidity problem. (SAC, ¶ 295; March 7, 2000.)

• Falsely reassured investors about the Company's liquidity and failed to disclose the manipulation of its indebtedness. (SAC, ¶¶ 315-316; April 27, 2000.)[40]

• Failed to disclose liquidity problems and failure of the Company's acquisition strategy (e.g., problems integrating the acquired companies, lower-than-expected revenues from the acquisitions, and failure to realize expected synergies), while claiming to be "confident" the Company's debt reduction goal would be achieved. (SAC, ¶¶ 377-378; February 22, 2001.)

• Perpetrated false and misleading assurances that despite "temporary set backs" in the first quarter of 2001, ITG was progressing toward "improved working capital management" and continued to believe its "debt reduction target for the year should be achieved." (SAC, ¶¶ 400-403; April 25, 2001.)

• Stated that ITG had increased operating cash flow in the second quarter of 2001 and achieved a debt level consistent with its overall debt reduction strategy, knowing that neither of these statements was true. (SAC, ¶¶ 422-425; July 26, 2001.)

On November 30, 2001, after Mr. DeLuca stepped down, Mr. Harvey announced in a press release that ITG would not pay dividends due on its preferred stock, but insisted that it had "begun to formulate a multi-faceted recovery plan." (SAC, ¶ 469.) He was forced to admit on December 13, 2001, that the Company would probably not be able to comply with year-end loan agreement covenants and had begun exploring "alternatives to remedy the situation and to address ongoing severe liquidity problems." Plaintiffs allege that these statements were false and misleading because Mr. Harvey "still did not announce [ITG's] dire condition." (SAC, ¶ 473.) Finally, on December 27, 2001, the Company "first advised investors that a bankruptcy filing could be expected," admitted that negotiations with lenders for additional funding had been unsuccessful, and finally disclosed that it would violate its loan agreement covenants, even though Defendants had known long before that ITG was headed toward bankruptcy. (SAC, ¶ 476.)

---

[40] *See also* press releases dated July 26, 2000 (SAC, ¶ 335), October 26, 2000 (SAC, ¶ 355), and October 30, 2001 (SAC, ¶¶ 445-447), which, according to Plaintiffs, contain the same omissions and misrepresentations.

Similarly, Plaintiffs allege that the Company's SEC filings[41] were false and misleading because they:

- Hid the Company's liquidity problems; understated its debt; disguised the true purpose of the Term C Loan, and failed to disclose (1) its inability to achieve the promised debt reduction, (2) the average revolver balance for each quarter rather than the manipulated balance, and (3) its violation of loan covenants when the average, rather than artificially suppressed, credit line balance was used in those calculations. (SAC, ¶¶ 300-303; 305-307; 1999 Form 10-K, March 30, 2000.[42])

- Failed to disclose that the Company had agreed with its lenders to sell-off not only "non-core assets," e.g., land in California, but also recently acquired businesses because of its cash flow problems and the failure of its growth-by-acquisition strategy. (SAC, ¶¶ 93-95; 2000 Form 10-K, March 20, 2001.)

- Falsely assured investors that the credit situation was under control unless the Company were "adversely impacted by unforeseen business conditions," in which case it would be required to seek additional modifications to the credit agreement; and misled investors by stating that when ITG was forced to amend its financial covenants to avoid default in December 2000, the potential default was the result of "special charges" related to write-offs of disputed legal claims, not to its ongoing cash flow problems. (SAC, ¶¶ 379- 387; 2000 Form 10-K, March 20, 2001.)

- Misrepresented to investors that ITG would be able to reduce its debt by the end of 2001 based on historically strong cash flow in the fourth quarter, although Defendants actually knew that in neither 1999 nor 2000 had ITG experienced such positive cash flow during the fourth quarter and that credit availability was near zero at the end of each year. (SAC, ¶¶ 409-410; Form 10-Q, first quarter 2001, May 11, 2001.)

- Disguised the Company's precarious financial condition by stating (1) that "average available borrowing capacity" in the first half of 2001 was approximately $25 million when Defendants knew that the revolving credit facility balance was near-zero during much of the second quarter. (SAC, ¶ 428; Form 10-Q, second quarter 2001, August 14, 2001.)

- Concealed the truth of its precarious financial condition by failing to clarify its statement that the Company's cash flow, available cash, and credit would be

---

[41] *See* Becker Decl., Tab F for 10-K reports and Tab G for 10-Q reports in chronological order. Dates provided in the text refer to the date on which the report was filed with the SEC.

[42] Similar misrepresentations or omissions were conveyed to investors in the Company's Form 10-Q for the first quarter of 2000 (SAC, ¶¶ 319-323; 326-328); Form 10-Q for the second quarter of 2000 (SAC, ¶¶ 338-343; 346-348); Form 10-Q for the third quarter of 2000 (SAC, ¶¶ 359-362; 365-367); Form 10-K for FY 2000 (SAC, ¶¶ 380-387; 389-392); Form 10-Q for the first quarter of 2001 (SAC, ¶¶ 406-411; 414-416); Form 10-Q for the second quarter of 2001 (SAC, ¶¶ 428-435; 437-439); and Form 10-Q for the third quarter of 2001 (SAC, ¶¶ 453-460.)

sufficient to execute the Company's "business plan [when] combined with the implementation of alternative strategies to access additional sources of capital to improve liquidity," rather than stating (as it had in the past) that cash flow, cash and credit would be sufficient to meet its "liquidity needs." (SAC, ¶¶ 430-433; Form 10-Q, second quarter 2001, August 14, 2001.)

•       Described the more restrictive loan covenants in effect at the end of the third quarter of 2001 only as a potential future problem which could be affected by "unforeseen business conditions," that might possibly require ITG to seek additional modifications to the credit agreement, even though Defendants knew ITG was having difficulty meeting its less onerous current obligations under the credit agreement. (SAC, ¶ 434; Form 10-Q, second quarter 2001, August 14, 2001.)

•       Although admitting that ITG had been forced to request amendments to its bank covenants in order to avoid default in the third quarter of 2001, failed to admit that the Company had been able to comply with the amended covenants only because it continued to manipulate the credit line and falsely assured investors that liquidity problems would arise only if ITG experienced "more severe business conditions," even though Defendants were "clearly aware"of the Company's serious financial problems. (SAC, ¶¶ 455-457; Form 10-Q, third quarter of 2001, November 6, 2001.)

The Court has considered each of these specific allegations and agrees with Defendants that when taken in context, they fail to establish that ITG misrepresented its financial condition to investors or, conversely, failed to disclose information which investors would have found useful.

### a. Purpose of the Term C Loan and failure to disclose the Company's liquidity crisis –

In the Form 10-K for 1999, Company stated:

Due to conditions existent in the long-term credit markets during the second half of 1999, we utilized our revolving credit facility to finance the acquisition of EMCOM. As a result of the utilization of funds for acquisition purposes and working capital requirements of the seasonal aspects of our business, we had limited average availability under our revolving credit facilities. On March 8, 2000, we obtained from our lenders under the credit facilities an additional $100 million, seven year term loan (Term C loan.) . . . The Term C loan net proceeds of approximately $97 million were used to pay down outstanding borrowings under the revolving credit facility portion of the credit facilities without reducing availability under the revolving portion of the credit facility, which will be used to support seasonal business pattern working capital requirements and growth from our prior acquisitions.

(Becker Decl., Tab F-2 at 23.)

In the 10-Q for the first quarter of 2000, ITG stated that "the revised debt structure with the

addition of Term C loan improved our ability to meet seasonal and overall working capital requirements which have increased as a result of the acquisitions completed in 1999." (Becker Decl., Tab G-1 at 12.)

A reasonable investor would have understood from these statements that by the end of 1999, ITG was in need of ready cash, having used the revolving credit line to buy Emcon[43] and meet working capital requirements, facts from which investors could infer that cash flow plus cash on hand were not adequate for the latter purpose.   ITG used the Term Loan to pay off the revolver so that it would have sufficient revolver availability to meet future working capital requirements.   It is clear in context that the purpose of the Term C Loan was not only to address seasonal activities. Whether using the revolving loan to acquire a new subsidiary was a good or bad business decision, the use of the Term C Loan to pay off the revolver in order to have those funds available to meet day-to-day capital requirements was not hidden from investors.   Nor is it likely investors were misled by the statement in the Form 10-Q for the second quarter of 2000 as Plaintiffs assert. (SAC, ¶ 341.)   Although ITG did state that it had used the Term C Loan to pay revolving credit facility loans, the very next paragraph advises investors that "paydowns of the Company's revolving facility allow for subsequent re-borrowing under the facility."   (Becker Decl., Tab G-2 at 6-7.) Finally, there is no factual support for Plaintiffs' allegation that ITG and its lending banks had begun discussing the sale of "non-core assets" in March 2000 when it took on Term C Loan; in fact, the Company continued its acquisitions through May 2000, as Plaintiffs acknowledge.   (SAC, ¶ 78.)

The fact that ITG was highly leveraged was never hidden from investors.  For instance, in the 10-K for 1999, issued shortly after the beginning of the Class Period, the Company stated:

---

[43]  According to the Notes to the Financial Statements in the 10-K for 1999, ITG acquired all of the outstanding capital stock of Emcon, Inc., on June 15, 1999, for $62 million plus $2 million in transaction costs.  (Becker Decl., Tab F-2 at 31.)

We have a significant amount of indebtedness. . . . Our substantial indebtedness could have important consequences.  For example, it could:

– increase our vulnerability to general adverse economic conditions;

– limit our ability to make further acquisitions;

– limit our flexibility in planning for, or reacting to, changes in our business and the environmental services industry;

– place us at a competitive disadvantage compare to our competitors that have less debt; and

– limit, along with the financial and other restrictive covenants in our indebtedness, our ability to borrow additional funds.  And, failing to comply with those covenants could result in an events of default which, if not cured or waived, could have a material adverse effect on us.

Our indebtedness will require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, and other general corporate purposes. . . .We can make no assurance, however, that our business will generate sufficient cash flow from operations or that future borrowings will be available to us under our credit facilities in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs.

(Becker Decl., Tab F-2 at 8-9.)[44]

Finally, Plaintiffs cite no case law for their assertion that investors were "entitled" to know that the Company suffered from a chronic liquidity crisis. Even if one considers the "true" information about the Company's revolver availability as estimated by Plaintiffs, after the Company took on the additional term loan in March 2000, its available credit on the revolver was never less than $21 million until the second quarter of 2001, when fell in three months from Plaintiffs' estimate of approximately $35.9 million to $7.7 million at the end of the third quarter.  (SAC, ¶¶ 140, 143.) The fact that ITG did not seek bankruptcy protection for almost two years after the alleged liquidity crisis began supports an inference that although for most of the Class Period, liquidity was a problem, there was no "crisis" to disclose.  See In re Ultrafem Sec. Litig., 91 F. Supp.2d 678, 700

---

[44] Similar caveats appeared the 10-K for 2000; see Becker Decl., Tab F-3 at 6-7.

(S.D. N.Y. 2000) (dismissing plaintiffs' allegations of fraudulent projections of company's working capital resources because the "complaint acknowledged that [the company's] capital lasted for nearly fifteen months, clearly negating any claim of misrepresentation.") By the time liquidity began to reach the crisis level in the second quarter of 2001 (again accepting Plaintiffs' estimates of true revolver availability), investors were well aware of the Company's liquidity problems and its failure to meet its debt reduction goals.

      **b. Artificially paying down the credit line –**  The Court notes that CW2 from Emcon and CW4 and CW5 from Beneco are the only witnesses who complain about the fact that the divisions for which they worked were compelled to "pay down the credit line" or "wire all available cash" to headquarters.[45]   Since Beneco is specifically named as a borrower in the credit agreement (Becker Decl., Tab R, cover sheet), it does not seem unreasonable that it should be required to make quarterly loan payments.  Furthermore, since the credit agreement requires loan covenants to be calculated on a consolidated basis, using cash generated in the divisions would not seem to be a violation of loan covenant principles, although it is not clear why monies needed to be physically transferred.[46]

      Writing checks to vendors in one quarter but not sending them out until the next would have

---

[45]  The Court gives no weight to the unsubstantiated hearsay statement by CW4 that it was "common knowledge" that "they were doing this with everybody," i.e., with the other ITG divisions.  (SAC, ¶ 271.)  *See* In re Cree Sec. Litig., 333 F. Supp.2d 461, 475 (M.D. N.C. 2004) stating that the plaintiffs' claim that the fraud "was well-known within [the company]" was too general to show that the defendant officers and directors had knowledge of the alleged fraud; CALPERS, 394 F.3d 126, 155 (3d Cir. 2004), rejecting "generic and conclusory allegations based upon rumor or conjecture."

[46]  We do not have a complete copy of the credit agreement, but the excerpt provided at Becker Decl., Tab R, includes a provision that "Each of the Borrowers agrees to cause all collections of Receivables, all proceeds of Collateral and all Net Cash Proceeds now or hereafter received directly or indirectly by such Loan Party or in the possession of the Loan Parties to be held in trust for the Administrative Agent for the benefit of the Lenders and, promptly upon receipt thereof, to be deposited into a Blocked Account.  All funds in the Blocked Accounts shall be automatically transferred into the Concentration Account pursuant to the Block Account Agreements."  (Second Amended and Restated Credit Agreement, Section 3.5.)  We cannot presume to know the full effect of this provision, but the language referring to the automatic transfer of funds into a concentration account could refer to the quarterly transfers of cash to Pittsburgh about which Confidential Witnesses 2, 4 and 5 complain.

the effect of increasing actual cash on hand at the end of the quarter, as Plaintiffs contend. However, the Company's accounts payable total would have decreased concomitantly unless the Company were keeping two sets of books, which Plaintiffs do not allege. Data compiled from the SEC filings between December 1999 and September 2001 show that while accounts payable were paid down in the first quarter of 2000 and 2001, they steadily increased throughout the remainder of each year.[47] The market would have understood from this information that ITG's creditors were providing an additional source of financing for the Company, another indication it was in financial difficulty.

Even if we accept Plaintiffs' contention that Defendants Soose and/or DeLuca instituted a practice of deliberately paying down the credit line at the end of each quarter in order for ITG to meet its loan covenants, Plaintiffs have failed to allege why this practice constitutes fraud, violated the terms of the loan agreements, GAAP, or any SEC regulation, or why it should have been disclosed to the market. Presumably, the banks knew on a daily basis just how much ITG had borrowed and could have easily detected the pattern of paying off the credit line at the end of each

---

[47]

| PERIOD ENDING | ACCOUNTS PAYABLE BALANCE (in thousands) |
|---|---|
| 12/99 | 206,068 |
| 03/00 | 186,668 |
| 06/00 | 192,904 |
| 09/00 | 221,887 |
| 12/00 | 254,689 |
| 03/01 | 215,918 |
| 06/01 | 240,253 |
| 09/01 | 240,373 |

(*See* Becker Decl., Tabs F and G.) The fact that accounts payable decreased in the first quarter of 2000 and 2001 lends credence to the Company's assertions in its SEC filings that cash flow seasonally increased in the fourth quarter of each year.

quarter only to borrow again immediately thereafter.  But, as noted above, the banks also received the SEC filings, and could have compared the data provided from their own records, particularly if there was any hint that ITG was not in compliance or only achieving compliance by using questionable accounting practices.  In order to accept Plaintiffs' theory that paying down the credit line at the end of each quarter was fraudulent, one would also have to infer that the banks ignored the fact that the SEC filings were materially different from the reports provided only to them.  There are no such allegations that the lenders (deliberately or inadvertently) assisted ITG in making false representations of its available credit to investors through the SEC filings and other public statements.

      **c.  Difficulty meeting loan covenants and failure to meet covenants if average credit line balance rather than the manipulated balance had been used** – Plaintiffs argue that because the Company publicly asserted that it had satisfied its loan covenants, it had a duty to disclose the difficulty it had meeting those covenants and the fact that it would have failed to meet them had the credit line balance not been manipulated downward at the end of each quarter.  (Plfs.' Memo at 24-26.)  They fail, however, to identify any specific GAAP provision[48] which requires a company to disclose the relative difficulty it experiences in meeting such financial obligations.  Even if there were such a requirement, however, the market would have been aware at two specific points that ITG was experiencing such difficulty.  First, the Company admitted that in December 2000, it had requested

      an amendment to the credit agreement for the exclusion of the special charge from

---

[48]  Plaintiffs allege that Defendants violated several "fundamental accounting principles," i.e., provide investors with useful information enabling rational investment decisions; provide accurate information about the economic resources of the enterprise; represent what they purported to represent; provide complete information; and use conservatism in the face of uncertainty to allow for adequate consideration of risks. (SAC, ¶ 234; Plfs.' Memo at 24-25.)  Even if these broad principles were violated by the unnamed "Defendants," allegations that information was "incomplete" or failed to provide sufficient accurate information about the Company's financial resources, without more, fail to satisfy the particularity requirements of the PSLRA.  Alabaster v. Bastiaens, CA No. 99-10237, 2000 U.S. Dist. LEXIS 22354, *21-22 (D. Mass. 2000).

[its] covenant ratio calculations and revisions to the financial covenants which included, among other items, the deferral of more restrictive future financial covenants for maximum EBITDA, minimum interest coverage and minimum fixed charge coverage, as defined, to later quarters over the next two years.

(Becker Decl., Tab F-3 at 17.)

Such requests, coming only nine months after the Company had taken an additional $100 million loan, would have alerted the market that ITG must have experienced difficulty meeting its loan covenants during the last quarter of 2000 if not before.

Second, in the 10-Q for the first quarter of 2001, ITG alerted investors to the fact that

We continue to have significant cash requirements including the service on our substantial indebtedness.[49]  Meeting the requirements of our debt agreements may from time to time affect our ability to balance operational and other cash requirements.  Through the first four months of 2001, our average available borrowing capacity was approximately $37 million. . . . The credit facilities . . . have various financial covenants for maximum EBITDA leverage, minimum interest coverage and minimum fixed charge coverage, as defined.  We were compliant with the covenants and all other limitations of our credit agreement at March 30, 2001.  Our ability to maintain our liquidity, maintain compliance with our financial covenants, and achieve our stated debt reduction goal is dependent upon our ability to successfully execute projects at adequate gross margin levels, to carefully manage our working capital, and to aggressively contain costs.  Our financial covenants begin to be more restrictive with the quarter ending September 28, 2001.  If we were adversely impacted by unforeseen business conditions, we may be required to seek additional modifications to our credit agreement.  In addition to the potential uncertainty of our ability to obtain additional modifications, if necessary, we would incur additional costs in the form of fees and interest expense for any such modifications.

(Becker Decl., Tab G-4 at 12.)

The Court interprets this language as a series of red flags to investors, i.e., (1) ITG had not been successful paying down its debt (otherwise, it would have had more than $37 million available on its credit facilities); (2) although ITG was able to comply with the debt covenants as of March 31, 2001, it was alerting investors (by using more cautionary language than in any previous SEC

---

[49]  At this point, the Company's long term debt stood at $663,956,000.  (Becker Decl., Tab G-4 at 2.)  If in the first four months of 2001, the Company's average available borrowing capacity was approximately $37 million, a simple calculation shows that had only 5% of its credit facility available for further borrowing.

filing) that compliance was already difficult and would become more so in six months; and (3) the Company was so close to the brink of failing to comply that any adverse change in the general business climate or its internal management could force it to seek an amendment to the credit agreement for the second year in a row.

Similar language appears in the 10-Q for the second quarter of 2001, alerting investors to the fact that liquidity was not improving; in fact, average borrowing capacity for the first half of the year had fallen to $25 million.  (Becker Decl.,Tab G-5 at 12.)  The Company revealed in its 10-Q for the third quarter of 2001 that it had anticipated it would not meet the more restrictive covenants in effect as of September 2001 (as it had previously warned investors) and had again sought modification of those covenants.  (Becker Decl., Tab G-6 at 11.)  It also warned investors that it expected to negotiate a third amendment during the first quarter of 2002, another sign that the Company did not expect its liquidity situation to improve in the near future.[50]

In a similar case, the plaintiffs alleged that the defendant company was suffering financially, operating at a loss and "was dangerously close to defaulting on billions of dollars of debt."  In re Goodyear Tire & Rubber Co. Secs. Litig., CA No. 03-2166 *et al.*, 2006 U.S. Dist. LEXIS 11914, *72-73 (N.D. Ohio Mar. 22, 2006).  The court found that neither these allegations, the allegation that the defendants must have committed fraud because they knew they were likely to breach certain loan agreements, nor the fact that Goodyear amended its bank credit facility agreements evidenced fraud.  In fact, the court noted that the steps Goodyear took to amend its loan covenants showed that "the company was (1) aware of its financial condition, (2) not hiding it, and (3) taking steps to remedy the situation."  Id., *74.

Likewise, we conclude that the fact Defendants were aware that the Company was having difficulty meeting its loan covenants does not automatically lead to the inference that Defendants

---

[50]  During the third quarter, the Company's reported average borrowing capacity under the credit agreement was only $10 million.  (Becker Decl., Tab G-6 at 11.)

perpetrated a scheme to defraud the banks and the investing public by falsely claiming to have met its loan covenants. And, contrary to Plaintiffs' claim that ITG hid the fact that it was having difficulty meeting those covenants, that information was made available to the market not later than March 20, 2001, when the 10-K for 2000 was issued, and in every SEC filings thereafter until the Company's demise.

Plaintiffs have created a series of charts in which they compare the "manipulated" balance on the revolving credit line to the "true revolver availability" from the fourth quarter of 1999 through and including the third quarter of 2001. (SAC, ¶¶ 127-146.) Based on the daily liquidity reports, they calculate the average credit line balance for each quarter. They then assert that if the average revolver balances had been used to calculate the leverage ratio, ITG would have violated its loan covenants every quarter except one. (Id., ¶ 135.)

The Court finds this claim that ITG would defaulted on its loan agreements if it had it had used the average credit line balance to calculate the loan covenants to be another entirely hypothetical allegation. While Plaintiffs' contention may be true, they have failed to identify (or even allege) a credit agreement provision that required the Company to determine its compliance with loan covenants in that manner. The available excerpts from the credit agreement which mention various compliance ratios, e.g., the minimum fixed charge coverage ratio, minimum interest coverage ratio, and maximum leverage ratio, are all to be determined "as of the end of the last day of each fiscal quarter." (Becker Decl., Tab F-3, Exhibit 10.11.2, Amendment No. 1 to the Second Amended and Restated Credit Agreement, December 21, 2000, at 8.) No document submitted to the Court indicates that any loan covenant was to be calculated based on the Company's average use of the credit line during the reporting period. Nor have Plaintiffs asserted that any GAAP provision or SEC rule requires a company to present such information in its SEC filings.

Plaintiffs seem to argue that ITG had a duty to alert investors to situations which might have

been created if it had presented its financial information the way Plaintiffs think it should have.  To our knowledge, there is no legal requirement that a company explicitly alert investors to *every* event which might potentially occur.  *See* <u>Basic, Inc.</u>, 485 U.S. at 237, requiring "balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Plaintiffs do not allege that the banks (1) objected to the way the loan covenant calculations were made, (2) waived any violations of the loan covenants, or (3) turned a blind eye to such violations, allegations which would lend support to an inference that the Company truly had defaulted on its loan covenants.   The fact that ITG twice requested modifications to its loan covenants -- which, as Defendant Harvey acknowledged, is a serious event – supports the inference that the Company was well aware of its precarious financial condition. Information about the requested modifications was made available to the public in the next SEC filing after those events occurred; furthermore, the market was told of a possible third modification before it occurred.  Thus, we conclude that Plaintiffs have created nothing more than a hypothetical misrepresentation, not a factual claim that Defendants engaged in fraudulent activity.

  **d.  False and misleading press releases –** A review of the press releases, in their entirety, shows that each of them contains language similar to the following:

> Statements regarding the intentions, beliefs, expectations or predictions of The IT Group, Inc., (the Company) and its management, including but not limited to, those statements denoted by the words "anticipate," "believe," "expect," "should," and similar expressions are forward-looking statements that reflect the current view of the IT Group and its management about future events and are subject to certain risks, uncertainties and assumptions.  Actual results could differ materially from those projected in such forward-looking statements as a result of a number of factors, including, but not limited to, competition and pricing pressures, bidding opportunities and success, project results including pursuing claims and change orders, management of the Company's cash resources, matters affecting contracting and engineering business generally, such as seasonal work, the impact of weather and clients' timing of projects, the Company's ability to generate a sufficient level of future earnings to use its deferred tax assets, the success of the Company's acquisition strategy, including the effects of the integration of recent acquisitions and any future acquisitions, and achievement of expected cost savings and other synergies from these acquisitions and industry-wide factors.

(Becker Decl., Tab J-1 at 2.)

"A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." In re Trump Casino, 7 F.3d at 371.  Courts have often concluded that to be effective, warnings such as the above related to forward-looking statements must be specifically tailored to the subject matter of the publication and must reveal the principal risks facing the company at the time the statements were issued.  Mere "inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading." See In re Immune Response Secs. Litig., 375 F. Supp.2d 983, 1035-1036  (S.D. Cal. 2005) and cases cited therein.

Here, in addition to general warnings relevant to any company in the contracting and engineering business, the disclaimer explicitly mentioned risks specific to ITG, e.g., "the Company's ability to generate a sufficient level of future earnings to use its deferred tax assets," and "the success of the Company's acquisition strategy."  Moreover, subsequent press releases tailored the warnings to events either mentioned in the release itself or to the subject matter of the release.  For instance, the press release of April 27, 2000, regarding the 10-Q report for the first quarter, added the phrase "particularly in light of the Company's substantial leverage," after "management of the Company's cash resources."  This caveat was tailored to the announcement in the 10-Q that ITG had just taken on an additional $100 million in debt.[51]  The disclaimer also added a warning with regard to "funding of backlog," again, an appropriate addition since the press release explicitly addressed that subject.  (Becker Decl., Tab J-3.)   In a press release which explained that the Company was "highly focused on its 2001 plan of $90 to $100 million of debt reduction," one element of that plan was receipt of an additional advance payment on a project identified as Iron Mountain Mines.  The disclaimer specifically noted that one of the uncertainties in the Company's

---

[51] This fact is not mentioned in the press release.

debt reduction plan was "the performance of other parties of their duties under the Iron Mountain

Mines Consent Decree." (Becker Decl., Tab J-6 at 2.) Moreover, by February 21, 2001, when this

press release was issued, ITG had publicly acknowledged that its financial situation had become

more precarious and the disclaimer was expanded to include warnings about

> the ability of the Company to negotiate and otherwise realize the amounts of project
> and legacy claims, including the uncertainty of the prospects of litigation, the ability
> to manage subcontracted work, the ability to attract and retain qualified personnel,
> the ability to manage costs and margins, the availability of Federal funding in the
> Company's outsourced services business, the ability to close real estate restoration
> transactions (including those for its excess land, the contracts for which are subject
> to customary closing conditions, including due diligence), the Company's ability to
> utilize tax loss carry forwards, management of the Company's cash resources,
> particularly in light of the Company's substantial and variable leverage . . . .

(Id., at 2-3.)

The Court concludes that the disclaimers in the press releases are sufficiently specific to

the risks facing ITG as compared to similar companies that the forward-looking statements therein

fall within the PLSRA's safe harbor. We therefore turn to other statements in the press releases

alleged to have been false and misleading.

Plaintiffs allege no facts to support their claim that when Mr. DeLuca stated in the press

release dated February 24, 2000, "our FY 2000 operating plan is highly focused on generating free

cash flow expected to be used to pay down debt further," he knew that ITG would be unable to

achieve this goal. While they imply that it was "no coincidence" that the $46 million pay-down of

debt in the fourth quarter of 1999 "matches well" with the $53 million in checks Defendants DeLuca

and Soose instructed CW1 to withhold at end of 1999 (SAC, ¶ 129), they do not dispute that such

a paydown actually occurred or that the Company generated operating cash flow that could also

have been the source of the funds used to pay down the debt.[52]

---

[52] Operating cash flow for 1999 was $47 million, an increase of $62 million "principally due to
improved operating results in 1999 and . . . also due to a $17 million net change in discontinued
operations cash flow as a result of the 1999 release of previously restricted trust fund assets of
discontinued operations." (Becker Decl., Tab F-2 at 22.)

Plaintiffs claim that a statement in the March 7, 2000 press release that four new contracts "offer further evidence that our diversification initiatives to expand construction, facility maintenance and outsourced services has [sic] been successful" was false and misleading because it failed to disclose the Company's growing liquidity problems related to this growth-by-acquisition strategy. (SAC, ¶ 295.)  Setting aside the question of whether these claims are merely puffery, Plaintiffs fail to identify how Mr. DeLuca knew at that point that the liquidity problems were related to the growth-by-acquisition strategy, a strategy which was still evolving since ITG continued to make acquisitions until May 2000.  (SAC, ¶ 78.)

The press release dated April 27, 2000, included several statements which we consider puffery.  Mr. DeLuca is quoted as saying, "The recent contract awards demonstrate our *excellent reputation* with a diverse range of clients and our *broad and sophisticated skill base*.  Our April announcement of the acquisition of W&H Pacific, Inc., . . . provides *further evidence of the success* of our diversification strategy."  (Becker Decl., Tab J-3, at 2, emphasis added.)   Plaintiffs contend that statements which refer to "net working capital" (i.e., current assets, including receivables minus current liabilities) and total debt were false and misleading "by virtue of the Company's ongoing liquidity problems and manipulation of its indebtedness, and because its receivables and therefore its revenues were overstated."  (SAC, ¶¶ 316-317.)  However, it is impossible to determine if the statements that net working capital was $202,303,000 and total debt was $690,443,000 as of March 31, 2000, are material misstatements because Plaintiffs fail to allege, even approximately, what those numbers truly should have been.

In a release issued on July 26, 2000, Mr. DeLuca stated that net income (which had fallen to $4.7 million in the second quarter as compared to $7.2 million in the second quarter of 1999) had been affected by higher goodwill and interest expenses, project delays, and technical personnel shortages.  The fall in the price of ITG stock from $7.875 per share on February 24, 2000, to $4.75

per share on July 25, 2000,[53] the day before the press release was issued, was also of sufficient concern that Mr. DeLuca stated, "Both the Company and the Carlyle Group . . . continue to believe that current market prices for the Company's common stock are not reflective of its true value." Plaintiffs contend these statements failed to disclose that ITG was suffering from a liquidity crisis or "the nature of its dealings and understandings with its lending banks" (SAC, ¶ 335), but fail to explain what those "dealings and understandings" encompassed. The argument that the press release was false and misleading because ITG did not disclose its liquidity crisis fails to take into account other information in the market place, e.g., the SEC filings for 1999 and the first two quarters of 2000, which would have alerted investors to the fact that the Company had just taken on an additional $100 million term loan and was not able to begin paying down its debt as it had assured investors it would.

The press releases between October 26, 2000 and October 30, 2001, take on ever-increasing somber notes regarding operating income, estimated earnings, the general economic downturn, and, eventually, the effects of September 11, 2001. Statements about the Company's ability to pay down its debt, e.g., "we continue to be confident that our debt reduction target will be achieved" (press release dated February 22, 2001) fade to the less confident "we believe we will substantially achieve our year-end debt reduction goals" (press release dated July 26, 2001.) These negative disclosures are reflected in stock prices which fell from $5.94 per share on July 26, 2001, to $3.57 on November 1, 2001. (Becker Decl., Tab O.)

In sum, the total mix of information available to the market would have led to the conclusion that despite its expressions of confidence, ITG was not in a position to make substantial inroads in its debt reduction, the price of its stock was steadily falling, it posted a net loss of $17.6 million in 2000 as compared to a net income of $32.2 million in 1999, and revenue was essentially flat

---

[53] These prices did not appear in the press release but are taken from the table of stock prices day-by-day for the Class Period, Becker Decl., Tab O.

throughout 2001.  Its liquidity problems, significant leverage and difficulty meeting loan covenants were not hidden from the market, contrary to Plaintiffs' assertions.  In particular, the increasing financial problems could be directly perceived from the SEC filings, e.g., the decreasing cash and cash equivalent balance, increasing long-term debt, and decreasing revolving credit availability.[54]  Thus, far from downplaying its debt problems, the Company acknowledged them.

        4.    *Failure to Disclose the Company's Inability to Abide by Pay-When-Paid Regulations:*  Plaintiffs allege that Defendants failed to disclose that the Company's liquidity problems were compounded by governmental pay-when-paid rules.  Under federal acquisition regulations,[55] a contractor must certify that it has satisfied all outstanding invoices due to its subcontractors before it can invoice the government for further payment.  Within seven to ten days of receiving payment from the government, the contractor must satisfy the invoices of subcontractors associated with that payment.  According to information compiled during the ITG bankruptcy proceedings, more than 50% of the Company's revenues were derived from federal

---

[54]

| QUARTER ENDING | CASH and CASH EQUIVALENTS (in thousands) | LONG-TERM DEBT (in thousands) | REVOLVER AVAILABILITY (in thousands) |
|---|---|---|---|
| 12/99 | 29,529 | 621,772 | 40,313,747 |
| 3/00 | 17,861 | 668,737 | 92,442,642 |
| 6/00 | 16,576 | 691,233 | 67,817,942 |
| 9/00 | 15,771 | 696,600 | 59,717,942 |
| 12/00 | 15,624 | 644,623 | 95,388,779 |
| 3/01 | 14, 510 | 663,956 | 74,304,389 |
| 6/01 | 14,293 | 674,051 | 56,749,389 |
| 9/01 | 12,588 | 686,558 | 46,024,300 |

(*See* Becker Decl., Tabs F and G; SAC ¶¶ 128, 132, 134, 136, 138, 140, 143, and 145.)

[55] Plaintiffs do not identify with specificity the source of this regulation, but Defendants do not deny that such regulations were applicable to at least some of the Company's government contracts.

government contracts which incorporated pay-when-paid provisions.   (*See* Becker Decl., Tab K, First Report of R. Todd Neilson as Examiner for the IT Group, Inc., *et al.* Pursuant to Order of Appointment Dated March 11, 2002 ("Examiner's Report"), at 19-20.)   The Examiner's Report concluded that "during the last quarter of 2001," the Company was no longer able to invoice the government because ITG could not certify that it had met the pay-when-paid conditions.   Once the Company's cash flow was insufficient to cover timely payments to subcontractors, it could no longer invoice the federal government and was in danger of default. (SAC, ¶¶ 200-203; *see also* Examiner's Report at 19-21.)   By the time ITG declared bankruptcy in January 2002, the amount owed to subcontractors was estimated at $79 million.   (SAC, ¶ 214.)

Confidential Witness 1 stated that Defendants Soose and DeLuca knew about the pay-when-paid regulations "better than he did in that they had been in the business of government contracting longer."   (SAC, ¶ 206.)   According to Mr. Soose, "by the end of November and early December 2001," unpaid subcontractors and vendors had stopped working on certain of the Company's projects.   (Id., ¶ 204.)   Plaintiffs assert that the actual default "substantially predated" Mr. Soose's estimate of when the Company violated the pay-when-paid rules, based on Mr. Harvey's testimony that about two weeks after became CEO, he discovered vendors were not being paid according to federal acquisition regulations and "put a stop" to the practice.   (Id., ¶ 205.)

Defendants argue that contrary to Plaintiffs' allegations, in every SEC filing published during the Class Period, ITG warned investors that if "due to liquidity constraints [it was] unable to timely pay subcontractors, suppliers and lessors, . . . results of operations, liquidity and financial condition could be negatively impacted."   (Defs.' Memo at 46; *see also* Becker Decl., Tab G-6 at 11.)

The Court agrees that the risks associated with government contracting were not hidden from investors.   For instance, in the 10-K for 1999, the Company stated, "As a major provider of services to governmental agencies, we face the risks associated with government contracting." (Becker Decl., Tab F-2 at 10.)   Specific examples of such risks were provided, e.g., reduction in

spending by federal agencies, civil and criminal fines and penalties for violations, public scrutiny of its performance at high profile sites, ongoing audits by the Defense Contract Audit Agency, and the potential of investigations by governmental agencies such as the Environmental Protection Agency.  (Id.)  The section on "Government Contractor Risks" concluded: "[T]he failure to comply with the terms of one or more of our government contracts could result in our suspension or debarment from future government contract projects for a significant period of time.  This could result in a material adverse effect on our business." (Id. at 11.)  These statements regarding risks associated with government contracting were repeated, essentially verbatim, in the 10-K for fiscal year 2000.  (Becker Decl., Tab F-3 at 9.)

We also agree with Defendants that the claim that ITG survived by violating the pay-when-paid regulations is too vague to satisfy the PSLRA requirements of particularity.  First, while Defendants Soose and DeLuca may have known about the regulations, as alleged by CW1, there is no allegation that either of them knew the regulations were being violated, when such violations began, or any description of a specific violation.  Although Plaintiffs assert that Mr. Harvey learned of the alleged violations shortly after becoming CEO, i.e., after November 13, 2001, this testimony is not inconsistent with Mr. Soose's testimony that "by the end of November and early December 2001," the Company could no longer meet this requirement, nor with the Examiner's Report that this problem arose "during the last quarter of 2001."  Moreover, consistent with this time period, the Company explicitly mentioned in a press release issued on December 13, 2001, its "ability to pay subcontractors and vendors on government projects after receipt of payments from the government" as one factor which could affect its recovery efforts.  (Becker Decl., Tab J-12 at 2.)  This timing for the failure to meet pay-when-paid regulations can also be inferred from a graph presented to the lenders on December 7, 2001, which shows that government payables had increased "significantly" only during the last two months.  (Becker Decl., Tab Q at ITG 00229.)

Apparently recognizing these problems with their allegations, Plaintiffs argue that the

general statements regarding the risks associated with government contracting are insufficient to adequately inform investors because they say nothing about the Company's inability to invoice its main customer if subcontractors were not paid.  Because Defendants mentioned the impact of government regulations generally, they were therefore legally obligated to make full disclosure concerning the paid-when-paid regulations.  Moreover, they argue, the issue is not that Defendants failed to disclose *violation* of the regulations, rather that they failed to disclose the *existence* of those regulations.  The key issue is that proper observance of these regulations substantially impaired ITG's liquidity even if they were never violated.  (Plfs.' Memo at 34.)

As another court has recognized in the context of a comparable claim that the defendant failed to disclose certain material facts stemming from Food and Drug Administration ("FDA") regulations,

> [t]he fallacy in the plaintiff's argument is that the FDA policies and . . . guidelines are public.  When a plaintiff complains that a defendant failed to disclose a material fact necessary to make its statement not misleading, the concealed information must be information known to the defendants that is not otherwise available to the investing public.   Securities laws require issuers to disclose *firm-specific* information; investors and analysts combine that information with knowledge about the competition, the regulatory conditions, and the economy as a whole to produce a value for stock. Here the plaintiff alleges fraud-on-the-market. . . . The regulatory environment is presumed to be known in an efficient market. . . .  The defendants did not engage in fraud by failing to tell investors about the FDA's published regulatory guidelines and how they might affect the FDA's view of [defendant's] application. Such information was available to investors.

Noble Asset Mgmt. v. Allos Therapeutics, Inc., CA No. 04-1030-RPM, 2005 U.S. Dist. LEXIS 24452, *20-21 (D. Colo. Oct. 20, 2005) (internal citations omitted; emphasis in original); *see also* Epstein v. Washington Energy Co., 83 F.3d 1136, 1142 (9th Cir. 1996) (the term "firm specific information" refers to information that is peculiarly within the knowledge of the corporation.)

When a plaintiff relies on a fraud-on-the-market argument, he must assume that all publicly known information has been incorporated into that market.   Basic, Inc., 485 U.S. at 246.  Government regulations pertaining to multi-year, multi-million dollar environmental remediation contracts clearly fall within the scope of publicly known information that analysts and investors would have combined with information specific to ITG in determining the market price for its stock.

Plaintiffs' claim that Defendants recklessly or knowingly defrauded investors by failing to disclose the existence of pay-when-paid regulations must therefore be dismissed.

        5.    *Misrepresentations as to the Value and Reliability of the ITG Contract Backlog:*  Plaintiffs allege that Defendants misrepresented or failed to disclose to investors that a substantial part of its "much-vaunted" backlog of government contracts either was known to be unprofitable and/or would be realized only five or more years in the future.  (SAC, ¶ 235.)  Contrary to statements in its SEC filings, the Company did not "bid selectively on new work," but rather "in its effort to generate revenue growth, . . . accepted a number of projects which were either low margin or unprofitable."  (Id., ¶ 236.)  The SEC filings further misled investors by implying that the Company was the only "successful bidder" on the indefinite delivery order contracts awarded by the federal government and that after ITG had been identified as the successful bidder, "work is typically awarded to us without further formal competitive bidding."  (Id. , ¶ 237.)  In reality, each IDO contract was awarded to a number of bidders, each one of whom could do the work required, and ITG could not consider itself the contractor until work was assigned when and if the contract was funded.  (SAC, ¶ 238.)

        Plaintiffs support these claims by referring first to a presentation Defendant DeLuca gave at a conference held by Donaldson, Lufkin & Jenrette ("DLJ")[56] on April 14-15, 1999.  Following the conference, DLJ released a transcript[57] of Mr. DeLuca's presentation in which he "touted" the Company's backlog, claiming that the revenue stability assured by the high quality and quantity of

---

[56]  Neither party identifies Donaldson, Lufkin & Jenrette for the Court, nor indicates why this conference would have been important to investors.  The Court takes judicial notice of the fact that Donaldson, Lufkin & Jenrette was a leading integrated investment and merchant bank serving institutional, corporate, government, and individual clients.  DLJ's businesses included securities underwriting; sales and trading; investment and merchant banking; financial advisory services; investment research; venture capital, correspondent brokerage services; private client; online, interactive brokerage services; and asset management.  On August 30, 2000, Credit Suisse First Boston acquired Donaldson, Lufkin, & Jenrette Inc.  *See* www.snlfinancial.com press releases.

[57]  The Court has not received a copy of this transcript and so accepts Plaintiffs' allegations as to its contents.

the Company's $4 billion contract backlog amounted, in essence, to a Company "annuity."  (SAC, ¶¶ 284-286.)  Similarly, in a press release dated February 24, 2000, Mr. DeLuca falsely referred to the Company's "backlog of $4.3 billion as of December 31, 1999, up from $3.5 billion at the end of 1998."  (SAC, ¶ 293; *see also* Becker Decl., Tab J-1.)

Plaintiffs allege the Company's Form 10-K for 1999[58] further misrepresented ITG's contract backlog by claiming that it expected to earn revenues "primarily over the next one to five years" and that the backlog was predictable and stable.  According to Plaintiffs, ITG again failed to disclose that much of the backlog work  was low margin or would lose money, and that the government had no binding obligation on the backlog until it funded the projects.  (SAC, ¶¶ 311-313.)

Plaintiffs also rely on statements by three Confidential Witnesses.  According to CW2, "everyone at IT Group knew the Company's claimed backlog was 'b.s.'"  He claimed that Mr. DeLuca "took the full budget number" for projects under IDO contracts, not the amount that had historically been awarded to ITG.  (SAC, ¶ 253.)

CW4 alleged that Beneco's claimed backlog in 1999 and 2000 was overstated because it was based on the maximum potential revenue from government contracts, not an estimate based on historical experience.  The backlog numbers CW4 provided each quarter for Beneco would come back in the form of "inflated 'outrageous numbers'" from Pittsburgh corporate headquarters, meaning Soose and DeLuca.  CW4 knew "odds were that this claimed backlog would never be taken into revenue."  (SAC, ¶ 276.)

CW5 stated that prior to its acquisition by ITG, Beneco recorded only revenues which reflected delivery orders actually received on IDO contracts.  Dave Derry, an ITG vice president who reported directly to Mr. Soose, ordered CW5 to book revenues in excess of orders already

---

[58]  Plaintiffs allege similar misrepresentations and omissions about the backlog were reiterated in the Company's Forms 10-Q for the first three quarters of 2000 (SAC, ¶¶ 332-333, 352-353, and 371, respectively); Form 10-K for 2000 (SAC, ¶¶ 397-398); and Forms 10-Q for the first three quarters of 2001 (SAC, ¶¶ 420, 443, and 464, respectively.)

received "as revenues in excess of billings, an asset account with an offset to revenue on the income statement," which he did under protest. CW5 told Ernst & Young field auditors about this directive to improperly book revenue, but assumed "they were going along with this methodology." (SAC, ¶ 280.)

Defendants argue that the published statements about the backlog are not actionable because the information Plaintiffs claim was not disclosed or false was fully explained, often in the very documents Plaintiffs claim were misleading. (Defs.' Memo at 57-58.) Moreover, the allegation that ITG overstated its total backlog amount by claiming the entire contract award rather than the historically anticipated ITG share is unsupportable because it rests entirely on vague, imprecise statements by CW2 and CW4 (e.g., "backlog was b.s." and "outrageous numbers were coming out of Pittsburgh"), neither of whom can be presumed to know ITG's corporate practices. (Id. at 58-59.) In response, Plaintiffs argue that their claim is not that the backlog was overstated by any specific quantifiable amount, but rather that ITG misrepresented that the backlog was "exclusive" to the Company and falsely misrepresented to investors that it could expect to receive 100% of the IDO contracts rather than disclosing that at best, the contracts could be performed by multiple contractors. (Plfs.' Memo at 36.)

The Court agrees with Defendants that published statements about the backlog informed investors about the tenuous nature of IDO contracts. In the Form 10-K for fiscal year 2000, for instance, ITG stated in relevant part:

> Our total funded and unfunded backlog at December 29, 2000 was $4.7 billion, including $0.5 billion relating to our share of joint ventures backlog. . . . Our backlog . . . includes approximately $1.9 billion of funded backlog. We expect to earn approximately $1.1 billion of revenue from our backlog in 2001, with a substantial portion of the backlog consisting of governmental contracts, many of which are subject to annual funding and definition of project scope. The backlog . . . includes $2.8 billion . . . of future work we estimate we will receive (based on historical experience) under existing indefinite delivery order programs. In accordance with industry practices, substantially all of our contracts are subject to cancellation, delay or modification by the customer. . . .

(Becker Decl., Tab F-3 at 18.)

Also, the Company explicitly identified as "risks, uncertainties, and assumptions" those related to "bidding opportunities and success" and "funding of backlog," and cautioned that "our actual results could differ materially from those projected in these forward-looking statements as a result of these factors, many of which are beyond our control."  (Becker Decl., Tab F-3 at 18-19.)

From these disclosures, a reasonable investor would know (1) only about 40%, i.e., $1.9 billion of $4.7 billion of the backlog was funded; (2) $2.8 billion of the total backlog was estimated based on historical experience; and (3) "substantially all" of the contracts were subject to change by the client.  Moreover, there is nothing in these statements from which a reasonable investor would infer that ITG was the "exclusive" contractor or that the Company was "guaranteed" the IDO contracts.

The February 24, 2000, press release which Plaintiffs claim fails to distinguish between funded and unfunded backlog (Becker Decl., Tab J-1) identifies as forward-looking statements those related to "bidding opportunities and success" and to "funding of backlog."  It also notes in the balance sheet section that the backlog of $4.3 billion "includes indefinite delivery orders."  (Id. at 6.)   Like the pay-when-paid regulations, the way in which IDO contracts function would be known in an efficient market.[59]  The Court also concludes that Mr. DeLuca's analogy to the backlog as "an annuity" during his presentation to Donaldson, Lufkin & Jenrette was the type of vague and obvious hyperbole on which no reasonable investor would rely.

Plaintiffs have also failed to show the statement that ITG expected to earn revenues from the backlog "primarily over the next one to five years" was misleading to investors.[60]  In the Form

---

[59]  See, e.g., Becker Decl., Tab P at 7, a report by Donaldson, Lufkin & Jenrette dated September 23, 1998, recommending investment in ITG and including a description of indefinite delivery orders and their effect on the reported backlog.

[60]  The Court notes that this argument is contradicted by Mr. DeLuca's statement at the DLJ conference where he stated that the backlog "runs out over four, five and six years."  (SAC, ¶ 286.)

10-Q for the third quarter of 2001, the Company stated: "Our total funded and unfunded backlog at September 28, 2001 was $4.8 billion."  (Becker Decl, Tab G-6 at 10.)  This is consistent with the "backlog burnoff" chart presented to ITG's lenders on December 7, 2001, which showed estimated revenues for the period 2002 through 2005 (i.e., the next 4 years) totaling $2.931 billion and revenues "thereafter" of $1.826 billion.  (SAC, ¶ 235; *see also* Becker Decl., Tab Q at ITG00245.)  That is, at least 62% of the funded and unfunded backlog of $4.756 billion was expected to be realized within the five year period which the Company had publicly stated.  With regard to the claim that "much" of the backlog was unprofitable or low margin, Plaintiffs have failed to allege any factual support for that conclusory statement.  (*See* Becker Decl., Tab Q at ITG 000245, showing that for the period 2002 through 2005 and "thereafter," an average of about 14% of the backlog was projected to be unprofitable.)

We also conclude that the statements by Confidential Witnesses 2, 4 and 5 are too vague and unsupported to form the basis of a claim that ITG fraudulently misrepresented its backlog.  A claim that "everyone at IT Group knew" certain facts about the backlog simply fails as the basis for a claim that the Company's statements were fraudulent.  There is no factual support for CW2's ambiguous statement that Mr. DeLuca "took the full budget number" for IDO contracts when the written evidence shows that the Company distinguished between funded and unfunded projects in its SEC filings.  There is no foundation for the statement by CW4 that the "inflated outrageous numbers" of backlog revenues came from Defendants Soose and DeLuca simply because they were located in Pittsburgh, nor is there a single example of any particular projection which was inflated.  CW5 explicitly notes that it was Dave Derry – not Mr. Soose – who directed him to book revenues in excess of orders already received.

In sum, the Court concludes that to the extent Plaintiffs assert material misrepresentations or omissions regarding the Company's backlog, they have failed to satisfy the pleading requirements of the PSLRA.

With some exceptions not applicable here, the Third Circuit has directed courts considering complaints brought under the PSLRA to analyze fraud allegations individually "to determine whether each alleged incident of fraud has been pleaded with particularity."  In re Rockefeller Ctr., 311 F.3d at 224, *citing* In re Westinghouse, 90 F.3d at 712 (each allegation must be examined by "compartmentalizing the evidence and wiping the slate clean after considering each component") and In re Nice Systems, 135 F. Supp. 2d at 574.  If "none of those events independently satisfies the pleading requirement of factual particularity, the complaint is subject to dismissal."  In re Rockefeller Ctr., id.  Were we to disregard this directive and read the Second Amended Complaint in its entirety, we might conclude that ITG showed poor management skills and perhaps lax accounting standards during its rapid expansion, but we find nothing from which to conclude that any Defendant acted with conscious misbehavior or recklessness.  Thus, we find  that Plaintiffs' claims of scienter on the part of Defendants Soose and DeLuca, based on the alleged misrepresentations and omissions addressed above, are insufficient to state a claim under the PSLRA.

C.   Economic Loss and Loss Causation

In the fifth and sixth steps of the Dura paradigm, plaintiffs must allege economic loss and "a causal connection between the material misrepresentation and the loss," i.e., "loss causation."  Dura, 554 U.S. at ____, 125 S.Ct. at 1631.  Although the parties do not address these elements, we mention them briefly in the interest of completeness and to show that Plaintiffs have failed to satisfactorily plead the loss causation element of a suit brought under the PSLRA.[61]

Plaintiffs allege that each of them "purchased shares of [ITG] common stock during the

---

[61]  Although the Supreme Court opinion in Dura was issued on April 19, 2005, after Plaintiffs filed their Second Amended Complaint, Plaintiffs acknowledge the opinion in their pleadings.  (*See*, e.g., Plfs.' Memo at 73.)

Class Period and were damaged thereby, as set forth in the Certifications[62] annexed hereto."

(SAC, ¶ 38.)  They further allege:

> In ignorance of the adverse facts concerning [ITG's] business operations and earnings, and in reliance on the integrity of the market, plaintiffs and the members of the Class acquired [ITG] common stock at artificially inflated prices and were damaged thereby.
>
> Had plaintiffs and the members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased [ITG's] common's stock at all or not at the inflated prices paid.

(SAC, ¶¶ 485-486.)

These are exactly the type of allegation the Supreme Court rejected in <u>Dura</u> where the plaintiffs had alleged "the following (and nothing significantly more than the following) about economic losses attributable to the . . . misstatement: "In reliance on the integrity of the market, [the plaintiffs] paid artificially inflated prices for Dura securities" and the plaintiffs suffered "damage[s] thereby." <u>Dura</u>, 554 U.S. at ____, 125 S.Ct. at 1630.

In <u>Dura</u>,[63] the Ninth Circuit Court of Appeals concluded that because the injury occurred when the plaintiffs purchased their stock at prices which were inflated by the corporation's misrepresentations, plaintiffs had satisfied the loss causation requirement.  The Supreme Court reversed, finding that the plaintiffs failed to adequately allege proximate cause.  <u>Dura</u>, 554 U.S. at _____, 125 S.Ct. at 1633.  Specifically, the Supreme Court held that a plaintiff cannot satisfy the

---

[62]  No such certifications are attached to the Second Amended Complaint.  Although according to the rules of civil procedure, an amended complaint supersedes the original complaint in its entirety unless the amended complaint specifically refers to or adopts the original (<u>Daimlerchrysler Corp. v. Askinazi</u>, 152 F. Supp. 2d 655, 662 (E.D. Pa. 2001)), and thus this allegation is technically without the certifications required by the PSLRA, the Court has relied on the documents attached to the Amended Complaint.

[63]  The plaintiffs alleged that the defendant pharmaceutical company made misrepresentations about the company's profitability and about the expected approval of its new asthmatic spray device by the FDA.  As a result of those statements, plaintiffs purchased Dura stock, only to learn, first, that earnings would be lower than expected due in part to slow drug sales, and second, that the FDA would not approve the device.  <u>Dura</u>, 554 U.S. at _____, 125 S.Ct. at 1630.  Plaintiffs sued Dura, its managers and directors under the PSLRA, invoking the fraud-on-the-market doctrine.  The District Court dismissed the case, finding that the complaint failed to adequately allege scienter or loss causation.  <u>Id.</u>

loss causation requirement of Section 10b-5 by simply alleging that the purchase price of the security on the date of purchase was inflated because of the misrepresentation. Id. at 1631. The Court reasoned that when the plaintiffs purchased Dura's shares, they did not immediately suffer a loss because they could have sold the shares at an equally inflated price any time before the truth became known.  That is, an inflated purchase price "will not itself constitute or proximately cause the relevant economic loss. . . . [I]f the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." Id.  In a fraud-on-the-market situation, the loss does not occur until the truth becomes known to the public, causing the share value to drop and preventing the plaintiffs from recouping the purchase value by re-selling the shares. Id. at 1631-1632. Thus, to successfully allege a cause of action, a plaintiff must allege that the share price fell significantly after the truth about the misstatement or omission became known. Id. at 1634.

Here, Plaintiffs allege that "the market experienced a severe reaction to the adverse developments between October 30, 2001 and January 16, 2002." (SAC, ¶ 477.)  The events on which they base this allegation are (1) the news release on third quarter results, dated October 30, 2001; (2) a Salomon Smith Barney's analyst's report following up on the third quarter results, dated November 6, 2001; (3) the announcement on November 30, 2001, that ITG was suspending payment of its dividend on preferred shares; and (4) the announcement on December 27, 2001, that the Company expected to file for bankruptcy.  We address each of those allegations in turn. We note as a threshold matter that the price per share on October 29, 2001, was $4.77.  (Becker Decl., Tab O.)

1.    *Third Quarter 2001 Results:*  On October 30, 2001, ITG issued a press release presenting financial results for the third quarter of fiscal year 2001. (SAC, ¶ 445.) Plaintiffs allege that once again, ITG failed to disclose the severity of its liquidity problem and falsely assured investors that debt would be paid down by selling "non-core assets" which, in reality, included

83

recently acquired businesses.  The press release provided numerous bits of bad news:

> Net loss for the quarter was $1.1 million, or $0.05 per share.

> Our outlook for the commercial business has proven to be optimistic as continued weak economic conditions combined with reactions to the devastating affects [sic] of the September 11th terrorist attacks resulted in a substantial revenue shortfall in September.  Commercial clients continue to delay project assignments and start-ups, seek regulatory relief to reduce or suspend environmental spending and stretch-out project schedules.

> Based on the uncertainties of the economy and post September 11th events . . . we cautiously estimate earnings of $0.05 to $0.15 per share and cash earnings per share of $0.20 to $0.30 in the fourth quarter.

> Debt level at end of the quarter was $699 million.

> Although certain real estate restoration transactions are expected to close in the fourth quarter, with the expectation of reduced fourth quarter levels of operating cash flow and the inability to complete off-balance sheet project financings as planned, we now expect our year-end debt level to be generally consistent with the current quarter.

(SAC, ¶ 445, *see also* Becker Decl., Tab J-9.)

Plaintiffs contend that this press release was "false and misleading by virtue of the Company's ongoing liquidity problems and practice of manipulating its indebtedness, and because its receivables (and therefore its revenues) were overstated."  Moreover, "the accounts receivable . . . is [sic] false and misleading because the Company failed to exclude unapproved change orders."  (SAC, ¶¶ 447-448.)  But if these allegations are accepted at face value, Plaintiffs have tacitly acknowledged that the press release did not reveal the truth about the alleged scheme to keep the price of ITG stock artificially inflated, but rather perpetuated it.  Even if it is true[64] that on the day the press release was issued, the price of ITG stock dropped from $4.77 to $3.48 per share, that decrease – by Plaintiffs' own admission – could not have resulted from the investing public learning the truth.  Because the previous misrepresentations about the fraudulent scheme

---

[64]  Plaintiffs offer no factual allegation to support this or any other price data in this portion of the Second Amended Complaint, but the Court will accept these figures as accurate in keeping with the standard for a motion to dismiss.

were not disclosed in the press release, there could have been no proximate cause between revelation of the truth and the decline in the stock price.  Instead, it is reasonable to infer that the price fell because the market reacted to (1) the announced net loss of $1.1 million in the third quarter; (2) a "substantial revenue shortfall" in September; (3) "cautious" earnings estimates of no more than $0.20 to $0.30 per share for the fourth quarter, after ITG had previously reported cash earnings of $0.59 per share for the first nine months of the year; and (4) the Company's projection that it would not reduce its debt between September 30 and year end, all of which were revealed in the press release.

2. *Salomon Smith Barney Report:*  Plaintiffs allege that stock prices again dropped dramatically when an analyst's report exposed the Company's  "entirely illusory" debt-resolution strategy.  In a report dated November 6, 2001, the analyst reported that debt levels had increased to $699 million at the end of the third quarter of 2001 from $686 million at the end of the second quarter.  The Company's year-end debt goal "is now expected to be flat with the third quarter versus a prior goal of $600 million."  (SAC, ¶ 449.)  The report also revealed that ITG had "retained an investment bank to explore deleveraging strategies" and had undertaken a "$15-$20 million cost reduction program" as part of a plan to "be able to remain in compliance with its bank covenants."  (Id., ¶ 450.)  The projected earnings were cut from $0.89 to $0.50 per share for fiscal year 2002.  (Id., ¶ 451.)

Plaintiffs allege when this report was released, the price of ITG "stock dropped from a $3.50 close on November 2, 2001, to a close of $1.65 on November 8, an additional 53% plunge."  (SAC, ¶ 477.)  Again, the proximate cause of that "plunge" cannot be the fact that investors learned the truth about the scheme that led to this situation because there is nothing in this report which disclosed any part of Defendants' allegedly fraudulent activities.

3. *Suspension of Preferred Shares Dividend:*  Plaintiffs claim that the next drop in the price of ITG shares was caused by ITG suspending payment of its dividend on preferred

shares.  (SAC, ¶ 477.)  On November 30, 2001, ITG announced that it would not pay the quarterly dividends payable on August 20, November 20, or December 31, 2001.  (SAC, ¶ 471; *see also* Becker Decl., Tab J-10.)  Mr. Harvey stated that results for the third quarter and the first nine months of 2001 "were disappointing;" that the Company continued to be affected by "recessionary economic conditions;" and that it "continues to experience weakness in its businesses and sees little relief from the earnings, operating cash flow and debt pay down shortfalls previously discussed."  (Id.)  He also stated that "in light of further deterioration in the economy and the in-depth review [of all aspects of the Company's performance] now underway, prior guidance for the fourth quarter and the full year 2001 is no longer applicable.  Furthermore, these uncertainties preclude us from providing new guidance for the fourth quarter of 2001 or fiscal year 2002."  (Id.)

Plaintiffs make no allegations about what "truth" was revealed in this press release, merely stating that the price of ITG stock fell from $1.72 per share on November 29, 2001, the day before it was published, to a closing price of $0.81 on December 3, 2001, a loss of over 50%.  Again, the content of the press release would not alerted investors that the Company had been perpetrating a fraudulent scheme for more than two years as Plaintiffs elsewhere allege.

4.    *Announcement of Bankruptcy:*  On December 27, 2001, ITG issued a press release stating that "talks with lenders about long-term financial restructuring haven't been successful and the company may be forced to file for bankruptcy."  (SAC, ¶ 476; *see also* Becker Decl., Tab J-13.)  The release noted that ITG  had previously warned investors it would violate the terms of its senior secured loan agreement.  "As part of a plan to return to profitability," the Company announced it would close facilities, cut jobs, and attempt to sell all or part of its assets. The market reacted to these statements by lowering the Company's corporate credit and senior secured bank debt ratings to CCC- from B; the New York Stock Exchange announced it had suspended trading in ITG shares and moved to delist them.  (Id.)  Plaintiffs claim that the December 26, 2001, closing price of $0.38 a share fell to $0.05 at market close on December 28,

2001.  (SAC, ¶ 477.)

Again, it seems reasonable to infer that the market responded to the news of the possible bankruptcy rather to than any disclosure in the press release as to the alleged fraudulent scheme since nothing would tip off investors to the "truth" as to why ITG was on the verge of bankruptcy.

The Court concludes that none of the statements made in the period October 30, 2001 through December 27, 2001, satisfies the cause-and-effect requirements of <u>Dura</u> because none of them discloses the alleged fraudulent scheme which purportedly cause the price of ITG stock to be inflated in the first place.  That is, not one of the alleged misrepresentations or omissions about the Company's liquidity problems, accounting manipulations, backlog overstatement, or other frauds is disclosed in the announcements Plaintiffs allege caused precipitous drops in the stock price.  While the precarious financial condition of the Company was publicly acknowledged between October 30 and December 27, 2001, nothing indicated that the cause of its demise was the result of Defendants' fraudulent activities.

As the <u>Dura</u> Court noted, a person who misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser for the loss the purchaser sustains when the facts become generally known and as a result share value depreciates.  <u>Dura</u>, 554 U.S. at _____, 125 U.S. at 1633, *citing* Restatement (Second) of Torts § 548A, Comment b (internal quotations and alteration omitted.)  Even if Plaintiffs had been able to satisfy the material misrepresentations and scienter requirements of the PSLRA, their claims would still fail because the loss they sustained occurred before the details of the alleged reckless behavior became generally known.  Plaintiffs acknowledge this fact, stating

> Facts demonstrating the existence of Defendants' wrongdoing were *first disclosed* in documents filed in the IT Group's bankruptcy proceeding *no earlier than March 2002* which disclosed information presented to IT Group's banks in December 2001.  Further facts were found in the Examiner's Report filed in the IT Group's bankruptcy proceeding *on or about April 2002.*

(SAC, ¶ 22. emphasis added.)

Defendants argue that if the Court accepts Plaintiffs' allegation that the October 30, 2001, press release revealed the truth to Plaintiffs, that is the date on which the Class Period must end. (Defs.' Memo at 30, n29.)  Plaintiffs respond that "there are alleged misrepresentations as late as November 28, 2001,[65] when the Company filed its 10-Q report for the third quarter, claiming that its liquidity would be "adequate to execute our business forecast for the next twelve months." (Plfs.' Memo at 73.)  The argument that Defendants continued their misrepresentations about liquidity is inconsistent with an argument that the market adjusted the price of ITG stock downward in part because the truth had been revealed about the Company's liquidity crisis.  That is, "[i]f the . . . misstatements were successfully covered up, they were never disclosed to the market and therefore could not have caused a loss."  In re IKON Office Solutions, Inc. Sec. Litig., 131 F. Supp.2d 680, 691 (E.D. Pa. 2001).  If Defendants' wrongdoing was not disclosed until March 2002 at the earliest, it can hardly be said that the disclosure of that wrongdoing was the proximate cause of Plaintiffs' losses in January 2002 when the Company declared bankruptcy.  The Court concludes that Plaintiffs' Second Amended Complaint fails to adequately allege loss causation.

**V.      COUNT II**

Under Section 20(a) of the 1934 Act,[66] any defendant identified as a "controlling person" can be held jointly and severally liable for securities violations by the controlled entity.  15 U.S.C. § 78t(a).  To establish liability under Section 20(a), the plaintiff must allege (1) an underlying violation of the securities laws by a person or entity; (2) that the defendant was a "controlling person," that is, one who had the power to control or influence the company, and (3) that the

---

[65]  The 10-Q report for the third quarter of 2001 was actually filed on November 6, 2001, not November 28.

[66]  In full, Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

defendant was "in some meaningful sense," a culpable participant in the fraud.   In re Digital Island, 223 F. Supp.2d at 560.

In Count II of the Second Amended Complaint, Plaintiffs assert that the Individual Defendants and Carlyle are liable as "controlling persons" of the Company, which violated the securities laws.  Specifically, they allege:

> The Individual Defendants and the Carlyle Group, by virtue of their offices, directorships, stock ownership and specific acts were, at the time of the wrongs alleged herein and as set forth in Count I, controlling persons of [ITG] within the meaning of Section 20(a) of the 1934 Act.  The Individual Defendants and the Carlyle Group had the power and influence and exercised the same to cause [ITG] to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above.
>
> The Individual Defendants' positions made the Individual Defendants and the Carlyle Group privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.  By virtue of the conduct alleged herein, the Individual Defendants and the Carlyle Group are liable for the aforesaid wrongful conduct and are liable to Plaintiff[s] and the Class for damages suffered.

(SAC, ¶¶ 490-491.)

The statute clearly requires that the plaintiff allege not only that one person controlled another, but also that the "controlled person" or entity is liable under the Act.  If no controlled person is liable, there can be no controlling person liability.  In re Alpharma, 372 F.3d at 153.  Here, the "controlled person" is IT Group, Inc.[67]  Because Plaintiffs fail to successfully allege that the Company violated Section 10(b) or Rule 10b-5, their Section 20(a) claims against The Carlyle Group and the Individual Defendants must fail as well.  In re Alpharma, id.

---

[67] As the Court of Appeals has recently made clear, however, there is no need for the company itself to have been named a defendant.  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 285 (3d Cir. 2006).  In circumstances very similar to those herein where the company itself had declared bankruptcy and therefore was not a named defendant in the suit brought against the company's officers and directors, the Court stated "it would be inconsistent with the broad remedial purposes of the securities laws to permit senior executives of a bankrupt corporation – whose actions allegedly contributed to the bankruptcy – to avoid liability by relying on the corporation's bankruptcy." In re Suprema, id. at 285-86, quoting Porter v. Conseco, Inc., CA No. 02-1332, 2005 U.S. Dist. LEXIS 15466, * 17 (S.D. Ind. July 14, 2005).  The Court of Appeals then vacated the district court's dismissal of Section 20(a) claims against two officers who had tightly controlled Suprema's corporate operations and acted as culpable participants in the fraud.

## VI.      LEAVE TO AMEND

At various points throughout the brief in opposition to the motion to dismiss, Plaintiffs assert that if the allegations and evidence presented to date are not sufficient, they are able and willing to provide more details.  (*See*, e.g., Plfs.' Memo at 1, n2, 6 or 64.)  However, as they have been reminded in our previous opinion denying the motion to the dismiss the Amended Complaint, footnotes and passing references to amendment are not the proper method of requesting leave to amend.  Plaintiffs attempt, it appears, to plead their case by successive approximation, asking Defendants and the Court to point out shortcomings which they then assert they will "fix."  This is not an acceptable method of pleading one's case in federal court.

The Federal Rules of Civil Procedure provide that as a general matter, leave to amend is to be "freely given when justice so requires."  Fed.R.Civ.P. 15.   However, in a similar suit brought under the Reform Act in which the plaintiff had "already filed previous complaints," and was given "ample time" to prepare the amended complaint, yet still "failed to satisfy the stringent pleading requirements of the PSLRA," leave to amend was denied.  In re Alpharma, 372 F.3d at 153-54; *see also* In re Interpool, 2005 U.S. Dist. LEXIS 18112 at * 58-60, denying plaintiffs leave to amend based on a footnote which failed to explain the basis for the request or how they would cure the defects and where the court was satisfied that plaintiffs would be unable to amend their complaint in such a way as to plead a strong inference of scienter.

The complaint now being dismissed is the third version, developed over a period of more than four years, and based upon evidence gleaned from an on-going bankruptcy proceeding from which Plaintiffs have received documentary and deposition evidence not usually available to typical securities fraud class plaintiffs.  Plaintiffs have offered voluminous exhibits to support their 491-paragraph complaint and have responded in detail to each issue raised by Defendants.  The previous opinion (Docket No. 68), we believe, pointed out precisely the shortcomings in pleading scienter for the individual Defendants, advice which Plaintiffs either failed to follow or are unable

to allege with the particularity required by the PSLRA.  We also conclude that Plaintiffs have made allegations related to loss causation which are not merely offered in the alterative, but are self-contradictory, a defect which is fatal to their claims.

One objective of the PSLRA is "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." GSC Partners, 368 F.3d 228 at 246, *quoting* In re NAHC Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002.)  As the Court of Appeals noted, "[t]his objective would be frustrated where there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA." GSC Partners, id. (internal quotation omitted.)   Therefore, to the extent the comments scattered throughout the brief in opposition are interpreted as ad hoc motions to amend, they are denied. The Second Amended Complaint is dismissed with prejudice.

An appropriate Order follows.

 

 

|  |  |
|---|---|
|  | _____ |
|  | s/Arthur J. Schwab |
|  | United States District Judge |
| for |  |
|  | William L. Standish |
|  | United States District Judge |

cc:

Kwasi Asiedu
Law Offices of Kwasi Asiedu
3858 Carson Street
Number 204
Torrance, CA 90503

Michael Goldberg
Glancy & Binkow
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067

Lionel Z. Glancy
Glancy & Binkow
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
Email: info@glancylaw.com

Richard J. Pocker
Dickerson, Dickerson, Consul & Pocker
Rainbow Corporate Center
777 North Rainbow Boulevard
Suite 350
Las Vegas, NV 89107

Robert Zabb
Glancy & Binkow
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
Email: info@glancylaw.com

David A. Becker
Latham & Watkins
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Email: david.becker@lw.com

Mark A. Willard
Eckert, Seamans, Cherin & Mellott
600 Grant Street
44th Floor
Pittsburgh, PA 15219

Robert V. Campedel
Eckert, Seamans, Cherin & Mellott
600 Grant Street
44th Floor
Pittsburgh, PA 15219

Charles A. DeMonaco
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222-5402
Email: cdemonaco@dmclaw.com

Kimberly L. Haddox
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222-5402
Email: khaddox@dmclaw.com

Richard J. Federowicz
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222-5402
Email: rfederowicz@dmclaw.com

Brian D. Long
Chimicles & Tikellis
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899

E. Powell Miller
Miller Shea
1301 West Long Lake Road
Suite 135
Troy, MI 48098

Steven A. Schwartz
Chimicles & Tikellis
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041

Thomas L. Patten
Latham & Watkins
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Email: tom.patten@lw.com

Courtney S. Schorr
Latham & Watkins
555 Eleventh Street, N.W.
Suite 1000
Washington, DC 20004-1304
Email: courtney.schorr@lw.com

Larry K. Elliott
Cohen & Grigsby
11 Stanwix Street
15th Floor
Pittsburgh, PA 15222-1319
Email: lelliott@cohenlaw.com

Laurie B. Smilan
American Civil Liberties Union of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
(703) 456-5220
Email: laurie.smilan@lw.com