## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS L. PAYNE, SID ARCHINAL, GARY H. KARESH, JO ANN KARESH, BELCA D. SWANSON AND MERLE K. SWANSON, individually and on behalf of all others similarly situated, ) ) ) ) ) ) | |
| Plaintiffs, ) | CLASS ACTION |
| vs. ) ) | No. 2:02-cv-1927 |
| ANTHONY J. DeLUCA, HARRY J. SOOSE, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, DANIEL A. D'ANIELLO, PHILLIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, JAMES DAVID WATKINS, and THE CARLYLE GROUP, ) ) ) ) ) ) ) ) ) ) | Judge Thomas M. Hardiman |
| Defendants. ) | |

## MEMORANDUM OPINION

On May 2, 2006, the second amended complaint (SAC) in this case was dismissed with prejudice. (Docket Nos. 123, 124; see Payne v. DeLuca, 433 F. Supp.2d 547 (W.D. Pa. 2006)). Plaintiffs timely filed two motions for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) on May 15, 2006. In its Motion for Reconsideration of the Court's May 2, 2006 Order (Docket No. 128), Plaintiffs argue that in dismissing the SAC, the Court (1) did not understand the significance of and fully consider certain documents filed in support of their allegations that Defendants violated generally accepted accounting principles (GAAP) by failing to write-off in a timely manner accounts receivable which they knew to be uncollectible and (2) did not recognize that loss causation may be shown by methods other than the corrective disclosure method discussed in Payne. In the second motion (Docket No. 131), Plaintiffs seek to have the judgment altered to dismissal without prejudice so they may file a Third Amended Complaint.

Because the facts of this case and details of the Second Amended Complaint are set out in great detail in *Payne*, they will not be reiterated here. This Opinion assumes familiarity with *Payne* and with the opinion issued in the companion case, *Glover v. DeLuca*, CA No. 03-0288, 2006 U.S. Dist. LEXIS 76093 (W.D. Pa. Sept. 29, 2006), dismissing with prejudice the amended complaint therein.

## I.    MOTION FOR RECONSIDERATION

### A.    Applicable Law

 Federal Rule of Civil Procedure 59(e) provides that a party may move to amend or alter a judgment within ten days after entry thereof. A motion under Rule 59(e) is a device to relitigate the original issue decided by the district court, and used to allege legal error. *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003). Although Rule 59 does not specifically mention a motion for reconsideration, such a motion is regarded as "the functional equivalent of a Rule 59 motion." *Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 348 (3d Cir. 1986).

A court may grant a motion for reconsideration if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence which was not available when the court issued its order; or (3) the need to correct a manifest injustice stemming from a clear error of law or fact. *Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *North River Ins. Co. v. Cigna Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995); *In re Dreyfus Mut. Funds Fee Litig.*, CA No. 04-0128, 2006 U.S. Dist. LEXIS 41359, *13-*14 (W.D. Pa. June 20, 2006). In the instant case, Plaintiffs claim there is a need to correct a clear error of law and/or prevent manifest injustice stemming from the *Payne* opinion, not that there has been a change in controlling law; they reserve their arguments concerning new evidence for the companion motion. (Plaintiffs' Memorandum of Law in Support of Motion for Reconsideration of May 2, 2006, Order Dismissing Second Amended Complaint, Attachment 1 to Docket No. 128,

2

Plfs.' Recon. Memo, at 4).

Where the moving party argues that the court overlooked certain evidence or controlling decisions of law which were previously presented, a court should grant a motion for reconsideration only if the matters overlooked might reasonably have resulted in a different conclusion. *Cataldo v. Moses*, 361 F. Supp.2d 420, 433 (D. N.J. 2004). A mere disagreement with the decision does not suffice to show that the court overlooked relevant facts or controlling law. *United States v. Compaction Sys. Corp.*, 88 F. Supp.2d 339, 345 (D. N.J. 1999). Nor may a motion for reconsideration be used to present new legal theories or arguments which could have been made in support of the first motion. *Federico v. Charterers Mut. Assur. Ass'n*, 158 F. Supp.2d 565, 578 (E.D. Pa. 2001).

Where the basis of the motion for reconsideration is to correct a manifest injustice, the party must persuade the court that not only was the prior decision wrong, "but that it was clearly wrong and that adherence to the decision would create a manifest injustice." *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998); *McCloud v. City of Sunbury*, CA No. 04-2332, 2006 U.S. Dist. LEXIS 16560, *4 (M.D. Pa. Apr. 3, 2006). "Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." *In re Loewen Group*, CA No. 98-6740, 2006 U.S. Dist. LEXIS 200, *4-*5 (E.D. Pa. Jan. 5, 2006), *quoting Pennsylvania Ins. Guar. Ass'n v. Trabosh*, 812 F. Supp. 522, 524 (E.D. Pa. 1992). "A district court has considerable discretion in deciding whether to grant or deny a motion to alter a judgment." *Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995). In exercising this discretion, a district court must "strike the proper balance between the need for finality and the need to render just decisions on the basis of all the facts." *Id.*

## B.    Plaintiffs' Arguments

In the memorandum of law filed in support of their motion for reconsideration, Plaintiffs first contend "the Court did not fully understand the significance of or take into consideration" certain

3

evidence presented in the Declaration of Lionel Z. Glancy in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint (Docket No. 84, Glancy Decl.). They also argue that the Court failed to take into consideration the "factual and legal aspects" of their loss causation arguments. (Plfs.' Recon. Memo at 4).

    1.    *Glancy Declaration*: Plaintiffs argue that the Glancy Declaration provides evidence that Defendants knowingly engaged in a pattern of overstating receivables by including accounts they knew were uncollectible. (Plfs.' Recon. Memo at 5). Plaintiffs also claim that Defendants covered-up a "massive" write-down of receivables in late 2000, misrepresenting to investors that it was a "special charge" as a result of a "new" settlement strategy, whereas, in reality, Defendants had known for months that a write-off of uncollectible accounts would be inevitable. (*Id.* at 9-12).

The Court addressed the Glancy Declaration in a footnote in *Payne*:

> Plaintiffs have provided a supplemental pleading which attempts to set out in great detail further allegations in support of this claim. *See* [Glancy Declaration]. A review of the documents attached thereto leads to the conclusion that, as Plaintiffs had previously alleged, the Individual Defendants were aware in 2000 and 2001 (1) that ITG had acquired a substantial accounts receivable problem along with its acquisition of OHM in 1998, (2) that two Beneco projects had changed-scope and performance problems, (3) that in 2000, the Company performed a comprehensive analysis of "acquired estimated unbilled accounts receivable and acquired claims," which resulted in a special charge in December 2000 (as discussed in text above) and (4) that the "full-scale review" of accounts receivable problems was still underway as late as December 2001. What none of these documents shows, however, is that any Defendant knew the accounts receivable which were not written off in 2000 were not collectible.

*Payne*, 433 F. Supp.2d at 576, n.27.

In the Glancy Declaration, Plaintiffs' counsel asserts that the 27 attached documents "clearly controvert" Defendants' assertions that certain accounts receivable were properly written down in a timely manner and that account practices at IT Group, Inc. (ITG or the Company) did not violate GAAP. (Glancy Decl., ¶¶2-3). Plaintiffs assert that contrary to Defendants' argument that the December 2001 write-down "reflects changes in estimates based on rapidly-changing

circumstances," "what actually occurred . . . is that ITG's management realized that it had an enormous accounts receivable problem and deferred making all the necessary and appropriate write-downs on a timely basis until the actual demise of the Company." (*Id.*, ¶¶4-5).

The Court had four reasons to relegate its discussion of the documents attached to the Glancy Declaration to a footnote. First, the Declaration was submitted in response to Defendants' argument that the write-down in December 2001 "was fully in accordance with GAAP, and does not, and is not shown to, reflect that the written down receivables were known to be uncollectible, in December 2001 or at any earlier point in time." The Glancy Declaration stated that "Plaintiffs believe the foregoing statement is factually incorrect." (Glancy Decl., ¶¶4-5). Thus, the pleading and exhibits thereto were filed in response to an argument raised by the opposing party, an improper maneuver on the part of Plaintiffs. "While counsel may 'clarify' a pleading through subsequent briefing, a lawyer's statement in a response brief is no substitute for adequately pleaded facts in a complaint, and a memorandum cannot provide allegations that are wholly absent from the Amended Complaint." *PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, No. 03-3972, 2005 U.S. App. LEXIS 3571, *18-*19 (3d Cir. Mar. 3, 2005), *citing Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 n9 (3d Cir. 2002) ("For the sake of clarity, a . . . plaintiff . . . should not be able effectively to amend a complaint through any document short of an amended pleading.")

Second, with few exceptions, the documents attached to the Glancy Declaration were not identified as pertaining to any specific allegations in the SAC, even if the Court had considered them persuasive. The Court declined to peruse a 491-paragraph complaint in an attempt to identify the allegations which these documents purportedly support. Similarly, the Court declined to consider statements made by Plaintiffs' counsel in the Declaration as allegations, *e.g.*, that Defendants "should have been aware" of certain problem accounts or that the Company anticipated taking certain write-offs which it subsequently did not do. *See In re Burlington Coat Factory Sec.*

5

*Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)(declining to consider documents extraneous to the pleadings except those which were "integral to or explicitly relied upon in the complaint," or to consider arguments based on those documents raised in the plaintiff's brief in opposition to the motion to dismiss).

Third, the Court disregarded those documents which could not be associated with any Defendant, that is, the documents which did not show on their face that any Defendant prepared, received, or was otherwise aware of the content. This eliminated Exhibits 8, 11, 12, 13, 17, 18, 19, 20, 21, and 22 from further consideration.

Finally, the Court separated the remaining documents with which Defendants could be associated either directly or by inference into three categories. The first were those related to the Audit Review Committee: Exhibits 1, 2, 3, 9, 14, and 15. The second were those related to meetings of the full ITG Board of Directors: Exhibits 4, 5, 6, 23 and 24; Exhibits 25 and 26 were also included in this group based on counsel's assertion that they were discussed at the December 6, 2001, meeting of the Board.[1]  The third group, Exhibits 10 and 16, was composed of notes which Plaintiffs describe as  pertaining to accounts which could or should have been be written off in late 2000 or in 2001.[2]

_____

[1]  Plaintiffs describe Exhibit 25 as a spreadsheet prepared by Jim Pierson on December 3, 2001, showing proposed year-end write-offs. "This is Plaintiffs' best estimate of the spreadsheet utilized as the basis for the \$92 million write-down reflected in the December 6, 2001 minutes." (Glancy Decl., ¶¶32-33). From this statement, the Court concluded that counsel intended to imply that the document was discussed at the December 6, 2001, meeting of the Board of Directors, but without guidance as to which allegations in the SAC relate to that meeting and nothing in the document itself from which to infer that the spreadsheet was in fact discussed at that meeting, no nexus between the document and the Defendants could be established. Exhibit 26 is a series of charts reflecting "2001 adjusted free cash flow reconciliation overall and by business line." (Glancy Decl., ¶¶34-35). Again, Plaintiffs assert that this analysis is the one mentioned in the minutes of the Board of Directors meeting provided as Exhibit 24, but there is no indication of which allegations in the SAC relate to this document or to the meeting itself.

[2]  Two other documents seemed to fit no particular category. Plaintiffs do not explain and the Court is unable to construe the import of Glancy Decl., ¶12 and Exhibit 7, an e-mail message sent neither from nor to any Defendant, dated October 4, 2000, with a spreadsheet dated July 21, 2000. Although several items appear in the spreadsheet, the Declaration refers only to a \$1.132 million error when income was apparently posted to the account using Argentinean rather than Canadian exchange rates. The Court

Reading the documents in each category together, the Court arrived at the conclusions stated in footnote 27. The Audit Review Committee agendas and minutes are consistent in their position that in mid-summer 2000, management had become aware of an inherited problem with the OHM Oracle computerized billing system and undertook a review of some 200 projects to determine the status of the associated accounts and their collectibility. Thus, Defendants McGill, DeLuca, Soose, Pugliese, Pogue, and Gibson – all of whom participated in one or more of those meetings – were undoubtedly aware of this problem and received status reports on its resolution at the meetings held on September 20, October 24, and December 19, 2000. They also were aware not later than December 19, 2000, that a special charge of $35 million was anticipated for December 31, 2000, in connection with some of those accounts. (See Glancy Decl., Exhibit 15, which incorporates notes about the financial impact of the special charge). Nothing in those documents, however, supports Plaintiffs' allegations that those Defendants knew the accounts were uncollectible and should have been written off before December 31, 2000, but were not.

Similarly, Exhibits 4, 5, and 6 show the same topic was discussed at meetings of the ITG Board of Directors. In their memorandum in support of the motion for reconsideration, Plaintiffs argue that by comparing those exhibits – drafts of the minutes of the Board meeting held on September 21, 2000 -- it can be shown "that the final minutes were thoroughly sanitized to eliminate reference to the Company's problems, including troubled receivables." They point in particular to the fact that Defendant DeLuca removed from the minutes a reference to unbilled accounts receivable and claims issues which were under review and which "could result in a material accounting charge." (Plfs.' Recon. Memo at 11). While this is true, it is also true that

_____

also disregarded Glancy Decl., ¶35 and Exhibit 27, excerpts from a deposition of Steven Hellman dated February 27, 2002, in part because of vague references to what an unidentified "they" were doing in regard to alleged accounting improprieties and in part because the statements were made in hindsight by someone who, Plaintiffs admit, was not an ITG employee who would have had firsthand knowledge of ITG's accounting practices during the Class Period.

7

numerous other details were deleted from the minutes. For instance, a summary of a presentation by the senior vice president of human resources which had been given five sentences (seven lines) in the draft provided to DeLuca for editing was reduced to a single sentence. Entire paragraphs regarding projects, acquisitions, and proposed asset sales were eliminated in favor of a single sentence summarizing the president's report as a discussion of "current financial results, market trends, billing activity, recent awards, non-core asset sales and various other matters." (*Compare* Glancy Decl., Exhibits 5 and 6). In light of the deletions on a variety of topics, DeLuca's deletion of detailed reference to the problems with accounts receivable and claims can give rise – at best – to no more than a slight inference of scienter on his part, not the required strong inference.

The minutes of the Board meetings on September 6, 2000, November 28, 2001, and December 6, 2001, along with the exhibits which were purportedly discussed at the last meeting (Glancy Decl., Exhibits 6, 23, 24, 25, and 26), are equally weak evidence of fraudulent intent. As stated in *Glover*, the allegations of scienter based on evidence that the Company's directors and officers were aware of problems associated with collecting certain receivables, systematically reviewed those problems, and wrote off substantial amounts in both 2000 and 2001 does not give rise to the inference that they did so in order to present a fraudulent picture of the Company's financial situation. *Glover*, 2006 U.S. Dist. LEXIS at *59.

Finally, handwritten notes by an unidentified person or persons from meetings held on November 13, 2000, and January 2-3, 2001 (Exhibits 10 and 16, respectively) refer to the fact that DeLuca and Soose participated in meetings where proposed write-offs for fiscal year 2000 were discussed. For instance, the notes from the meeting on November 13, 2000, attended by Soose, apparently summarize discussions of various ITG projects, *i.e.*, Wellsville, Monticello, Weyerhauser, Lake Apopka, Occidental-OHM, and Sevenson. When read together with other financial information showing when write-offs were actually taken, Plaintiffs argue it was obvious in November 2000 that all or most of the receivables on these projects were uncollectible, but they

8

were not written down completely at the end of 2000; in fact, some were not written off until December 2001. (Plfs.' Recon. Memo at 5-6).

These and similar exhibits were discussed at length in *Glover* where the same arguments were made, leading to the conclusion that because the plaintiff never clarified (1) how the Company concluded that a certain account was collectible or uncollectible and who made that decision, (2) the materiality of the amounts which were uncollectible, or (3) which Individual Defendants knew those receivables were uncollectible during the Class Period and how they knew it, his arguments were based solely on hindsight and constituted an attempt to equate bad business decisions with fraudulent intent. *Glover*, 2006 U.S. Dist. LEXIS 76093 at *48-*61.

In their second argument for reconsideration of the Glancy Declaration, Plaintiffs contend the Court did not fully take into account evidence that Defendants misrepresented the $40 million "special charge" taken at the end of 2000. In the Company's SEC 10-K report for 2000, the special charge was represented primarily as the result of an "accelerated resolution strategy" aimed at reducing project claims which had been in protracted litigation and adjusting the close-out value of certain acquired accounts receivable. (*See* SAC, ¶224). In reality, Plaintiffs argue, Defendants knew the December 2000 special charge was "just a portion of a massive write-down" of over $60 million of receivables[3] and that it was not part of a "new" or "recent" settlement strategy because they were advised as early as September 2000 that the Company had undertaken the review of problem receivables which ultimately resulted in the special charge. (Plfs.' Recon. Memo at 10).

The special charge appears to be mentioned in the SAC at only two points. In paragraphs 224-226, Plaintiffs allege that because of the extensive review in 2000, Defendants knew certain

---

[3] Plaintiffs rely in this portion of their analysis on Glancy Decl. Exhibit 21, a "Project Claims & A/R Analysis" dated March 13, 2001, and Exhibit 22, purportedly a draft footnote to ITG's 10-K for 2000. Exhibit 22 actually appears to be slides or power-point charts presented at a Government Services division meeting on May 1-2, 2001. *See* instead, Exhibit XX to the proposed TAC which is the underlying analysis for footnote 4.

9

accounts which were not written down until December 2001 should have been written down a year earlier. In the section of the SAC alleging misrepresentations made to investors in the Company press releases and SEC filings, the 10-K report for 2000 is discussed in detail (see SAC, ¶¶379-399), but the special charge is mentioned only once. Plaintiffs alleged that although the Company admitted in the 10-K that it had been forced to seek modification of its credit agreement, including exclusion of the special charge in calculating certain covenant ratio calculations, it failed to disclose that compliance with even the amended covenants was achieved only by manipulation of the revolving credit line. (SAC, ¶¶386-387).

In short, the Court has been unable to identify any allegation in the Second Amended Complaint that Defendants knowingly misrepresented either the magnitude of the December 2000 special charge or the reason it had been undertaken, i.e., the accelerated resolution strategy. Plaintiffs do not direct the Court to allegations in the SAC nor to arguments made in pleadings filed in opposition to the motion to dismiss which the Court overlooked. Moreover, the Court will not consider evidence or arguments submitted in connection with the Glover complaint as Plaintiffs urge. (Plfs.' Recon. Memo at 9, 12). The Court finds Plaintiffs' argument that the Court did not fully consider Defendants' misrepresentations allegedly made in connection with the 2000 special charge is a new argument improperly raised on a motion for reconsideration. "[R]econsideration motions may not be used to raise new arguments or present evidence that could have been raised prior to the entry of judgment." Hill v. Tammac Corp., CA No. 05-1148, 2006 U.S. Dist. LEXIS 18531, *7 (M.D. Pa. Mar. 3, 2006).

Plaintiffs also refer to Klebanow v. NUI Corp. (In re NUI Sec. Litig.), 314 F. Supp.2d 388, 401-402 (D. N.J. 2004), which was cited in the Payne opinion as an example of a suit in which the plaintiffs had identified precise accounts reflecting improper classification of bad debts, the amounts thereof, the SEC regulation and GAAP directive violated by the defendants. (Plfs.' Recon. Memo at 12-13, citing Payne, 433 F. Supp.2d at 580). Plaintiffs argue that they have satisfied the

10

standards applied in *In re NUI* by demonstrating a pattern of improper accounting practices with respect to specific accounts, the magnitude of the problems, and the specific accounting principles which were violated. (Plfs' Recon. Memo, *id*). In particular, they argue that "since a write-off of 20% sufficed in *NUI* to allege a claim of a pattern of accounting wrongdoing, a write-off of 82% of change orders is sufficient in this case to allege that Defendants engaged in an improper practice with respect to those receivables." (*Id.* at 13).

Plaintiffs fail to recognize two important differences between this case and *In re NUI*. First, in that case, the court dismissed the claims brought under Section 10(b)-5 against the company's chief executive officer and chief financial officer for lack of scienter (although they remained in the suit as controlling persons liable under Section 20(a)). *In re NUI*, 314 F. Supp.2d at 413-414, 417-418. The Section 10(b)-5 claims against the corporation itself were allowed to proceed not only because the plaintiffs had alleged with great detail the accounting misrepresentations (as Plaintiffs here correctly point out), but also because the plaintiffs had alleged that the corporation had motive and opportunity to engage in improper accounting practices. That is, they alleged the corporation needed to keep its share price and its reported earnings high in order to ensure the success of two financial transactions. Moreover, the corporation's senior management had been explicitly advised of the improper accounting for bad debts but failed to take action to stop the practice. The court found that the plaintiffs had identified a strong motive for artificially inflating the value of the company stock at the time the alleged misrepresentations were made and therefore had adequately pled scienter on the part of the corporation. *Id.* at 410-412.

As noted in *Payne*, although Plaintiffs allege that Defendants "must have known" of numerous repeated GAAP violations, there are only two items of evidence in the SAC which explicitly discuss improper accounting practices. Exhibit D contains handwritten notes in which Confidential Witness 5 writes that he was told by Dave Derry to "slowly bring down" the anticipated loss on the Beneco project, rather than recognizing the loss at the time it was known as required

by GAAP. The second item, also part of Exhibit D, is a letter from Beneco's controller, stating that because he could not agree to several accounting practices, he would resign at the end of March 2001. (SAC, ¶282). Unlike the allegations in *In re NUI*, where there was evidence that the improper accounting practices were explicitly brought to senior management's attention, as noted in *Payne* (433 F. Supp.2d at 579), there is no evidence here that any Defendant received a copy of the controller's resignation letter or had been otherwise advised that any practice violated GAAP. Thus, the Court finds Plaintiffs' reliance on *In re NUI* misplaced.

As footnote 27 in *Payne* shows, the Court did not "overlook" the Glancy Declaration and its exhibits. The major legal factor which resulted in the Court's relegation of the Glancy exhibits to a footnote is Plaintiffs' reliance, once again, on group pleading based on Defendants' positions as officers or directors of ITG, a technique which most courts agree has been abolished by the Private Securities Litigation Reform Act (PSLRA). *See Payne*, 433 F. Supp.2d at 570-571. In short, the Court was unable to draw a strong inference of scienter on the part of any Defendant based on the Glancy exhibits when issuing the *Payne* Opinion in May 2006 and is equally unable to do so upon reconsideration.

      2.    *Loss Causation*:  Plaintiffs argue that reconsideration of the Court's ruling on loss causation is appropriate as a matter of justice since the issue was not fully argued in connection with the motion to dismiss the second amended complaint. (Plfs.' Recon. Memo at 15). Plaintiffs contend that because Defendants did not move to dismiss the case on the grounds of inadequately pled loss causation allegations, reargument is appropriate where the court has patently misunderstood a party or has made a decision outside the adversarial issues presented to the Court by the parties. (*Id.* at 14, *citing Brambles USA v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990)).

As the Court stated in *Payne*, however, the discussion of loss causation was offered only in the context of providing a complete analysis. While it is true that the parties did not substantively

brief the applicability of *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), to the pleading standards for loss causation, a district court may dismiss all or part of a complaint *sua sponte. Joe Hand Promotions v. Rennard St. Enters.*, 954 F. Supp. 1046, 1055 (E.D. Pa. 1997), *citing* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1357 at 301 (2d ed. 1990) ("Even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair.") Since Plaintiffs acknowledged the Supreme Court's decision in *Dura* in their opposition to the motion to dismiss (*see Payne*, 433 F. Supp.2d at 606, n.61), the Court's application of *Dura* in its analysis cannot be said to have been unfair or surprising. Moreover, while the motion to dismiss was pending, Plaintiffs never sought to brief the loss causation issue or amend their SAC to comply with the pleading requirements of *Dura*.

Plaintiffs alleged throughout this litigation that their losses were caused by the Company's undisclosed chronic lack of liquidity and that the price of ITG stock fell when the Company was forced to admit its liquidity problems. Specifically, Plaintiffs alleged "[d]uring the Class Period, Defendants **concealed the Company's [liquidity] problems** from investors. . . . The market was stunned when the Company was **forced to announce adverse financial information**. . . . From October 30 to December 27, 2001, the Company was **forced to make progressively greater admissions of its liquidity weakness**.") (SAC, ¶¶6-7, emphasis added). These statements seemed to imply (although Plaintiffs never clearly alleged) reliance on a corrective disclosure theory of loss causation which the Court then applied. But the Court concluded in *Payne* that the "truth" regarding the Company's liquidity problems had been repeatedly acknowledged by the Company in its SEC filings and other public statements. In an attempt to draw all reasonable inferences in favor of Plaintiffs, the Court also considered whether disclosure of the total alleged fraudulent scheme (*i.e.*, overstatement of receivables, manipulation of the credit line, over-estimation of the

13

Company's contract backlog, failure to disclose its inability to meet pay-when-paid regulations) was the cause of Plaintiffs' losses and – based on Plaintiffs' allegation that Defendants' "wrongdoing" was first disclosed in March 2002 (SAC, ¶22), well after the stock was worthless – concluded that it could not have been. *Payne, id.* at 606-611.

"In ruling on a motion to reconsider, the court should keep an open mind, and should not hesitate to grant the motion if necessary to prevent manifest injustice or clear error." *Karr v. Castle,* 768 F. Supp. 1087, 1093 (D. Del. 1991), *aff'd sub nom., U.S. v. Carper,* 22 F.3d 303 (3d Cir. 1994), *cert. denied,* 513 U.S. 1084 (1995).  The issue of whether the Court fully considered the other methods by which Plaintiffs may show loss causation, *i.e.,* materialization of the risk and direct causation, is immaterial to the outcome of the decision  dismissing the Second Amended Complaint.[4]  As explained in *Payne,* even if Plaintiffs had adequately alleged loss causation, the Second Amended Complaint would still have been dismissed because Plaintiffs failed to plead adequately not only material misrepresentations by any Defendant, but a strong inference of scienter on the part of any Defendant, either of which alone would be sufficient grounds for dismissal.  *Payne, id.* at 606.  Plaintiffs' Motion for Reconsideration is therefore unmeritorious.[5]

---

[4] The plaintiff in *Glover* did brief the materialization of the risk argument extensively and the Court analyzed that argument in the decision granting the motion to dismiss.  *See Glover,* 2006 U.S. Dist. LEXIS 76093 at *120-*139, concluding that the plaintiff had not satisfied the criteria for stating materialization of the risk allegations as set out by courts which recognize this as an alternate way of pleading loss causation and did not give the defendants fair notice of his economic loss and proximate cause in the amended complaint.

[5] In further support of their argument that they have adequately alleged loss causation, Plaintiffs provide a transcript of a hearing held on April 20, 2006, in *Moorhead v. Consol Energy, Inc., et al.,* CA No. 03-1588. (Supplemental Submission of the Ruling on Loss Causation in *Moorhead v. Consol Energy* in Support of Plaintiffs' F.R.C.P. 59 Motions for Reconsideration and Leave to Amend, Docket No. 144). Plaintiffs contend that the ruling in that case (1) demonstrates that disclosure of a fraudulent scheme is not required to show a causal link between a stock price decline and the wrongfully concealed facts and (2) supports their position that allegations of fraud made with the particularity required by the PSLRA must be accepted as true in ruling on the sufficiency of pleadings, *i.e.,* the Court may not reject their allegations that Defendants hid the Company's liquidity problems from investors. (*Id.* at 1).  In response, Defendants argue that the Court's ruling in *Moorhead* should be disregarded because (1) the decision was not "new" but had been decided before the motion to dismiss was granted in this case; (2) the Court limited its ruling to the unique facts of that case; and (3) the holding was directed to the question of  materiality, not loss

## II.    MOTION TO ALTER JUDGMENT TO ALLOW AMENDMENT OF THE COMPLAINT

The crux of Plaintiffs' second motion is a request to the Court to alter dismissal of the

Second Amended Complaint with prejudice to a dismissal without prejudice in order for Plaintiffs

to seek leave of Court to amend. However, since the parties moved beyond the point of the motion

into arguments for and against amendment and inasmuch as Plaintiffs have filed a proposed Third

Amended Complaint (Plaintiffs' Supplemental Submission of Proposed Third Amended Complaint

for Consideration, Docket No. 142, Plfs.' Supp. Memo, and Exhibit 1 thereto, [Proposed] Third

Amended Class Action Complaint, PTAC), the Court will address the pending motion as if it were

a motion seeking leave to amend.

### A.    Applicable Law

Final judgment, by way of a dismissal with prejudice, is appropriately rendered under Rule

12(b)(6) when it is "plain that the plaintiff has no claim to state." When a plaintiff has imperfectly

stated what may arguably be a valid claim, however, "leave to amend is ordinarily in order." *Alley*

*v. Resolution Trust Corp.*, 984 F.2d 1201, 1207 (D.C. Cir. 1993) (Ginsburg, J.) As the Supreme

causation as Plaintiffs claim. (Defendants' Brief in Response to Plaintiffs' Submission of Proposed Third Amended Complaint and Submission of Supplemental Authority, Docket No. 145, at 2). Plaintiffs answer only that they acted diligently in submitting this supplemental authority as soon as the case was reassigned. (Reply Brief to Defendants' Response Brief, Docket No. 146, at 7). Thus, they offer some explanation as to the first argument by Defendants, but fail entirely to address the much more critical issue, *viz.*, whether the bench ruling in *Moorhead* is relevant to the loss causation argument or materiality. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005), noting that materiality and loss causation are different concepts.

The Court need not examine these positions in detail. Assuming for the sake of argument that the ruling in *Moorhead* is relevant to the issues herein, accepting Plaintiffs' first argument regarding disclosure of a fraudulent scheme would not save the SAC because, as discussed in the text above, failure to adequately plead loss causation was only one independent reason for dismissal. With regard to their second argument, a court is not required to accept conclusory allegations in a complaint when those allegations are contradicted by documents incorporated in the pleadings. *Muti v. Schmidt*, No.03-1206, 2004 U.S. App. LEXIS 7933, *11, n.2 (3d Cir. Apr. 21, 2004), *citing* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §1363, at 464-65 (2d ed. 1995). Here, Plaintiffs repeatedly alleged omissions and misrepresentations made in the Company's filings with the SEC. Defendants provided the Court with copies of those filings and it is well-established that the Court may take judicial notice of those documents in their entirety, not only because Plaintiffs relied upon them, but because they are properly authenticated public disclosure documents. *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000). As discussed at length in *Payne*, the SEC filings repeatedly made reference to the Company's ongoing liquidity problems.

Court has observed:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires;" this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal citation omitted); *see also Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000).

In the context of cases brought under the PSLRA, the Third Circuit has noted the "unique impact of narrowing application of this standard." *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 164 (3d Cir. 2004) (*Chubb*). "Allowing leave to amend where there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA, would frustrate Congress's objective in enacting this statute of providing a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." *Id.* (internal citations and quotations omitted).

As Judge Sloviter noted in *Chubb*:

> The tension between the liberal amendment approach of Fed. R. Civ. P. 15 and the strict pleading requirements of the PSLRA has been noted by the courts. Our court seems to have given inconsistent signals. Compare *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1333 (3d Cir. 2002) (stating in dictum that goals of PSLRA "would be thwarted if, considering the history of this case, plaintiffs were liberally permitted leave to amend again"), with *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) ("we will not add to the strict discovery restrictions in the . . . PSLRA . . . by narrowly construing Rule 15 in this case, even at this late stage in the litigation. Given the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity to amend their complaint to include allegations relating to the newly discovered Board meeting minutes.")

*Chubb*, 394 F.3d at 170 (Sloviter, J., dissenting in part).[6]

In this case, the "tension" between the liberality of Rule 15 and the strict standards of the PSLRA is informed further by the fact that "[i]t is well-settled that when judgment has been entered, the presumption favoring liberal amendments is reversed." *Return on Equity Group, Inc. v. MPM Techs., Inc.*, No. 02-3374, 2003 U.S. App. LEXIS 9769, \*7 (3d Cir. May 20, 2003), *citing Werner*, 267 F.3d at 296. At this point in the proceedings, leave to amend becomes the "long-odd exception, not the rule." *Werner, id., quoting The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 22 (1st Cir. 1989).

In determining whether to dismiss a complaint with prejudice, and, by extension, whether to grant a motion for leave to amend, a court considers five factors: bad faith, undue delay, prejudice to the opposing party, the futility of amendment, and whether plaintiff has previously amended his complaint. *Chubb*, 394 F.3d at 165, *citing In re Burlington*, 114 F.3d at 1435 (in the context of cases brought under the PSLRA, leave to amend is generally granted when the complaint is dismissed solely on failure to satisfy the particularity requirements of the PSLRA). Standing alone, the mere fact that the claimants have had multiple attempts to comply with PSLRA pleading requirements is insufficient reason to dismiss a complaint with prejudice. *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 n.3 (3d Cir. 2003), *citing Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (noting that "the undeservedly common 'three bites at the apple' cliche . . . too often provides a substitute for reasoned analysis"). Nor does the mere passage of time require that a motion to amend a complaint be denied on grounds of delay, although "at some point, the delay will become 'undue,' placing an unwarranted burden on the court

---

[6] Judge Sloviter went on to opine that contrary to the majority holding, the plaintiffs should be allowed to amend their complaint if they could divorce their securities claims brought under Sections 11 and 14(a) of the Securities and Exchange Act of 1934 (Act) from any allegations of fraud. *Chubb*, 394 F.3d at 170-172. That is not an option in this case since the only claims here are brought under Section 10(b) of the Act, 15 U.S.C.S. §78j(b), and derivatively under §20(a) of the Act, 15 U.S.C.S. §78t.

17

or will become 'prejudicial,' placing an unfair burden on the opposing party." *Cureton v. NCAA*, 252

F.3d 267, 272 (3d Cir. 2001). The decision to grant or deny a motion for leave to amend a

complaint is committed to the sound discretion of the district court. *Id.* at 273 (internal citations and

quotations omitted).

## B. Plaintiffs' Arguments

In dismissing the *Payne* SAC with prejudice, the Court noted:

> The complaint now being dismissed is the third version, developed over a period of
> more than four years, and based upon evidence gleaned from an on-going
> bankruptcy proceeding from which Plaintiffs have received documentary and
> deposition evidence not usually available to typical securities fraud class plaintiffs.
> Plaintiffs have offered voluminous exhibits to support their 491-paragraph complaint
> and have responded in detail to each issue raised by Defendants. The previous
> opinion (Docket No. 68), we believe, pointed out precisely the shortcomings in
> pleading scienter for the Individual Defendants, advice which Plaintiffs either failed
> to follow or are unable to allege with the particularity required by the PSLRA. We
> also conclude that Plaintiffs have made allegations related to loss causation which
> are not merely offered in the alternative, but are self-contradictory, a defect which
> is fatal to their claims.

*Payne*, 433 F. Supp.2d at 612.

Plaintiffs argue that "newly discovered evidence" will allow them to rectify the problems

discussed in the opinion dismissing the *Payne* SAC with prejudice, specifically the question of

Defendants' scienter. Plaintiffs ask the Court to apply the reasoning of two recent opinions, *Belizan*

*v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006), and *In re Remec Inc. Sec. Litig.*, 415 F. Supp.2d 1106

(S.D. Cal. 2006).[7] The Court finds neither of those cases persuasive.

---

[7] Plaintiffs also rely on *Werner* for the principle that even at the appellate stage of litigation, courts
may allow parties to amend their pleadings pursuant to Fed. R. Civ. P. 15. (Plaintiffs' Memorandum of
Law in Support of their Supplemental Rule 59 Motion to Alter or Amend the Judgment so as to Allow
Leave to Amend Their Complaint with Newly Discovered Evidence and to Add Allegations in Conformance
with *Dura Pharmaceuticals*, Attachment 1 to Docket No. 131, at 3-5). In light of *In re NAHC*, which was
handed down by the Court of Appeals more than a year after *Werner*, the Court questions Plaintiffs'
description of the latter case as controlling precedent. Moreover, the Court finds *Werner* distinguishable
on its facts. In that case, after the motion to dismiss was granted, the plaintiff shareholders discovered
corporate minutes which explicitly contradicted the defendants' material misrepresentations to
shareholders that they had no intention of selling the corporation, thereby inducing the plaintiffs to sell at a
price much lower than they would have accepted had they known of the possible sale. *Werner*, 267 F.3d
at 294. Here, as discussed in the text above, there is no such "smoking gun," only circumstantial

At a hearing on the defendants' motions to dismiss in *Belizan*, plaintiffs' counsel stated that they "probably could, if it was required, file [an] amended complaint" and could, "if the Court requires us to," plead additional allegations from a source not mentioned in the original complaint. The plaintiffs did not follow up on these oral representations with a written motion for leave to amend or with a proposed amended complaint. *Belizan*, 434 F.3d 579, 581. The district court dismissed the complaint with prejudice, concluding that the statements at the hearing did not constitute formal motions for leave to amend and, even if they were so interpreted, the PSLRA "sets a high standard of pleading which if not met results in a mandatory dismissal. . . . *with prejudice*." *Id.* (internal citations omitted; emphasis in original). The district court denied a subsequent motion for reconsideration, concluding (1) Belizan had not properly moved to amend her complaint and (2) the draft amended complaint filed without leave of court "shared important failings with [her] earlier effort." *Id.*

On appeal, the court held that the district court had not abused its discretion by determining that Belizan had never properly moved for leave to amend her complaint by virtue of the statements of her counsel at oral argument. "Rule 15(a)-- even as liberally construed -- applies only when the plaintiff actually has moved for leave to amend the complaint; absent a motion, there is nothing to 'be freely given.'" *Belizan*, 434 F.3d at 582-583. On the other hand, the appeals court rejected the lower court's conclusion that the PSLRA required dismissal with prejudice; that is, the heightened pleading requirements of the PSLRA did not alter the operation of Rule 15(a) and preclude a plaintiff the opportunity to amend a complaint determined not to meet those requirements. *Id.* at 583-584. The lower court had erred as a matter of law in dismissing the complaint without providing an adequate explanation of why the dismissal was with prejudice. *Id.* at 584, citing the standard for dismissal with prejudice set out in *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C.

_____

evidence, largely based on group pleading, from which the Court cannot draw a strong inference of scienter.

19

Cir. 1996) ("dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency").

It appears the district court in *Belizan* had rejected the first iteration of the complaint, not one which was drafted after the court had provided a blueprint for curing the deficiencies therein and *sua sponte* directing the plaintiffs to file an amended complaint as occurred in the instant case. (*See* Docket No. 68). Unlike the *Belizan* court, this Court did not imply that dismissal with prejudice was mandated by the PSLRA, only that dismissal was mandatory if the complaint failed to comply with the PSLRA's pleading requirements. *Payne*, 433 F. Supp.2d at 557, *citing GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). Moreover, it is important to note that the Court of Appeals in *Belizan* did not rule that the district court had erred by dismissing the complaint with prejudice, only that it had erred by failing to provide an adequate explanation for that decision. On remand, the lower court was directed "to enter a new order either dismissing without prejudice or explaining its dismissal with prejudice in a manner consistent with this opinion." *Belizan*, 434 F.3d at 584.[8] In dismissing the *Payne* SAC, this Court provided what it believes was a detailed explanation of why the dismissal was with prejudice. *See Payne*, 433 F. Supp.2d at 612-613.

Plaintiffs' reliance on *In re Remec* is no more persuasive. When the defendants moved to dismiss the second amended complaint with prejudice in that case, the plaintiffs countered with a motion to amend. *In re Remec*, 415 F. Supp.2d at 1119. The court noted the PSLRA's onerous particularity requirement regarding scienter. Relying on *Eminence Capital*, *supra*, the court

---

[8] On remand, the district court took the second option, again dismissing the complaint with prejudice, explaining that "based on the record before the Court at the time of dismissal, there was no indication that plaintiffs were capable of making additional allegations, consistent with their prior pleadings, that would cure the deficiencies in the claims" in that they had identified only two statements alleged to have been materially misleading, neither of which was pled with the particularity required by the PSLRA, and had failed to establish strong inferences of scienter on the part of the defendants. *In re Interbank Funding Corp. Secs. Lit.*, 432 F. Supp.2d 51, 55-56 (D.C. Cir. 2006).

concluded that in light of the heightened standard, "the drafting of a cognizable complaint can be a matter of trial and error," and permitted the plaintiffs "one last opportunity to state a claim that complies with the PSLRA." *Id.*

Plaintiffs here do not argue, but seem to imply based on *In re Remec*, that as long as they assert there is additional evidence which would allow them to state a claim, the court must permit repeated attempts to satisfy the pleading standards of the PSLRA. (Plaintiffs' Memorandum of Law in Support of Their Supplemental Rule 59 Motion to Alter or Amend the Judgment so as to Allow Leave to Amend Their Complaint with Newly Discovered Evidence and to Add Allegations in Conformance with *Dura Pharmaceuticals*, Attachment 1 to Docket No. 131, Plfs.' Memo to Amend, at 6). The *In re Remec* opinion, however, reflects the stage at which the court is pointing out the deficiencies of the complaint being dismissed and providing guidelines for rectifying those problems. *See*, *e.g.*, the detailed analysis of shortcomings in the GAAP violation and scienter allegations at 415 F. Supp.2d at 1114-1119. The *In re Remec* court believed the plaintiffs could rectify some or all of these problems. Unlike *In re Remec*, here the Court finds Plaintiffs have already been given the same type of detailed analysis and guidance about amendment in the opinion dismissing the first amended complaint.

C. Defendants' Arguments

In their memorandum opposing Plaintiffs' motion to amend, Defendants raise four principal arguments. First, they argue Plaintiffs' "wait-and-see strategy" of delaying the request to amend until after the SAC was dismissed wastes judicial resources and has been soundly rejected by the Third Circuit Court of Appeals. (Defendants' Memorandum of Law in Opposition to Plaintiffs' Supplemental Rule 59 Motion to Alter or Amend Judgment so as to Allow Leave to Amend Their Complaint, Docket No. 141, Defs.' Opp., at 1-2). Second, because Plaintiffs failed to provide a proposed amended complaint with the motion to alter the judgment, the Court is unable to properly

consider the request.[9]  Third, any motion for leave to amend would be futile because the alleged

newly discovered evidence on which Plaintiffs rely is not only redundant but cannot cure the

substantive inadequacies which were pointed out in *Payne*.  (*Id.* at 2-4).  Finally, Defendants argue

that they would suffer substantial prejudice if Plaintiffs were allowed to amend yet again at this

point in the proceedings.  (*Id.* at 11).

     The Court finds that under the facts and circumstances of this case and the related litigation

in *Glover*, Defendants will be prejudiced by being forced to defend against the complaint for the

third time.  The Court also finds Plaintiffs have demonstrated undue delay in failing to amend the

complaint earlier in these proceedings based on evidence they knew about in some instances

almost a year before the SAC was dismissed, and  that amendment on the basis of that evidence

would be futile.

     1.     *Prejudice to the Nonmoving Party*:  The Third Circuit has repeatedly held that

"prejudice to the non-moving party is the touchstone for the denial of an amendment."  *Chubb*, 394

F.3d at 171; *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993).  Prejudice in this context

means "undue difficulty" in defending a lawsuit "as a result of a change in tactics or theories on the

part of the other party."  *Winer Family Trust v. Queen*, CA No. 03-4318, 2005 U.S. Dist. LEXIS 652,

*11 (E.D. Pa. Jan. 13, 2005), *citing Deakyne v. Comm'rs of Lewes*, 416 F.2d 290, 300, n.19 (3d

---

     [9]  Defendants argue that the failure to provide a copy of the proposed TAC is sufficient in itself to
deny the motion for leave to amend.  (Defs.' Opp. at 12, *citing Lake v. Arnold*, 232 F.3d 360, 374 (3d Cir.
2000) and *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 47 F. Supp.2d 546, 562 (D. N.J. 1999)).
Plaintiffs respond only they "did not have the opportunity" to file a proposed amended complaint "in view of
the stringent, possibly jurisdictional 10-day time limit provided in Fed. R. Civ. P. 59 for filing these motions.
The demands of filing these factually and legally complex motions required the full attention and resources
of Plaintiffs' counsel during that short time period."  (Plfs.' Supp. Memo at 2).
     The Court notes two relevant facts in this regard.  First, Plaintiffs filed their motions for
reconsideration on May 15, 2006, but never requested an extension of time in which to file a proposed
TAC.  The history of this case shows that requests for extensions have been freely agreed to by both
parties and by the Court, and there is no reason to believe the same would not have been true at this
point.  Second, the fact that the proposed TAC was not filed until after Defendants pointed out its absence,
some six weeks after the Rule 59(e) motions were filed but within a week after the omission was noted,
undermines Plaintiffs' claim that the motion could not be filed timely.  Nevertheless, the Court does not
agree with Defendants that this failure alone is sufficient grounds for dismissal.

Cir. 1969).

Defendants contend they would be substantially prejudiced by being forced, once again, to "move to dismiss legally inadequate pleadings, responding to complaints of 150 and 189 pages, hundreds of pages [of] exhibits, and Opposition briefs of great length." (Defs.' Opp. at 11, *citing Cureton*, 252 F.3d at 273, and *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 654-655 (3d Cir. 1998)). In particular, they argue *Cureton* and *Rolo* stand for the proposition that the cost and preparation involved in defending against new facts or new theories in a case of excessively long duration are factors prejudicing the defendant. (Defs.' Opp., *id.*)

In response, Plaintiffs argue that "it is implausible" for Defendants to claim prejudice since they "have been preparing their defense on the issue of overstatement of receivables in three actively litigated cases," and should therefore be "fully motivated and able to prepare to defend against the analogous claims in this case." (Reply Brief to Defendants' Response Brief, Docket No. 146, Plfs.' Reply, at 1-3). The Court takes judicial notice that the primary issue in *IT Group, Inc. v. D'Aniello* appears to be breach of fiduciary duty rather than securities fraud; that none of the Individual Defendants here are defendants in *Highland Capital Mgmt. v. T.C. Group LLC*;[10] that all Defendants except Soose have been dismissed from *Staro Asset Management LLC v. Soose*, CA

---

[10]  As described by the court in an opinion denying the defendants' motion for reconsideration, the litigation trust plaintiff in *IT Group* alleges the defendants (who are primarily the same as the Individual Defendants herein) "breached their fiduciary duties as directors and officers of the IT Group by, *inter alia*, approving payments, including dividends and consulting fees, to the Carlyle Defendants while the IT Group was insolvent or in the zone of insolvency" and that the Carlyle Defendants (who are not the same as The Carlyle Group herein) "breached their fiduciary duties as controlling shareholders of the IT Group and aided and abetted the Individual Defendants' breaches." The trust also brings "claims for waste of corporate assets, unlawful payment of dividends, avoidance of preferential transfers, and recovery of fraudulent transfers." *IT Group, Inc. v. D'Aniello*, CA No. 04-1268, 2006 U.S. Dist. LEXIS 5035, *2-*3 (D. Del. Feb. 9, 2006). According to an unpublished opinion in *Highland Capital Mgmt.*, the crux of that case rests on alleged misrepresentations concerning the financial stability of ITG made by various Carlyle entities to five investment firms who participated in the credit agreement between ITG and Citibank. *See Highland Capital Mgmt. v. T.C. Group LLC*, CA No. 04C-06-068, 2006 Del. Super. LEXIS 290 (Super. Ct. Del. July 27, 2006). Thus it appears that in both *IT Group Inc.* and *Highland Capital Mgmt.*, the main defendants are Carlyle-related entities whereas in this case, the focus is on the Individual Defendants.

No.02-886, and that the *Glover* lawsuit has been dismissed with prejudice.[11] Therefore, it is not at all clear that the defenses in the other cases are analogous to those herein.

Plaintiffs also claim Defendants have failed to identify the prejudice they would suffer if the motion to amend were granted. (Plfs.' Reply at 2). A full reading of the brief opposing amendment, however, shows this not to be the case. Defendants note that in four years, they succeeded in both efforts to dismiss the suit; they anticipate doing so again if Plaintiffs were permitted to amend. They note the "effort and financial burden" of defending the case, along with the "cloud on their reputations from the ongoing allegations of fraud." (Defs.' Opp. at 11). In at least two instances, the Third Circuit has found that requiring defendants to defend against repeated iterations of the complaint was sufficient to establish prejudice. *See Chubb*, 394 F.3d at 166, holding that the district court's denial of leave to amend was properly within its discretion where the lower court found the need to "ultimately incur the effort and expense of a third motion to dismiss after two successful dismissal motions would clearly constitute undue prejudice to the defendants," and *Rolo*, 155 F.3d at 655, affirming district court's denial of leave to amend, in part because of the "substantial effort and expense of resolving defendants' motion to dismiss the first amended complaint."

        2.    *Undue Delay and Bad Faith*:  Defendants argue that "as early as July 2005, Plaintiffs were aware that they possessed documents that might provide a basis for amendment." (Defs.' Opp. at 5, referring to the Glancy Declaration). The documents attached to the Kunis Declaration[12] were also, by Plaintiffs' own admission, "reviewed in late fall 2005." (*Id.*)  Yet, Defendants argue, instead of promptly requesting permission to amend at either of those points,

---

[11]  Plaintiffs in *Glover* appealed the decision dismissing their amended complaint with prejudice without seeking reconsideration in this Court, meaning Defendants will have to proceed with their defense of that case to some extent, depending on the issues raised by Plaintiffs on appeal.

[12]  The "Kunis Declaration," "Devor Declaration," and "Exhibit GGG" are identified and discussed in detail below.

Plaintiffs opted to "wait and see" if the Court would dismiss the SAC, a tactic which is strongly discouraged by the courts. (*Id.* at 6-8, *citing, inter alia, In re Digital Island Secs. Litig.*, CA No. 02-57, 2002 U.S. Dist. LEXIS 22618 (D. Del. Nov. 25, 2002), *aff'd*, 357 F.2d 322 (3d Cir. 2004), and *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F. Supp.2d 351 (S.D. N.Y. 2003)).

Plaintiffs argue that unlike the plaintiffs in the cases relied upon by Defendants, they "acted timely in bringing newly discovered evidence to the Court's attention." (Plfs.' Reply at 3). In particular, the documents attached to the Glancy Declaration were provided to the Court in July 2005 in opposition to the motion to dismiss the SAC, only a month after they became available; the documents obtained in March and April 2006 were provided in May 2006; the *Glover* complaint was promptly amended within one week after being ordered by the Court to do so; and Exhibit GGG was not available until May 2006. (*Id.* at 3-5).

The foregoing is true as far as it goes. However, when Defendants identified deficiencies in the Amended Complaint and in the Second Amended Complaint, Plaintiffs responded by filing numerous declarations and exhibits, but never filed a motion to amend. The SAC was filed on March 3, 2005, and Defendants filed a motion to dismiss on May 27, 2005. As early as July 7, 2005, when the Glancy Declaration was filed,[13] Plaintiffs could have amended their complaint to cure the deficiencies and bolster their allegations of GAAP violations in the SAC, but failed to do so. In fact, the last paragraph of the Glancy Declaration states:

**PLAINTIFFS ARE PREPARED TO FILE A THIRD AMENDED COMPLAINT IF THE COURT SO DESIRES:** Plaintiffs believe that the Court can take judicial notice of the following [sic] facts as they relate to allegations that are set forth in the [Second Amended Complaint.] However, in the event the Court determines that the proper manner of briefing these issues will be in connection with a newly amended Complaint, Plaintiffs would be willing and prepared to file such a complaint on an expedited basis.

_____

[13] *See* Glancy Declaration, ¶2: "This declaration will provide for the Court's review specific documents which Plaintiffs have recently obtained that clearly controvert certain assertions set forth in Defendants' Moving Brief at 49-55, regarding the propriety of defendants (sic) write-down of specific accounts receivables [sic]."

(Glancy Decl. at 17).

This statement was just one in a series of offers to amend which Plaintiffs made in footnotes and parenthetical comments. "A bare request in an opposition to a motion to dismiss -- without any indication of the particular grounds on which amendment is sought . . . does not constitute a motion within the contemplation of Rule 15(a)." *In re NAHC,* 306 F.3d at 1332, *quoting Confederate Mem'l Ass'n v. Hines,* 995 F.2d 295, 299 (D.C. Cir. 1993); *see also In re CIGNA Corp. Sec. Litig.,* CA No. 02-8022, 2006 U.S. Dist. LEXIS 13205, *17-*18 (E.D. Pa. Mar. 27, 2006), denying leave to amend where plaintiff's "motion" was made in a footnote without providing grounds for amendment or proposing amended claims, there had been numerous delays in the case, the plaintiff had already had several opportunities to amend, and the defendant would be prejudiced by having to respond to new claims in another amended complaint.

Plaintiffs do not address *In re Digital Island,* but the Court finds the tactics of the plaintiffs there remarkably similar to those of Plaintiffs here.[14]  When deciding a motion for leave to amend, the *In re Digital Island* court noted that the plaintiffs had failed to make such a motion until after a pending motion to dismiss had been granted. It also noted that after the motion to dismiss was filed, "the plaintiffs would have been well within their rights to request leave to amend," but instead opposed the motion without seeking such relief. *In re Digital Island,* 2002 U.S. Dist. LEXIS 22618 at *4. Again, like Plaintiffs here, they had "signaled" that if the court agreed with the defendants'

---

[14]  Plaintiffs do address another case cited by Defendants, *In re Merrill Lynch,* arguing that unlike those plaintiffs, they have not withheld evidence in their possession, but rather presented the relevant facts learned after the SAC was filed through the Glancy Declaration. (Plfs.' Reply at 6). Like the *In re Digital Island* plaintiffs, the plaintiffs in *In re Merrill Lynch* waited until their complaint was dismissed before they requested leave to amend.  The decision to deny the motion for leave to amend was based not only on the fact that the plaintiffs were aware of the purportedly new information long before the motion to dismiss was decided, but also on the conclusion that the plaintiffs had demonstrated bad faith by waiting to see how they would fare on the motion to dismiss. Secondly, as in this case and in *In re Digital Island,* the plaintiffs in *In re Merrill Lynch* indicated their "ability" and "desire" to amend only in a footnote to an opposition brief. *In re Merrill Lynch,* 273 F. Supp.2d at 391; *see also In re Dreyfus Mut. Funds Fee Litig.,* 2006 U.S. Dist. LEXIS 41359 at *11, stating that a court expected plaintiffs to take "any and all procedural steps to protect their claim, to include filing a motion for leave to amend even if they thought that they would prevail on the [pending] motion."

26

arguments about deficiencies in the complaint, they "could adequately and easily replead to cure

any such deficiencies." As the district court pointed out,

> [u]nfortunately, . . . in making this statement, the plaintiffs have apparently forgotten
> that it is their duty, not the court's, to request leave to amend. Had the plaintiffs
> been as interested in amending as they claim to have been, the appropriate
> response would have been a request for leave to amend, before the court
> dismissed their case. The court does not, and will not, make its decisions based
> on covert "signals" from counsel.

*In re Digital Island*, 2002 U.S. Dist. LEXIS 22618 at *5-*6.

In another securities fraud case with a similar procedural history, the plaintiffs moved for

leave to file a second amended complaint after most of the previously asserted securities claims

had been dismissed, claiming that the second amended complaint would "remedy all of the defects"

identified in the court's decision. *In re Stone & Webster, Inc., Sec. Litig.*, CA No. 00-10874, 2003

U.S. Dist. LEXIS 14644, *4 (D. Mass. Aug. 25, 2003). They conceded, like Plaintiffs here, that

much of the information on which they would rely in the second amended complaint had been

available to them during the period while the court was considering the first motion to dismiss. In

denying leave to amend, the court stated:

> The fact that the plaintiffs chose to oppose the motions to dismiss on the grounds
> that their complaint was, in their view, sufficiently pleaded, rather than providing the
> additional information known to them during the necessarily lengthy period during
> which the motions to dismiss were being considered, smacks of gamemanship
> bordering on bad faith. A plaintiff shouldering the burden of pleading under the
> PSLRA cannot pull its punches in this way and then expect a district court to allow
> that plaintiff another chance once the matter has not only been fully briefed, but
> actually decided. Considerable effort of the parties and the court was expended in
> deciding the motion to dismiss: the papers of the parties in support of and in
> opposition to the motion, the relevant documents at issue, and the pertinent cases
> created a veritable mountain of documents - a mountain that I laboriously climbed
> more than once . . . .When a plaintiff fails to seek leave to amend after a motion to
> dismiss has been filed, and is aware of the stringent pleading requirements [of the
> PSLRA], the logical inference is that the plaintiff intends to stand on his or her
> complaint. To hold back facts the plaintiffs now characterize as helpful or even
> crucial to their case . . . strikes me as precisely the sort of 'undue delay' that should
> result in a denial of leave to amend.

*In re Stone & Webster, id.* at *9-*11 (internal citations and quotations omitted).

The Third Circuit has held that where a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied. *Cureton*, 252 F.3d at 273 ("The question of undue delay requires that we focus on the movant's reasons for not amending sooner.")  Here, Plaintiffs offer no reason why they did not move to amend the complaint at the time they filed the Glancy Declaration.  As another court has held where the plaintiffs made a strategic decision to stand on the complaint while the motion to dismiss was pending, to allow amendment after that decision was handed down "would in effect reward Plaintiffs for their lack of diligence and undue delay." *In re Capstead Mortg. Corp. Sec. Litig.*, CA No. 98-1716 *et al.*, 2003 U.S. Dist. LEXIS 16525, *11 (N.D. Tex. Sept. 19, 2003); *see also Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000) ("Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.") The Court finds that given the history of this case, Plaintiffs' delay in formally seeking leave to amend on a timely basis weighs against them being granted another opportunity to amend at this point in the litigation.

3.    *Futility*:  Finally, coming full circle to the original reason for dismissing the amended and second amended complaints, the Court concludes that Plaintiffs have failed to show that they can amend the complaint to cure the deficiencies in establishing scienter on the part of any Defendant.  In determining the futility of further amendment, the Court applies the same legal standard as in a motion to dismiss. *In re Burlington*, 114 F.3d at 1434.  Plaintiffs offer numerous documents in support of their argument that the TAC will incorporate newly discovered evidence, *i.e.*,  evidence which the Court has not considered in connection with earlier versions of the *Payne* complaint (including the documents provided with the Glancy Declaration discussed above), which will resolve the prior difficulties in adequately alleging scienter.  The Court disagrees, as an analysis of the proposed evidence shows.

a.    Plaintiffs contend that the newly discovered evidence, as discussed

28

in the declaration of their accounting expert, reflects that Defendants "had to know" of the financial crisis created by the Company's decision to continue to carry uncollectible receivables on its books in violation of GAAP. (Declaration of Harris L. Devor, CPA, in Support of Plaintiffs' Motion for Reconsideration of May 2, 2006 Order, Docket No. 127, Devor Decl.) Plaintiffs argue that the Devor Declaration provides concrete examples of problem accounts which were "manifestly uncollectible many months, if not years," before the December 2001 write-off of certain accounts receivable, *e.g.*: (1) Beneco-Norfolk, (2) Lake Apopka, (3) Logixx Automation, and (4) Beneco-Sanders. (Plfs.' Memo to Amend at 2-3).

Mr. Devor "tentatively concluded"

that ITG, in violation of GAAP improperly deferred the recognition of expense relating to certain amounts that either remained unbilled for several years, and/or amounts due from bankrupt companies, and/or amounts for which the Company itself had forecasted to be written off in the future. The improperly deferred amounts . . . appear to be violations of GAAP, which if material, would have required ITG to restate its financial statements.

(Devor Decl., ¶13).

The Court will not consider the Devor Declaration as newly discovered evidence because it is inappropriate to consider it on a motion to dismiss. *In re Burlington*, 114 F. 3d at 1421 (whether a company's accounting practices were consistent with GAAP is a factual question best resolved by expert testimony and should not be addressed on a motion to dismiss). Secondly, even if the substantive content of the Declaration were considered, it still fails to shed light on the critical question: did any Defendant deliberately or recklessly allow the Company to persist in accounting practices he knew violated GAAP in order to misrepresent the Company's financial condition to investors? Nevertheless, the Devor Declaration is pertinent to the analysis of other evidence which follows inasmuch as several points raised therein correlate to allegations in the proposed TAC.

        b.     Plaintiffs' attorney, Joshua J. Kunis, avers that Plaintiffs have diligently examined documents which became available to them through the ITG bankruptcy

litigation pending in the U.S. District Court for the District of Delaware.[15]  (Declaration of Joshua

J. Kunis in Support of Plaintiff's Memorandum of Law in Support of Their Supplemental Rule 59

Motion to . . . Amend Their Complaint, Docket No. 129, Kunis Decl., ¶3).  Mr. Kunis states that "the

overwhelming majority" of these documents were reviewed "in late fall 2005."  He further avers that

despite their diligence, Plaintiffs did not have "any significant access to IT documents until after the

SAC was already filed" in March 2005.  (Id., ¶33).  Thirteen of these documents were deemed

sufficiently important to be provided with the Kunis Declaration to support Plaintiffs' arguments that

they should be permitted to amend their complaint on the basis of this newly discovered evidence.

Exhibit B is an internal ITG memorandum from Defendant Francis J. Harvey (Harvey) dated

December 3, 2001, sent to an unidentified "Distribution."  Plaintiffs quote from the memorandum:

> It has become readily apparent that a change is required in our process of
> projecting cost and profit recovery in project work involving changes, modifications,
> amendments and claims . . . . We have often undertaken changed work without any
> assurances from our clients that the changed work will be compensated and without
> promptly notifying our clients as contractually required.

(Plfs.' Memo to Amend at 11-12).

Plaintiffs contend this statement shows the Court erred when it concluded "[t]he fact that

Mr. Harvey changed the standard by which accounts receivable were deemed uncollectible is not

evidence that Defendants DeLuca or Soose acted recklessly by not arriving at the same conclusion

earlier."  Rather, Plaintiffs argue, the statement was a "belated admission that the prior treatment

---

[15]  Plaintiffs also provide a Declaration of Robert M. Zabb in support of their motion for leave to amend their complaint.  (Docket No. 130).  Plaintiffs' counsel avers that the purpose of the Zabb Declaration is "to provide evidence of Plaintiffs' diligence in connection with preservation and inspection of available documents in this case." (Id., ¶2).  The declaration recounts in detail the steps Plaintiffs took in late 2005 to preserve documents which were threatened with destruction by the trustee in the ITG bankruptcy case pending in Delaware.  In this regard, the Zabb Declaration is redundant of the Kunis Declaration.  The Court is unable to pinpoint any reference to the Zabb Declaration in Plaintiffs' pleadings filed in connection with either motion and thus cannot determine if it was intended to serve some other purpose.  Plaintiffs admit, in essence, that they have ignored the PSLRA stay by inspecting documents before the motion to dismiss was decided.  This flies in the face of one objective of the PSLRA, namely that plaintiffs plead legally sufficient claims prior to any discovery.  See In re Merrill Lynch, 273 F. Supp.2d at 391, n.6.

was incorrect and wrong." (Plfs.' Memo to Amend at 11; *see Payne*, 433 F.2d at 579).

Plaintiffs are comparing apples and oranges. The Court was writing in *Payne* about Plaintiffs' allegations that Soose and DeLuca knew certain accounts receivable were not collectible yet did not write them off in order to fraudulently bolster the Company's financial statements. *Payne, id.* Harvey is writing in this memorandum about how project managers are to account for change orders, *e.g.*, if the client has authorized the change in writing for an agreed upon amount, 100% of that amount is to be shown in the revised estimated amount column on project status reports, while different methods are to be used if the client has authorized the change but not the amount or has approved neither the change nor the amount. (Kunis Decl., Exhibit B). While Harvey's change in accounting would ultimately affect the Company's accounts receivable totals, it has no bearing on the collectibility of past accounts.

Moreover, the proposed TAC is confusing on the relevance of this evidence and the purpose for which it is offered by Plaintiffs. Plaintiffs allege "IT's inclusion of amounts in receivables that reflected work that was not contracted for with clients and was not approved by the clients, and was not objectively verifiable or capable of reliable estimation, is a violation of GAAP." (PTAC, ¶275). Plaintiffs then allege that Harvey was aware of, or was reckless in not knowing, of this GAAP violation because he testified in the bankruptcy proceedings that one of the reasons DeLuca was fired was for "putting changes on the balance sheet that were not negotiated." (*Id.*, ¶276). The next allegation then states:

Moreover, DeLuca's new rules regarding recording revenues from change orders was known to DeLuca to be required because the prior treatment failed to conform to GAAP, not just an optional shift to more conservative accounting. This is reflected in a December 3, 2001 internal memorandum authored by Harvey which stated: "It has become readily apparent . . . [etc.]"

(PTAC, ¶277).

Assuming Plaintiffs intended to refer to Harvey, not DeLuca, when referring to "DeLuca's new rules" and that "DeLuca" knew this change was required, the allegations fail to establish either

31

(1) that DeLuca knew or was reckless in not knowing that the method of accounting for change orders which had been used while he was CEO was a violation of GAAP or that he had condoned that practice with fraudulent intent or, alternatively, (2) that Harvey knew of this practice before he became acting CEO in November 2001, but allowed it to continue in order to fraudulently bolster the Company's accounts receivable. There is nothing in Exhibit B from which to infer that Harvey was changing the method of accounting for change orders because he knew the past practice was a violation of GAAP.

Exhibit C is a set of handwritten notes dated August 25, 2000, concerning the Beneco-Norfolk project, which "appear to be authored by James Pierson." (Kunis Decl., ¶37). Plaintiffs argue that as vice president for finance and Company controller, Mr. Pierson "would be expected to report to Defendants DeLuca and Soose." (Plfs.' Memo to Amend at 12). This reporting relationship is insufficient to establish scienter on the part of either of those Defendants. *See In re Alpharma*, 372 F.3d at 150, *citing Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 828 (8th Cir. 2003) for the principle that an allegation that a subordinate of a named defendant knew of accounting irregularities was "not specific enough to support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring." Plaintiffs also conclude from these notes that "as early as August 2000, **senior management** was already aware that the Norfolk project was a fiasco" and that collectibility of the accounts receivable was doubtful. (Plfs.' Memo to Amend, *id.,* emphasis added). Significantly, however, the notes do not show that DeLuca, Soose, or any other Defendant was aware of those facts. Plaintiffs point to a notation at the end of the document stating "per discussion w/ Jim Kirk @ the direction of Jim Kirk work is conducted[;] Jim Kirk directs copies to Pierson, Soose, Backus J, Hendrickson" as evidence that by no later than August 2000, Soose was "to be updated on the Norfolk project and would by then be aware of the doubtful collectibility of the related receivables." (Plfs.' Memo to Amend at 12-13). The Court

32

accepts Plaintiffs' interpretation of the handwritten notes, but it is unclear from Exhibit C what "copies" Soose was to receive. Plaintiffs allege that Soose and others were to receive copies of work order approvals. (PTAC, ¶331). Accepting this allegation as true, it does not explain why those documents would reveal the related accounts to be uncollectible, whether Soose actually received the work orders, or what Soose may have learned from them to establish fraudulent intent on his part.

Exhibit D is an internal memo dated August 29, 2000, also about the Beneco project, written by Roger Corless to Jim Kirk with a copy to Soose and others. Plaintiffs contend this document further reflects the fact that by August 2000, "senior management" was aware of the problems with the Beneco-Norfolk project, although $2.5 million in receivables was not written off until December 2001. (Plfs.' Memo to Amend at 13). Contrary to Plaintiffs' characterization, this document supports Defendants' position. The August 29, 2000, memorandum states:

> For accounting purposes, the potential loss of $2.5 million is being carried at $1.2 million, with the difference based on the potential for claims against the government or against subcontractors. . . .The threatened liquidated damages [by the Navy for late completion of the project] could amount to as much as $600K, which is not reflected as a potential loss in the accounting reports. Because of the focus on completion, **the analysis of claims is just now commencing**. Pat Hendrickson [the project manager concludes] there are significant defenses against the liquidated damages claims. Pat has commenced **the first stage of the claims process**, document gathering and control. . . . Once the documents are assembled, a framework for claims analysis will be defined and then documents will be evaluated for their ability to support the various possible claims. . . . Beneco management is **continuing a dialogue** with the government to gain an understanding of their position on liquidated damages which continue to be withheld from payments. A high level meeting is also scheduled that may set the stage for **possible settlement negotiations**.

(Kunis Decl., Exhibit D (emphasis added)).

In short, a reading of the entire memo shows that in August 2000, "senior management," including Soose, recognized that as much as $2.5 million might be lost on the Beneco project, but (1) determining the scope of the problem had just begun, (2) the Company believed it had offsetting

33

claims of about $1.3 million, (3) it intended  to pursue those claims and to negotiate the possible

liquidated damages, and (4) settlement negotiations had not yet begun.  The fact that ITG was not

successful in reducing the amount and eventually had to write-off $2.5 million in December 2001

does not necessarily lead to the inference that the delay in doing so was the result of fraudulent

intent or even that the loss was sufficiently "probable" at that time that it should have been written

off pursuant to GAAP. *See In re Digital Island*, 327 F.3d 322, 330 (3d Cir. 2004), rejecting the

plaintiffs' scienter arguments where the inferences to be drawn from the evidence in question were

"merely reasonable," not "strong" as required by the PSLRA and the "far more compelling

inference" was that the defendants acted lawfully; *see also Wilson v. Bernstock*, 195 F. Supp.2d

619, 634 (D. N.J. 2002) (a complaint brought under the PSLRA cannot survive a motion to dismiss

unless the inferences of scienter are "reasonable, rational or plausible *and* strong" (emphasis in

original)).

Exhibit E, a July 27, 2001 e-mail from Anthony McGrath at Ernst & Young, the Company's

auditing firm, is addressed to Dave Derry and James Pierson. This e-mail focuses on changes that

had been made at Beneco since Ernst & Young's last visit there in 1998-1999, *e.g.*, "new internal

control processes to better conform with IT-JDEdwards processing, a new management team, new

accounting managers . . . and an overall increase in business/sales volumes."  The only reference

to this document the Court could identify in the proposed TAC is in connection with the vague and

inconclusive statement that "IT Group did not rely on its auditors with respect to the accounting for

Beneco's Norfolk project.  A July 27, 2001 e-mail from Ernst & Young auditor Anthony McGrath to

[business line controller] Dave Derry states that Ernst & Young's last prior field visit to Beneco took

place in 1998-1999."  (PTAC, ¶342).  Not only is there no evidence that any Defendant received

or even knew of this e-mail, Plaintiffs fail to explain its relevance to their claims of accounting fraud

and GAAP violations.

Exhibit F is a document captioned "Business Line Accounts Receivable Reviews" dated November 29, 2001. The author (MHD) and recipient (Jim) are unidentified, but do not correlate with any Defendant; there is no indication that any Defendant participated in the meetings summarized in the document. Plaintiffs highlight three points in the document: (1) a reference to the fact that of unbilled amounts of approximately $1.9 million, $1.7 million should be reserved because the "majority are old, closed contracts that cannot be billed now" and "were not properly written off in purchase accounting;" (2) another reference to the approximate write-off of $2.5 million on the Norfolk project stemming from problems that "appear to relate to FY 2000;" and (3) the Beneco-Sanders project in which no invoice was apparently issued to the customer despite being included on the billed accounts receivable summary for work performed in 1998-1999. Plaintiffs refer to the Sanders project as "another blatant example of senior management's improper avoidance and postponement of writing-off uncollectible receivables," but the Court is unable to infer from the paragraph about the Sanders project in Exhibit F that any Defendant improperly postponed writing off uncollectible receivables. (Plfs.' Memo to Amend at 15; see also PTAC, ¶329, referring to two June 1999 invoices for the Beneco-Sanders project which are listed in a document entitled "IT Group's A/R Aging Summarized by Invoice as of September 30, 2001).[16] The Court declines to draw a strong inference of scienter from Exhibit F which seems to reflect chronic mismanagement at the project level and a lack of accounting rigor at the subsidiary level rather than fraudulent intent by any Defendant.[17] See Rowinski v. Salomon Smith Barney, Inc., 398 F.3d 294, 301 (3d Cir. 2005) (claims challenging internal corporate mismanagement are not

[16] This allegation also refers to PTAC Exhibit MM, but the document at Exhibit MM is not the September 30, 2001, chart, but rather Kunis Exhibit F.

[17] In the proposed TAC, Plaintiffs allege that in this memo "the Company. . . admitted its error and acknowledged that such amounts should have been reserved for at an earlier date by stating that 'apparently the amounts were not properly written off in purchase accounting.'" (PTAC, ¶346). Since the author of this memo is unknown, it is impossible to infer that this is an admission by any Defendant of improper accounting.

actionable under Section 10(b)).

Kunis Exhibits G, H, and I are management representation letters from ITG to Ernst & Young, signed by Soose and DeLuca on February 15, 1999, February 18, 2000, and February 14, 2001, respectively, which the Court has already reviewed in connection with *Glover*. (*See Glover* Amended Complaint, Exhibit Q). In *Glover*, the Court determined that Plaintiffs had failed to provide any factual foundation from which to draw an inference that DeLuca or Soose knew when they signed the letters that there was no legal basis for recognition of the amounts recorded as assets in the financial statements, nor for the contention that the auditing firm required these letters because of its increasing concerns about the collectibility of ITG's claimed receivables. *See Glover*, 2006 U.S. Dist. LEXIS 76093 at *61-*64.

Plaintiffs now base a slightly different argument on these documents, focusing on the statement therein that "[s]ubstantially all unbilled receivables are billed and collected in the subsequent fiscal year." (Plfs.' Memo to Amend at 16-17). According to the Devor Declaration, "[t]hese representations appear to contradict the evidence . . . that indicates that amounts remained unbilled for many years." (*Id., citing* Devor Decl., ¶16). In turn, the Devor Declaration cites four examples of accounts which remained unbilled and uncollected "for many years." Claims on the Lake Apopka project were settled in April 2000, although the unbilled balance of approximately $657,000 was not written off until December 2001. (Devor Decl., ¶17; *see also* PTAC, ¶326). A receivable from Logixx Automation of approximately $122,000 was recorded in 1999 and remained outstanding until written off in 2001, although the Company was aware that Logixx had filed for bankruptcy protection in April 2000. (*Id.,* ¶18; PTAC, ¶328). Third, receivables on the Beneco-Sanders project totaling $541,000 dated from work performed in 1998 and 1999 but were not written off until December 2001. (*Id.,* ¶¶19-20; PTAC, ¶329). Finally, on the Norfolk-Beneco project, a memorandum dated August 2000 shows that the Company was aware of a probable loss on this project of $1.2 million, yet failed to record the ultimate loss of $2.5 million until December

36

2001. (*Id.*, ¶¶21-25; PTAC, ¶¶332-340; Kunis Decl., Exhibit D).

The Court accepts as true all the foregoing allegations. Nevertheless, the Devor Declaration and the proposed TAC fail to establish that the statement "[s]ubstantially all unbilled receivables are billed and collected in the subsequent fiscal year" is false, since these four accounts represent $3.82 million in receivables for a company which had – according to Plaintiffs' own calculations – $293 million in "true" receivables as of December 31, 2000. (*See* SAC, ¶176). Because "substantially" is a relative term, and because there is nothing from which to infer that most receivables were **not** billed and collected within a year, the Court is unable to infer from these examples any scienter on the part of Soose and DeLuca that the statements concerning the timing for billing and collection of accounts receivable were false when made or that the statements materially misrepresented the Company's accounting practices.

Exhibit J is a seven-page chart entitled "Selected Project Status – November 8, 2001," providing summaries of some forty projects, with notations such as "written off," "settled," or other references to the settlement or litigation posture of the projects as of that date. A handwritten note, "Pierson," presumably a reference to James Pierson, the Company controller and vice president for finance, appears at the top of the first page. Plaintiffs argue that "at the very least," this document shows Mr. Pierson was aware in November 2001 that Lake Apopka involved "blatantly improper accounting." (Plfs.' Memo to Amend at 17). The Lake Apopka project, entry 19 in Exhibit J, states: "Settlement reached on 4/20/00. Payment of $1,250 received 5/26/00." The only allegation referring to Lake Apopka in the proposed TAC summarizes the status of the project from October 19, 2000, through its eventual write-off in December 2001. (*See* PTAC, ¶ 326, and Exhibit HH thereto, identical to Kunis Decl. Exhibit J).[18] It appears as part of a series of allegations related

___

[18] The proposed TAC includes the following with regard to Kunis Decl. Exhibit J: "Reflecting the lack of activity on this project claim, ITG's November 8, 2001 Selected Project Status analysis (Exh. "HH") just repeats the analysis of October 19, 2000, that "settlement reached on 4/20/00. Payment of $1250 received 5/26/00." (PTAC, ¶ 326.)

to the Oracle computer system problem which Plaintiffs contend provides evidence of "Defendants' scienter as to the bad receivables . . . by (1) the longevity of the receivables, (2) the extensive discussions and reviews of these receivables, (3) the poor prospects of collection, and (4) the failure to take appropriate write-offs until the end of the Company's existence." (PTAC, ¶ 313). However, as this Court has noted numerous times, knowledge of and attempts to resolve the problem accounts, without more, is insufficient to establish scienter on the part of any Defendant. Moreover, since there is no allegation in the proposed TAC that any Defendant prepared, received or otherwise had any knowledge of Exhibit J, there is no nexus to any Defendant.

Exhibit K is a document entitled "Accounts Receivable Billed and Unbilled Analysis, September 2001," broken down by business division. Out of 118 pages and an accounts receivable total of some $422.4 million, Plaintiffs identify the same four accounts as previously mentioned: Norfolk-Beneco, Lake Apopka, Logixx Automation, and Beneco-Sanders. (Plfs.' Memo to Amend at 17-18; see also PTAC, ¶¶326, 347-350). Neither Exhibit K nor the allegations in the proposed TAC where Exhibit K is mentioned indicates the author or recipients and there is no nexus to any Defendant.

Finally, Exhibit M is an internal document entitled "Third Quarter 2001 July 30 Forecast and May 10 Forecast." Plaintiffs contend that as early as May but not later than July 2001, "IT Group management was aware of the probability that extensive charges against earnings would be necessitated by certain, identified uncollectible receivables," e.g., $1 million for Beneco-Norfolk, $500,000 for Beneco-Sanders, and $600,000 for eCom solutions and others. (Plfs.' Memo to Amend at 20-21). The Court can find no reference to this document in the proposed TAC and Plaintiffs' reference in their brief to the fact that "management" was aware of that extensive write-offs would be necessary in 2000 is insufficient to establish scienter on the part of any Defendant, particularly because the distribution, authorship and purpose of Exhibit M are all unknown.

The Court concludes that of the thirteen documents attached to the Kunis Declaration, Exhibits E, F, J, K, and M have no nexus to any Defendant; Exhibits B, C, and D fail to establish a strong inference of scienter on the part of Harvey, Soose and/or DeLuca; and Exhibits G, H, and I fail to establish that Soose and DeLuca knew the statements were false when made.[19]   In short, none of this newly discovered evidence would rectify the shortcomings in Plaintiffs' allegations of scienter.

                c.        Plaintiffs have asked the Court to take judicial notice of certain

bankruptcy records to support their motion to allow amendment with newly discovered evidence

(Plaintiffs' Request for Judicial Notice of Certain Bankruptcy Court Records in Support of their

F.R.C.P. 59 Motion, Docket No. 126).   In the proposed TAC, Plaintiffs allege:

> An improper receivable from Logixx Automation was invoiced, and therefore recorded, in July-October 1999. (Exh. "JJ" at KUN 179-180). According to publicly available information Logixx filed for bankruptcy protection in April 2000, showing the receivables to be probably uncollectible. IT Group knew of the bankruptcy since the Company was listed on the list of 20 largest creditors (Exh. "KK") and therefore received notice from the bankruptcy court. (*See* bankruptcy rule 2002). IT Group submitted its proof of claim in the Logixx bankruptcy, signed by treasurer Conte, May 16, 2000. (Exh. "LL"). The Company's Analysis of Accounts Receivables by Invoice as of September 28, 2001 indicates "bankrupt" next to the listing for Logixx, but it is indicated to still be included in reported Billed Accounts Receivable (Exh. "II" KUN 85).

(PTAC, ¶328).

Plaintiffs contend that Kunis Exhibit L (referred to in the proposed TAC as Exhibit II), a series of accounts receivable aging reports dated November 2, 1999, June 3, 2000, August 4, 2000, and September 29, 2000, identify Logixx payments as outstanding and collectible "despite the fact that Defendants knew that Logixx had filed [for] bankruptcy protection in April 2000." (Plfs.' Memo to Amend at 18).

---

[19]   Exhibit A, an undated list entitled "IT Group Categorization of Containers Summary by Location," is irrelevant to the PTAC. Exhibit L will be addressed in the following section in conjunction with other documents pertaining to Logixx Automation Corporation.

As Defendants point out, there is no evidence that any Defendant knew of the bankruptcy of a Tennessee company against which IT Group had a claim of less than $132,000 or received a copy of the September 28, 2001, analysis of accounts receivable. (Defs.' Opp. to Amend at 18-19, n.13 and n.14). The documents provided with the request for judicial notice show that ITG Treasurer Richard Conte and George Gokovich, a paralegal with ITG, processed those documents and thus knew of Logixx's bankruptcy. Without more, that knowledge cannot be imputed to any Defendant, much less that he knew it in April 2000 and should have determined that the amount outstanding was uncollectible.

d.      Finally, Exhibit GGG consists of undated, handwritten notes allegedly

by ITG consultant Lucio Fucchini (Fucchini). According to the proposed TAC,

> By October 2001, Defendants realized that the survival of the Company was in serious doubt, and since they wanted to seek additional bank financial backing, they felt they had to come clean to the banks, for the first time, regarding the questionable quality of IT Group's receivables. Thus, although they knew the receivables were overstated, Defendants hired an outside consultant, Lucio Fucchini, who had worked at Westinghouse and was therefore known to Defendant Pugliese from his tenure at Westinghouse. Fucchini could thus be cited by Defendants as the purported discoverer of the receivables issues. Within days, Fucchini recognized that IT Group's receivables were overstated and he drafted a memorandum to defendant Harvey explaining the problems with the receivables, a true and correct copy of which is attached as Exhibit "GGG."

(PTAC, ¶175).

Accepting as true the factual aspects of this allegation, nothing therein sheds light on the scienter of *Defendants* that the prior treatment of IT Group's receivables had been a violation of GAAP or otherwise presented fraudulent financial information to investors. The allegation that in October 2001, Defendants "felt they had to come clean to the banks" regarding the "questionable quality" of the accounts receivable is inconsistent with Plaintiffs' numerous other allegations that the lending banks were aware throughout the Class Period that the Company's collectible accounts receivable were far smaller than the amounts presented in SEC filings and other public information. The portion of the allegation that Defendants would identify Fucchini as the "discoverer of the

receivables issues" is entirely inconsistent with documentary evidence provided with the Glancy Declaration that Defendants were aware of the receivables problem as early as summer 2000. (*See, e.g.*, Glancy Decl., Exhibit 2, minutes of the Audit Review Committee meeting on July 25, 2000). Most significantly, there is no allegation that Fucchini sent his hand-written notes or a memorandum based thereon to Harvey or even discussed his findings with him and, if so, when. Finally, even if the Fucchini notes were provided to Harvey or other Defendants, the Court is unable to discern anything to support Plaintiffs' allegation that they consequently knew certain receivables were overstated because no specific accounts are discussed therein. Nor do the notes (as far as the Court can discern) address accounts receivable problems at all except as they can be subsumed in the broader context of concerns about aggressive income recognition. (*See, e.g.*, Exhibit GGG at 1 and 5.)

The Court has considered every document provided with the Kunis Declaration, the documents provided with Plaintiffs' request for judicial notice, and Exhibit GGG, along with the arguments in the Devor Declaration and Plaintiffs' memorandum in support of their motion to alter the judgment so that they may amend their complaint. The Court concludes that amendment on the basis of those documents would be futile inasmuch as there is nothing therein from which to infer scienter on the part of any Defendant.

## III. CONCLUSION

As the Court has previously noted, Plaintiffs appear to believe they can establish a securities fraud violation solely by alleging that a Defendant knew the Company's treatment of the accounts receivable problem was a violation of GAAP. As the Second Circuit has stated, however, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.), *cert.*

41

*denied*, 531 U.S. 1012 (2000)).  To conclude that any Defendant possessed fraudulent intent, the Court would have to accept allegations based solely on their positions as officers and directors of the Company, on the knowledge of their subordinates, and on unfounded speculation that certain documents they **may have received** showed them particular accounts were uncollectible despite ongoing attempts to negotiate, settle or otherwise collect many of those accounts.  None of those actions is permissible under the PSLRA.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999) ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company"); *In re Bio-Technology General Corp. Sec. Litig.*, 380 F. Supp.2d 574, 596 (D. N.J. 2005) ("Mere allegations of knowledge on the part of subordinates do not provide a sufficient basis for imputing knowledge to executives"); and *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) ("The allegation that the [defendants] qua directors and members of the audit committee, had access to unspecified business records and a duty to review them does not give rise to a strong inference that the [defendants] individually knew of or recklessly disregarded particular wrongful recognitions of revenue.")

Plaintiffs seek an opportunity to file the fourth version of their complaint since 2002.  The two prior motions to dismiss those complaints were thoroughly briefed by the parties and supported with voluminous documentation.  The parties requested and received a protective subpoena for thousands of other documents threatened with destruction by the trustee in bankruptcy.  As a result, Plaintiffs have had the opportunity to research those documents as part of discovery in related cases despite the fact that this case theoretically remains under a stay imposed by the PSLRA, 15 U.S.C. §78u-5(b)(3)(B),[20] and have repeatedly supplemented their pleadings based on those documents.  The Court has granted both parties' numerous motions to extend the time to respond to pleadings filed in connection to the motions to dismiss.

---

[20] *See* Docket No. 107, Memorandum Order of Court, December 23, 2005.

The two opinions granting the motions to dismiss (Docket Nos. 68 and 123) have been detailed in their analysis of the arguments and evidence upon which Plaintiffs relied. As previously noted, this Court explicitly pointed out Plaintiffs' shortcomings in pleading scienter in the first amended complaint. Indeed, the failure to rectify those shortcomings was one of the reasons the Second Amended Complaint was dismissed with prejudice because the Court concluded Plaintiffs were unable or unwilling to do so. *Payne*, 433 F. Supp.2d at 612; *see also Krantz v. Prudential Invs.*, 305 F.3d 140, 144 (3d Cir. 2002) ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them"), and *Chubb*, 394 F.3d at 164 ("Plaintiffs chose at their peril not to heed the District Court's guidance and avail themselves of an opportunity to rectify the deficiencies of the Amended Complaint. Under this scenario, justice does not require that leave to amend be given.") Courts have no obligation to scrutinize a complaint filed under the PSLRA, advise the plaintiff of its deficiencies, allow amendment, and, "perhaps like a law school professor," advise the plaintiff if he has passed the test. *See In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 237 (D. N.J. 2002), *citing In re Champion Enter. Inc. Sec. Litig.*, 145 F. Supp.2d 871, 872 (E.D. Mich. 2001).

The Court is convinced that under the facts and circumstances of this case, its decision to dismiss the *Payne* SAC with prejudice was correct. Plaintiffs' motion to alter or amend the judgment to permit further amendment is therefore denied.

An appropriate Order follows.

December __ll__, 2006

Thos M. Hardiman

Thomas M. Hardiman
United States District Judge

cc: Counsel of Record

43

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THOMAS L. PAYNE, SID ARCHINAL,      )
GARY H. KARESH, JO ANN KARESH,      )
BELCA D. SWANSON AND MERLE K.       )
SWANSON, individually and on behalf )
of all others similarly situated,   )
                                    )
                  Plaintiffs,       )      CLASS ACTION
                                    )
            vs.                     )
                                    )      No. 2:02-cv-1927
ANTHONY J. DeLUCA, HARRY J.         )
SOOSE, FRANCIS J. HARVEY, JAMES C.  )      Judge Thomas M. Hardiman
McGILL, RICHARD W. POGUE,           )
DANIEL A. D'ANIELLO, PHILLIP B.     )
DOLAN, E. MARTIN GIBSON, ROBERT F.  )
PUGLIESE, JAMES DAVID WATKINS,      )
and THE CARLYLE GROUP,              )
                                    )
                  Defendants.       )

## ORDER OF COURT

**AND NOW**, this  $\underline{\text{11}^{th}}$  day of December 2006, upon consideration of Plaintiffs' Motions

for Reconsideration, Docket Nos. 128 and 131, it is **ORDERED** that both Motions are **DENIED**.

*Thos M. Hardiman*

Thomas M. Hardiman
United States District Judge

cc: Counsel of Record