## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS L. PAYNE, SID ARCHINAL,<br>GARY H. KARESH, JO ANN KARESH,<br>BELCA D. SWANSON AND MERLE K.<br>SWANSON, individually and on behalf<br>of all others similarly situated, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs,<br>vs.<br>ANTHONY J. DeLUCA, HARRY J.<br>SOOSE, FRANCIS J. HARVEY, JAMES C.<br>McGILL, RICHARD W. POGUE,<br>DANIEL A. D'ANIELLO, PHILLIP B.<br>DOLAN, E. MARTIN GIBSON, ROBERT F.<br>PUGLIESE, JAMES DAVID WATKINS,<br>and THE CARLYLE GROUP, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

CLASS ACTION

CA No. 02-1927

## MEMORANDUM OPINION

### I.    Introduction

On January 5, 2007, Plaintiffs filed a motion (Doc. No. 149), seeking reconsideration of the Court's previous Orders dismissing with prejudice their Second Amended Complaint (Doc. No. 124) and denying their previous motions for reconsideration and to alter or amend the judgment (Doc. No. 148).

The facts of this case are well known to the parties and will not be reiterated here. *See Payne v. DeLuca*, CA No. 02-1927, 2006 U.S. Dist. LEXIS 89251 (W.D. Pa. Dec. 11, 2006), and 433 F. Supp.2d 547 (W.D. Pa. 2006). Unlike the previous motion for reconsideration which was based on Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiffs base their current motion on Rule 60(b), specifically "newly discovered evidence which by due diligence could not have been

discovered" in a timely manner.[1] Plaintiffs' new evidence is the deposition testimony of Hovey Gwin (Gwin), a former southeast regional controller employed by IT Group, Inc. (ITG or Company) from the time ITG acquired Fluor Daniel GTI, Inc., until the Company declared bankruptcy in February 2002. According to Plaintiffs, Gwin's sworn testimony exposes deliberate efforts by the Company to conceal its true financial condition from investors. (Plaintiffs' Memorandum of Law in Support of Motion Pursuant to F.R.C.P 60(b). . . ., Doc. No. 150, Plfs.' Memo, at 2).

The Court's consideration of the motion is complicated by the fact that on January 8, 2007, the next business day after filing their Rule 60(b) motion, Plaintiffs filed a Notice of Appeal to the United States Court of Appeals for the Third Circuit. (Doc. No. 153). Their appeal seeks review of the same Memorandum Opinions and Orders which are the subject of Plaintiffs' pending motion.

Defendants argue that by appealing those decisions, this Court no longer has jurisdiction to decide the pending motion in favor of Plaintiffs. (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion . . . , Doc. No. 161, at 5). In response to Defendants' Memorandum, Plaintiffs do not refute this statement, offer any exceptions thereto, or propose alternative courses of action available to the Court. (Plaintiffs' Reply to Defendants' Memorandum of Law . . . , Doc. No. 1562, Plfs.' Reply). The Court agrees with Defendants that its jurisdiction at this time is limited.

## II. Jurisdictional Considerations and Standard of Review

A recent case from the United States Court of Appeals for the Fifth Circuit succinctly states the correct steps for a district court and the movant to follow under the procedural circumstances which now exist in this matter:

---

[1] Rule 60(b) provides in relevant part: "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken." Fed.R.Civ.P. 60.

2

A perfected appeal divests the district court of jurisdiction. Once the notice of appeal has been filed, while the district court may consider or deny a Rule 60(b) motion (filed more than ten days after entry of the judgment), it no longer has jurisdiction to grant such a motion while the appeal is pending. When the district court is inclined to grant the 60(b) motion, . . . it is necessary to obtain the leave of the court of appeals. Without obtaining leave, the district court is without jurisdiction, and cannot grant the motion. If the district court indicates that it will grant the motion, the appellant should then make a motion in the Court of Appeals for a remand of the case in order that the district court may grant such motion.

*Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 329 (5th Cir. 2004) (internal citations, quotations, and emphasis omitted); *see also, Hancock Industries v. Schaeffer*, 811 F.2d 225, 240 (3d Cir. 1987), and *Blue Mt. Envtl. Mgmt. Corp. v. Chico Enters., Inc.*, CA No. 01-460, 2006 U.S. Dist. LEXIS 4613, *3 (W.D. Pa. Feb. 7, 2006). Because, as noted, a district court has the power to grant a pending Rule 60(b) motion only after it has indicated to the court of appeals that it is inclined to do so, the district court must first consider the merits of the motion.

Under Rule 60(b)(2), the proffered evidence must have been discovered after trial or after a dispositive motion has been ruled upon (here, Defendants' Motion to Dismiss the Second Amended Class Action Complaint, Doc. No. 73). *Betterbox Communs., Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 337 (3d Cir. 2002). Failure to discover the evidence at an earlier time must not result from lack of diligence, and the evidence must be "material to the issues involved, not merely cumulative, and of such a nature that it probably would change the outcome of the litigation." *Betterbox, id.*, *citing Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983). The movant "bears a heavy burden" since relief "should be granted only where extraordinary justifying circumstances are present." *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991), *quoting Plisco v. Union R. Co.*, 379 F.2d 15, 17 (3d Cir.), *cert. denied*, 389 U.S. 1014 (1967). That is, the party seeking reconsideration must do more than merely show the "potential significance of the new evidence." *Bohus, id.*

"The decision to grant or deny relief pursuant to Rule 60(b) lies in the 'sound discretion of

3

the trial court guided by accepted legal principles applied in light of all the relevant circumstances.'"

*United States v. Hernandez*, 158 F. Supp. 2d 388, 392 (D. Del. 2001), *quoting Ross v. Meagan*, 638 F.2d 646, 648 (3d Cir. 1981).

**III.   Analysis**

Plaintiffs' motion surmounts its first hurdle, that is, Gwin's deposition testimony could not have been discovered before the Court issued its previous opinion denying the motions for reconsideration on December 11, 2006. According to a declaration by Plaintiffs' counsel, Gwin's deposition was taken on October 24, 2006, during discovery in *Staro Asset Mgmt v. Soose*, CA No. 02-886 (W.D. Pa.), a companion case to *Payne*.[2]  (*See* Declaration of Lionel Glancy in Support of Plaintiffs' Memorandum of Law . . . Doc. No. 151, Glancy Decl.). Plaintiffs' counsel states that Gwin provided him with a copy of the transcript on December 14, 2006, after a period of confidentiality ordered in *Staro Asset Mgmt.* had elapsed. (Glancy Decl., ¶ 4). The Court does not, therefore, find any lack of diligence on Plaintiffs' part in bringing this evidence to its attention promptly after the transcript was made available to them.

Plaintiffs do not fare so well on the second hurdle, however. Having carefully reviewed the entire deposition transcript (*see* Glancy Decl., Exhibit A, Tr.), the Court finds the evidence is not only cumulative, but would not have changed its prior decision that Plaintiffs failed to adequately allege scienter on the part of any Defendant.

Plaintiffs argue that Gwin's testimony "brings to light with new clarity and specificity the accounting fraud which occurred at IT Group, involving intentional decisions to actively conceal the Company's true financial decision." (Plfs.' Memo at 1). Briefly stated, his testimony is offered in support of the following facts alleged in the Second Amended Complaint:

•       The Company experienced serious liquidity problems from the time it undertook its

---

[2]  The parties in *Staro Asset Mgmt.* subsequently filed a joint stipulation to dismiss their case with prejudice which was granted by the Court on December 18, 2006.

growth-by-acquisition plan, resulting in its inability to make timely payments to subcontractors and vendors. (Plfs.' Memo at 3).

- •   ITG "consciously" failed to properly account for project costs on fixed price or lump sum contracts involving the percentage of completion accounting method, which in turn artificially inflated the Company's estimated revenues. (*Id.* at 3-4).

- •   On instructions from "upper level management," ITG had "an ongoing practice of postponing the recognition of project losses" which were allowed to remain on the books as unbilled receivables, "even though they were never going to be collectible." (*Id.* at 4-5).

- •   When Gwin – like other employees – expressed concerns about practices which violated generally accepted accounting principles (GAAP), "upper management" prevented him from taking corrective action, even though management knew the practices were fraudulent and should be corrected. Furthermore, "management's" intention was clear – fraudulently postponing the adjustments was a way to "actively conceal the true financial condition of the Company." (*Id.* at 5-6).

- •   Defendant Anthony DeLuca (DeLuca) was "at the center of this widespread fraud," as evidenced by Gwin's perception of events at meetings, Company practices, and the "general attitude and culture of the Company" regarding accounting practices before and after Deluca's departure. (*Id.* at 6).

The only Defendants to whom Gwin refers in his testimony are Chief Executive Officer

DeLuca, Chief Financial Officer Harry Soose (Soose), and Francis Harvey (Harvey), who replaced

DeLuca in November 2001 in a last-ditch effort to prevent the Company's bankruptcy. Soose is

mentioned in only one context. When asked if he had communicated with Soose, Gwin replied,

> Not often. We communicated at the time of the acquisition. . . . I think I made a trip or two to Pittsburgh, either right before or right after the acquisition closed. He made, I believe, at least one trip, maybe more, down to Tampa. But probably all that occurred within the first three to six months of the acquisition.[3] After that point, I don't believe I had much, if any, conversations [sic] with Harry.

(Tr. 15-16).

He further stated that he could not recall being in any meetings with Soose after the

---

[3] ITG acquired Fluor Daniel in December 1998 according to the Company's filings with the Securities Exchange Commission. *See Payne*, 433 F. Supp.2d at 554. It follows that "three to six months [after] the acquisition" would mean his interactions with Soose occurred not later than mid-1999. Thus, even if these interactions were material and substantive, they occurred well before the Class Period, *i.e.*, February 24, 2000, through January 14, 2002.

acquisition transition period, and while Soose may have participated in conference calls after that time, Gwin did not recall any particulars. (Tr. 16).

Similarly, Harvey and DeLuca are mentioned only in the context of an e-mail Gwin received on November 26, 2001, with an attachment from James Pierson (Pierson), the Company Controller, scheduling a conference call in connection with "a comprehensive review of our balance sheet as part of Dr. Harvey's in-depth review of the Company's performance and in preparation of our year-end financial data." (Tr. 103-105). Although Gwin did not recall which members of management above his level participated in the conference call, he commented that there was "very little pushback" from "corporate people" involved when he and others suggested that unbilled accounts receivable be written-off to more accurately reflect revenues on certain projects. (Tr. 105). When asked why he thought this was so, he responded:

- A. My sense was . . . that the prior management, senior management of I.T. Corporation, specifically Tony DeLuca, had been removed from power, and Dr. Harvey had been brought in to, quote, clean up the books and flush out all of the problems.

- Q. Do you have a sense . . . as to whether DeLuca was a driving force behind the need to delay write-offs through the years?

       . . . .

- A. . . . I would say, yes, I do have a sense of that, but I was not involved in any specific meetings where he said those words.

- Q. How do you formulate your sense? On what basis do you have a sense for that?

- A. Well, part of it is exactly what I had said here, is that . . . up until the point he was removed from office, the prior discussions that we had [were] pretty consistent from the beginning that we were not allowed to record these adjustments, and that management did not seem serious about identifying over-recognized revenue and problem accounts receivable and taking the appropriate adjustments on the financial statement to fairly state those balances. After he was taken out of power, that attitude or that culture seemed to change pretty rapidly.

(Tr. 106-107; see also further testimony regarding this review at Tr. 108-112).

Gwin never worked at any ITG location other than Tampa, Florida, and always held the same position after the six-month transition period, *i.e.*, as an accountant in the southeast region of the commercial business line. (Tr. 152). He did not know the chain of command above his own immediate supervisors, Larry Stabler and Jim Price, except Gary Gardner to whom Price reported. (Tr. 15; 142; 155). He "assumed" that Price also reported to Pierson,[4] but did not know the accounting chain of command above that level. He did not think Gardner reported directly to DeLuca. (Tr. 155). While he testified he knew Stabler and Price were aware of certain practices he regarded as GAAP violations (*e.g.*, failing to recognize loss on a project when it became apparent), he did not know if anyone above their level had been informed of the purported violations. (Tr. 146-147). Although his "assumption" was that Stabler and Price were getting pressure from above, he had "no direct knowledge" of that, and admitted his comments about anyone above his immediate supervisors "would be speculation." (Tr. 28-29; 111). With regard to his testimony that he was repeatedly told to delay posting losses on certain projects in order to boost apparent revenues, Gwin stated that he did not know who, if anyone, above Stabler gave that directive. (Tr. 48). His belief that dubious accounting practices occurred throughout the Company was based on "people that [he] spoke to" and periodic conference calls with other financial staff (most of whom were also employed in the commercial business line), but he could not recall names of participants, dates or specifics of the conversations. (Tr. 18; 28; 155).

Plaintiffs argue that "the mere fact that Gwin, his superiors and their superiors all knew directly of [improper accounting methods] shows that ITG knew of the fraudulent accounting practices." (Plfs.' Memo at 12). The Court disagrees. Gwin did not testify to any personal, first-hand knowledge of acts or statements by any Defendant which would give rise to the strong inference of scienter necessary to establish a securities fraud violation under the Private Securities

---

[4] This is not an inconsistency. Price reported on a matrix basis to Gardner as the head of the commercial business line and as an accountant to Pierson as Company Controller. (Tr. 155-156).

Litigation Reform Act (PSLRA). As the Court has previously pointed out, scienter may not be established by attributing knowledge to a Defendant simply because of his position within a corporation. *Payne*, 433 F. Supp.2d at 570, *citing In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (it is well-established that allegations of scienter may not rest on "a bare inference" that an officer or director, because of his position within the company, "must have had knowledge of the facts" or "must have known" certain information).

Plaintiffs attempt to tie Gwin's testimony about being prohibited from making required revenue adjustments in a timely manner to a memorandum written by DeLuca and Soose on February 28, 2001. (*See* Declaration of Robert M. Zabb, Doc. No. 157, Zabb Decl., Exhibit A). In that memo, they ask the recipients (who do not include Gwin, Stabler, Price, or Gardner) to provide updates of their financial forecasts for February through June 2001. The memo concludes, "[w]e absolutely need your best outlook to ensure the first quarter is completed profitably." When asked about the memo at his deposition on July 13, 2005, DeLuca stated that this language reflected the practice of "operations people" to be overly conservative, meaning that they "hid profits for future quarters or for future events" and did not recognize as much profit "as good accounting practices would otherwise allow." (Zabb Decl., Exhibit B, at 100-101).

The Court disagrees that the memo and DeLuca's testimony reinforce Gwin's "strong, direct evidence of DeLuca's and Soose's scienter concerning IT Group's improper accounting." (Plaintiffs' Supplemental Memorandum, Doc. No. 156, Plfs.' Supp. Memo, at 2). That is, contrary to Plaintiffs' conclusions, the memo does not show that DeLuca and Soose "knowingly ordered [project personnel like Gwin] not to enter costs into IT Group's accounting system." (*Id.*) Furthermore, Gwin apparently did not testify, as Plaintiffs assert, "that instructions not to enter costs came from the very top of the Company." (Plfs.' Supp. Memo at 3). Even construing the content of the memo liberally in favor of Plaintiffs, the phrase "best outlook" is reasonably interpreted as meaning "most accurate" or "most optimistic." In short, nothing therein constitutes

8

an order "not to enter costs."

Although Plaintiffs argue that Gwin's testimony is qualitatively different from other testimony in this matter, *i.e.*, not cumulative (Plfs.' Memo at 7), the Court disagrees. His testimony about accounting practices is cumulative of reports by other confidential witnesses, particularly witnesses 4 and 5 who were, respectively the Controller and Assistant Controller of the Beneco division. Although Plaintiffs describe Gwin as a "Company controller" and infer that his position gave him access to broad knowledge of Company practices, this appears to be inaccurate based on his own testimony that after the transition period, his primary responsibilities were (1) to provide financial support to operations managers and project managers in the southeast region and (2) to support the internal financial reporting process. (Tr. 14-15; 144). He did not testify that he participated in any Company-wide meetings or conversations with Defendants or even company presidents, and explicitly stated several times that any testimony he might offer about what occurred at management levels above his immediate supervisors or on a corporate-wide basis would be speculation or presumption. (*See, e.g.*, Tr. 18; 26; 28-29; 48; 51; 95; 111; 121). To rely on such testimony would violate the directive of the Third Circuit that scienter may not be pled through "generic and conclusory allegations based upon rumor or conjecture." *See Payne*, 433 F. Supp.2d at 593, *citing Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004).

Plaintiffs also attempt to apply Gwin's testimony too broadly. For example, they argue that "the company actively concealed its true financial condition by prohibiting its accountants from making proper and required adjustments to costs, revenue and margins, despite specific complaints from Gwin throughout the Class Period about the impropriety of such prohibition." (Plfs.' Memo at 9; *see also* the statement that "upper management prevented employees like Gwin from making the proper required adjustments" to revenues, Plfs.' Memo at 12, emphasis in the original). The "company" is not a defendant herein, and there is no evidence that DeLuca and/or Soose (particularly in the memorandum cited by Plaintiffs) "prohibited" the Company's accountants

9

from making any required adjustments. At most, Gwin's testimony supports the conclusion that the policy which prevented Gwin from making adjustments to costs, revenue and margins could be attributed to Stabler and Price, his immediate supervisors, and perhaps to one level higher since he testified that he was aware the practice also occurred in other divisions of the commercial business line. (Tr. 48). Moreover, there is no evidence that Gwin complained to anyone above them in the company hierarchy about the impropriety of such a prohibition (Tr. 49-50; 56), nor evidence that he did so "throughout the Class Period." Finally, Gwin did not know if anyone else with whom he interacted, e.g., other people who participated in the financial conference calls, discussed these problems with a higher level of management. (Tr. 56-67).

Similarly, there is no testimony to support Plaintiffs' contention that "the write-offs which Harvey permitted were the same items which were the subject of his complaints to management and which management did not permit him to write-off earlier." (Plfs.' Memo at 14). Gwin testified that while he recognized some of the accounts which appeared in the itemization of the $92.6 million write-off at the end of 2001, he did not recall any particulars about those projects which would allow him to determine if the amount of the write-offs was appropriate or when the write-offs should have been taken in compliance with GAAP. (Tr. 114-119). Moreover, there appears to be no evidence Gwin complained to anyone in "management" about failing to write-off any of those specific projects at any time.

Finally, Plaintiffs argue that Gwin's testimony must be considered material because his knowledge of GAAP violations was first-hand. From this, Plaintiffs segue to the conclusion that Gwin's knowledge resolves the question of whether any Defendant deliberately or recklessly allowed the Company to persist in accounting practices he knew violated GAAP in order to misrepresent the Company's financial condition to investors.   (Plfs.' Memo at 14-15). Gwin testified that he had no direct contact with any Defendant other than a few meetings with Soose regarding the acquisition of Fluor Daniel and that Soose may have participated in some conference

10

calls. He testified that after Harvey replaced DeLuca, the corporate culture seemed to change, (Tr. 107), but did not testify as to any direct dealings with Harvey or DeLuca or direct knowledge of their actions. Contrary to Plaintiffs' argument, Gwin's belief that certain accounting practices at ITG may have violated GAAP – even when that belief is reasonably based on his knowledge and training as a certified public accountant and on his long career in finance – does not resolve the question of what Soose, DeLuca, or Harvey knew about those purported violations or the question of whether any of them instigated the practices or allowed them to continue with fraudulent intent.[5]

Plaintiffs' reply memorandum is largely irrelevant for four reasons: first, it does not respond to the arguments raised in Defendants' memorandum in opposition to Plaintiffs' motion, except to argue that Defendants "artificially construe the evidence presented . . . in a narrow, isolated fashion. Its larger significance cannot be fairly ascertained by employing this methodology, and it would be an injustice to do so." (Plfs.' Reply at 1). In short, they offer no substantive argument to rebut Defendants' contentions that Gwin's testimony is vague speculation and conjecture about what an undefined and unidentified "upper management" knew and that his testimony consequently fails to satisfy the heightened standards of the PSLRA for pleading scienter on a specific, individualized basis.

Second, Plaintiffs argue that Gwin's testimony about not being permitted to make timely adjustments to revenue is direct evidence of DeLuca's command to ITG accounting personnel to violate the GAAP principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered."

_____

[5] Plaintiffs also argue that "Gwin's testimony supports a modification of this Court's earlier conclusion that GAAP was not implicated." (Plfs.' Reply at 2). To the contrary, the Court has analyzed in detail Plaintiffs' numerous allegations of GAAP violations. The Court's conclusion on this subject, however, was that Plaintiffs failed to show that any Defendant knew of the violations or had fraudulent intent in allowing them to continue. *See Payne,* 433 F. Supp.2d at 579, *quoting In re Exxon Mobil Corp. Sec. Litig.,* 387 F. Supp.2d 407, 426 (D. N.J. 2005) ("allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim[;] only where such allegations are coupled with evidence of corresponding fraudulent intent might they suffice.")

11

(Plfs.' Reply at 3, *citing* Statement of Financial Accounting Concepts No. 2, ¶¶ 95, 97). DeLuca's testimony is not newly discovered evidence since his deposition was taken in July 2005, and Plaintiffs do not assert that it was unavailable to them prior to December 2006. If they thought the memo and his testimony establish that DeLuca directed accounting personnel to violate accounting principles of conservatism, they could have made such allegations in the Proposed Third Amended Complaint (filed on June 30, 2006) by tying the memo and testimony to the Statement of Financial Accounting Concepts. In short, Gwin's testimony is unnecessary to support such allegations.

Third, Plaintiffs argue that failure to apply historical experience in evaluating collectibility criteria for revenue recognition constitutes a GAAP violation which is actionable under Section 10(b). (Plfs.' Reply at 4-5). While that may be true, the Court has been unable to identify any allegations on this subject in either the Second Amended Complaint or the Proposed Third Amended Complaint. Moreover, Gwin's testimony does not, as far as the Court can tell, mention such a GAAP violation or the Company's historical practices of revenue recognition. Rather, he testified only that ITG's revenue recognition practices were not the same as he had used at Fluor Daniel before the acquisition and that while many of ITG's accounting practices were "more aggressive" than those he was used to applying, he could not say any of them violated GAAP other than not properly recording losses against revenue. (Tr. 53-55; 79-80; 145-148; 174).

Finally, Plaintiffs attempt to establish scienter on the part of generic "Defendants" by using a "totality of the circumstances approach," arguing that the United States Court of Appeals for the Third Circuit has endorsed a "variant" of this method.[6] That is, "Gwin's testimony about being

_____

[6] In context, the Court of Appeals stated in *In re Rockefeller Ctr. Props.*, 311 F.3d 198 (3d Cir. 2002), the case indirectly cited by Plaintiffs, that the district court had not erred by "taking a piecemeal approach" in its analysis of the plaintiffs' factual allegations and "ignoring the purportedly reasonable inference that it would have reached had it viewed their allegations under the totality of the circumstances." *Id.* at 224. The Court held that the plaintiffs' argument that a number of "suspicious coincidences" surrounding the sale of a portion of Rockefeller Center (*e.g.*, the timing of a proxy vote relative to the sale and the close correlation between the purchase price and the amount of debt financing the investors/defendants intended to obtain) lacked merit. "As we have held before," the Court wrote in affirming the district court's judgment dismissing the complaint, "fraud allegations should be analyzed

ordered not to record project costs compounds the suspicious circumstances which support . . .

taking a totality of the circumstances approach in evaluating Defendants' scienter in this case."

(Plfs.' Reply at 5).  The following "suspicious circumstances" and "mischaracterizations" of certain

public statements, they argue, support taking such an approach:

- the allegation that accounts payable checks were cut but "stuffed into a drawer" at the end of each quarter in order to artificially manipulate the Company's credit line. (*See Payne*, 443 F. Supp.2d at 588, 593-594 for discussion of this subject).

- inconsistencies between the amounts of billed versus unbilled receivables in the monthly compliance reports to the lending banks as compared to the amounts reported in the Company's SEC filings and in reports to the Board of Directors and the Audit Review Committee.  (*Id.* at 582-587).

- the claim that the Company had paid down its debt by $46 million in December 1999 when, according to Plaintiffs, the paydown was accomplished only by DeLuca expressly ordering the Company to secretly withhold $53 million of outstanding accounts payable.  (*Id.* at 598-599 and n.52).

- the false reassurance to investors that a $100 million loan would be used to support working capital requirements and growth when, in reality, it was only a "stopgap means of addressing the Company's liquidity crisis."  (*Id.* at 591-592).

_____

individually to determine whether each alleged incident of fraud has been pleaded with particularity. If, after alleging a number of events purportedly substantiating a claim of fraud, none of those events independently satisfies the pleading requirement of factual particularity, the complaint is subject to dismissal under 15 U.S.C. § 78u-4(b)(3)(A). While it is true that in other securities fraud contexts, the Court has endorsed a variant of the totality of circumstances approach, those occasions are reserved for cases presenting unusually suspicious circumstances." *Id.*  The Court noted that

> each factual event alleged by the [plaintiffs] fails to support a claim of fraud with the requisite particularity.  In addition, if the mere coincidences were as suspicious as the [plaintiffs] contend, then a totality of the circumstances approach might warrant some consideration.  That is not the case here, however. As the [defendants point] out, the fact that the sale . . . occurred one month after the proxy vote, rather than substantiating fraud, reflects the frenetic pace and scope of negotiations that financially troubled enterprises often experience.  As to the purported symmetry in the amount of the [defendants'] proposed debt offering and the actual sale price. . . , we strain to see how it would support the serious allegations of fraud asserted here.  To set the purchase price in perfect symmetry with its refinancing obligations, the [defendants] would have to have had perfect, absolute control over such volatile factors as interest rates, market prices, and the skill of [the purchasers'] negotiators. It is doubtful that when [the] negotiators discussed the purchase price, they had the financing needs of the [defendants] in mind.  In any event, the [plaintiffs'] attempt to support their claims of fraud with this purported symmetry is precisely the sort of speculative fraud by hindsight that the Reform Act was intended to eliminate.

*Id.* at 224-225.

> This Court cited *In re Rockefeller Ctr. Props.* numerous time in its opinion dismissing the Second Amended Complaint, including the precise section now relied upon by Plaintiffs. *See Payne*, 433 F. Supp.2d at 606.

- • discrepancies between public statements and the private knowledge of the Board Members regarding the size and nature of the special charge announced at the end of 2000. (*Id.* at 585).

- • the $92.6 million accounts receivable write-off "disclosed secretly in a meeting with the Company's banks in December 2001 but never made public until after the Company declared bankruptcy." (*Id.* at 575-582).

(Plfs.' Reply at 5-7).

The problem with this argument is that Gwin's testimony sheds no light whatsoever on any of these suspicious circumstances or public misrepresentations. Although he testified that the Company consistently had cash flow problems and trouble paying its vendors on a timely basis, (Tr. 17; 137-139; 145), he offered no testimony about consistently withholding payments at the end of the quarter in order to allow the Company to reduce the amount owed on its revolving loan and meet its bank loan covenants. The $100 million term loan and the December 1999 debt paydown do not appear to be mentioned anywhere in his testimony. Gwin stated he knew nothing about the content of the SEC filings; he neither read them nor provided any input into their preparation; and he did not discuss them with any ITG officer or director. (Tr. 58; 64; 140; 144; 168). He explicitly testified that he did not know why the amounts of billed versus unbilled receivables in reports to the Board of Directors differed from those in the Company's SEC filings. (Tr. 128-130). He did not know any details about the write-offs which occurred in 2000 and could not compare them to those taken in 2001. (Tr. 25; 57-60; 112-113). He knew nothing about the credit agreement, the monthly compliance letters, or the December 2001 meeting with the lending banks. (Tr. 112; 86-87; 161-162; 170-171).

As the Court noted when dismissing the Second Amended Complaint, if the totality of the circumstances approach were to be applied, the Court "might conclude that ITG showed poor management skills and perhaps lax accounting standards during its rapid expansion, but we find nothing from which to conclude that any Defendant acted with conscious misbehavior or recklessness." *Payne*, 433 F. Supp.2d at 606. Despite his cumulative reports of accounting

14

irregularities, Gwin's lack of direct knowledge about the actions of any Defendant from which scienter may be inferred is fatal to Plaintiffs' argument that his testimony compounds other suspicious circumstances.   Therefore, it cannot be construed as being of "such a nature that it probably would change the outcome of the litigation."

## IV.  Conclusion

The Court concludes that the newly discovered evidence proposed by Plaintiffs as the basis on which the Court should reconsider its previous decision dismissing the Second Amended Complaint with prejudice is cumulative and unpersuasive. Had Plaintiffs' presented this testimony in its opposition to the motion to dismiss the Second Amended Complaint or with its previous motions for reconsideration, it is highly unlikely this evidence would have changed the Court's decisions.  The Court is not inclined to grant the motion now pending at Docket No. 149 and will not recommend that Plaintiffs seek a remand from the United States Court of Appeals for the Third Circuit so the motion can be granted.  An appropriate Order follows.

Thos M. Hardiman

Thomas M. Hardiman
United States District Judge

April 2, 2007

cc: Counsel of Record

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS L. PAYNE, SID ARCHINAL,       )
GARY H. KARESH, JO ANN KARESH,       )
BELCA D. SWANSON AND MERLE K.        )
SWANSON, individually and on behalf  )
of all others similarly situated,    )
                                     )
                  Plaintiffs,        )       CLASS ACTION
                                     )
      vs.                            )       CA No. 02-1927
                                     )
ANTHONY J. DeLUCA, HARRY J.          )
SOOSE, FRANCIS J. HARVEY, JAMES C.   )
McGILL, RICHARD W. POGUE,            )
DANIEL A. D'ANIELLO, PHILLIP B.      )
DOLAN, E. MARTIN GIBSON, ROBERT F.   )
PUGLIESE, JAMES DAVID WATKINS,       )
and THE CARLYLE GROUP,               )
                                     )
                  Defendants.        )

## ORDER OF COURT

**AND NOW**, this  2nd  day of April 2007, upon consideration of Plaintiffs' Motion Pursuant

to Federal Rule of Civil Procedure 60 for Relief from the May 2, 2006 Order Dismissing the Second

Amended Complaint and the December 11, 2006 Order Denying Rule 59 Relief, Docket No. 149,

it is **ORDERED** that the Motion is **DENIED**.

Thos M. Hardiman

Thomas M. Hardiman
United States District Judge

cc: Counsel of Record